**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND**

| | |
|---|---|
| HUNT VALLEY BAPTIST CHURCH, INC., a Maryland religious corporation, | |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| BALTIMORE COUNTY, MARYLAND and THE BOARD OF APPEALS OF BALTIMORE COUNTY, MARYLAND. | |
| Defendants. | |

Plaintiff HUNT VALLEY BAPTIST CHURCH, INC. (the "Church"), by its undersigned attorneys, complains of Defendants BALTIMORE COUNTY, MARYLAND (the "County'), and THE BOARD OF APPEALS OF BALTIMORE COUNTY, MARYLAND (the "Board") (collectively, the County and the Board shall be referred to as "Defendants") as follows:

**NATURE OF ACTION**

1.     Plaintiff files this action to redress violations of its civil rights caused by the Defendants' burdensome, discriminatory, and unreasonable land use regulations and intentional conduct that have prohibited and continue to prohibit the Hunt Valley Baptist Church from building and operating a place of worship on its property in Baltimore County, Maryland, in violation of the First and Fourteenth Amendments to the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA").

2.     Specifically, the Church is suffering great hardship at its current, inadequate

location and has located property approximately 500 feet from the on-ramp to Interstate 83 at 821 Shawan Road, and located next to another church and across the street from a country club, to develop a place of worship that can accommodate its religious needs.  This location is wholly suitable for such use, and County planning staff and the administrative law judge recommended and granted approval of a special exception for the Church, which is permitted with approval on such property.

3.     However, substantially motivated by hostility to the religious character and activities of the Church and its evangelical Christian form of worship, various local residents objected to such use on the Subject Property, opposed the Church's application in a lengthy appeal at the Board of Appeals of Baltimore County, and succeeded in having the Board reverse the special exception approval that was previously granted by the administrative law judge for a church use, and despite the recommendations issued by various County agencies that recommended approval of the proposed church.

4.     Such reversal constitutes a severe and substantial burden on the Church's religious exercise, discriminates against the Church, and is patently irrational and contrary to any legitimate governmental interests.

**THE PARTIES**

5.     Plaintiff HUNT VALLEY BAPTIST CHURCH, INC. is a nonprofit corporation incorporated under the laws of the State of Maryland in 2004.

6.     Defendant BALTIMORE COUNTY is a chartered county of the State of Maryland, having offices at 400 Washington Avenue, Towson, Maryland, which, through the governing body, adopted the land use regulations in question in this matter.

7.     Defendant BOARD OF APPEALS OF BALTIMORE COUNTY is a board of appeals duly appointed pursuant to the Charter of Baltimore County, Maryland, Article VI, Sec. 601-602 to consider appeals from orders relating to zoning.

## JURISDICTION AND VENUE

8.     The subject matter jurisdiction of this Court is founded upon 28 U.S.C. § 1331 (federal question jurisdiction) in that this action is brought under 42 U.S.C. § 2000cc *et seq.*, 42 U.S.C. § 3604, and 42 U.S.C. § 1983.  This Court also has supplemental jurisdiction over Counts VIII and IX under 28 U.S.C. § 1367(a) for claims brought under Maryland law because those claims are related to the federal claims and are part of a single case or controversy.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all of the events giving rise to the claims herein occurred in this District and the Defendants are subject to personal jurisdiction in this District as of the commencement of this action.

## FACTUAL ALLEGATIONS

### Hunt Valley Baptist Church

10.     The Hunt Valley Baptist Church is an independent Baptist church founded in 2004.

11.     Most of the Church's congregants reside in Baltimore County.

12.     The Church is one of only two Independent Baptist churches located in northern Baltimore County.

13.     The Church is led by its Senior Pastor and two Assistant Pastors.  Two deacons serve as Trustees for the Church.

14.     The Church was founded for the purpose of establishing and maintaining religious worship, evangelizing to the unsaved by proclaiming the Gospel of the Lord Jesus Christ, the

educating of believers in a manner consistent with the requirements of Holy Scripture, establishing and maintaining a ministry to help reform those with harmful addictions, and maintaining missionary activities in the United States and in foreign countries.

15.     The Church's religious mission is based on the Bible, which is the sole and final source of the Church's beliefs, and set forth in the Church's Constitution.

16.     The Church believes that it has a religious obligation to evangelize to non-believers so that they may be saved, which is encompassed in its mission to support "a great commission to proclaim the Gospel to all nations" including its local community and supporting missionaries abroad.

17.     The Church's current facilities and location create great burdens on the Church's fundamental mission to evangelize to the community and otherwise engage in religious worship and service.

18.     The Church is currently located at 1800 Worthington Heights Parkway, designated in the upper-left hand corner of the aerial photograph below (the Subject Property is located at 821 Shawan Road, also designated below).



19.    The Church's current location does not permit it to adequately engage in its religious exercise.

20.    The Church has grown since it moved into the Worthington Heights property in 2009, and now that property can no longer accommodate its congregation and visitors.

21.    Travel to the Church's current location involves driving two miles on a dark, unlit

and winding local road, which is known as Cuba Road.

22.     The roads that visitors must travel to get to and from the Church are dangerous at night.

23.     The Church's current location is only visible to local residents in the immediate area.

24.     Visitors to the Church often cannot find its location.

25.     The Church cannot be seen from Cuba Road.

26.     The Church seeks to be visible to the community in order to draw people to worship services and other religious activities.

27.     The Church serves a diverse and vibrant community.

28.     Visibility and participation in the local community is vitally important to the Church's religious beliefs and exercise.

29.     The Church seeks to welcomes those who are new to the community and invite them to attend Church.

30.     The Gospel teaches that "[n]either do men light a candle, and put it under a bushel, but on a candlestick; and it giveth light unto all that are in the house. Let your light so shine before men, that they may see your good works, and glorify your Father which is in heaven."

31.     The Church believes that it is imperative that it proclaim the Word of God to the world, starting with its own community.

32.     The Church cannot proclaim anything to those who cannot find it.

33.     The Church previously had a sign at the northeast corner of Shawan and Cuba roads directing people to the site.

34.     The sign had stood on the corner for more than twenty years, since before the Church bought its current location, when it was the home of another church.

35.     Defendant County contacted the Church to remove the sign, stating that off-site signs were not permitted.

36.     When a representative of the Church told the County that there were other off-site signs in Baltimore County, a County official told the Church that there had been a complaint about the sign.

37.     Baltimore County's refusal to permit the Church to have any sign at the corner of Shawan and Cuba roads has made it even more difficult for visitors to find the Church.

38.     Upon information and belief, other religious and nonreligious uses in Baltimore County are permitted to have off-site signs.

39.     Currently, the Church offers four services each week, including Sunday School for adults and children, a main Sunday morning service, a Sunday evening service and a Thursday evening service that includes Bible study.

40.     The Church's current facility has seating for 350 people.

41.     The Church can have up to 500 individuals attempting to attend religious services.

42.     The Church only has 84 parking spaces.

43.     The number of existing spaces are inadequate to meet the Church's needs.

44.     There are often more attendees who need to park for Church services than there are parking spaces available, and the surrounding residential area does not have sufficient on-street parking for attendees to park off-site.

45.     Those who cannot find a parking spot will often leave rather than attend Church services.

46.     The lack of adequate parking for the Church's current members means that there is not adequate parking for new members or visitors to the Church.

47.     The Church also seeks to engage in a number of ministries meant to affect lives, bring new members into the Church, and spread the Word of God.

48.     The Church highlights and supports this work during its yearly "Missions Conference" during which international missionaries come to the Church and appeals to its members to assist in their own work.

49.     Additionally, every Tuesday, the Church engages in outreach within the community to spread the Gospel.

50.     The Church goes into the community to hand out information about the Church and invite members of the community to attend the Church.

51.     Once each year, the Church holds an event called "Roundup Sunday" where members are invited to bring their friends to Church.

52.     The insufficient parking is especially apparent during events like "Roundup Sunday" and other days of high attendance at the Church such as Christmas and Mother's Day.

53.     Contrary to the Church's mission, some members feel uncomfortable inviting friends to Church knowing that their friends may not be able to find the Church and likely will have difficulty finding available parking at the Church if they do.

54.     The Church operates a bus ministry, which is staffed by volunteers and travels to a low-income section of the community to work with children and adults.  On Saturdays, the bus ministry visits families in the community, and on Sundays the bus picks up children and some adults and brings them to Church.

55.     The Church currently operates one bus, but seeks to expand this ministry.

56.     At a location with a larger parking lot and better access roads, the Church could operate a second bus.

57.     Aside from the lack of visibility and ability to evangelize, the Church also suffers from severe limitations on its ability to provide religious worship, education and other activities at its existing facility.

58.     The Church believes that, as written in the Bible, its ministry is "fitly joined together" so that the facilities and ministry complement each other as one Church body.  The Church believes that it has a responsibility to create effective facilities for its worship and ministry so that God can put them to use to reach new members.

59.     The Church holds an annual "men and boys" campout for boys and a meaningful male adult in their lives during which the Church rents out a campground and carves out devotional times to highlight Biblical Scripture that speaks to men.

60.     The Church holds a free Vacation Bible School for a week each summer in the evenings.

61.     The Church hosts approximately 100 children for the program, which utilizes the Church's gymnasium and all of its existing classroom space.

62.     The Church has to turn away participants from the Vacation Bible School.

63.     At the new location described below, the Church would have more classrooms and would be able to accommodate more children into the Vacation Bible School.

64.     Only Church members are eligible to have weddings in the sanctuary.

65.     The Church does not rent out its facilities or allow outside groups to use their facilities.

66.     The Church's need for a visible and adequate place of worship led the Church to

begin searching for an alternate facility.

<u>The Church's Search for Adequate Property and the Subject Property</u>

67.     After its founding, the Church held services at a storefront in Timonium, Maryland where it leased space in a commercial shopping center.

68.     The Church outgrew its rented storefront location in 2008, after which it began looking for a more permanent home.

69.     The Church's Senior Pastor originally found the site located at 821 Shawan Road, Cockeysville, Maryland (the "Subject Property") during the 2008 search.

70.     The Church's Senior Pastor felt that the Subject Property was well situated for the Church's use, since it was on a major road, was large enough to accommodate the Church's ongoing growth and need for expanded facilities, was next door to another church, and was in close proximity to Interstate 83 and other existing development.

71.     At that time, however, the Subject Property was not for sale.

72.     The Church's Senior Pastor met with the owner of the Subject Property, who had opposed the development of the church next door to the Subject Property, the Saint Mary Antiochian Orthodox Church.

73.     The Church's Senior Pastor, however, prayed with and for the owner of the Subject Property.

74.     The Church also continued its search for a home.

75.     The Church found its current site at 1800 Worthington Heights Parkway, Hunt Valley, Maryland (the "Worthington Heights Property"), the site of a congregation that had been there since the 1950s and was in the process of disbanding.

76.     The Church purchased the Worthington Heights Property in 2009.

77.     The Worthington Heights Property is located approximately three miles northwest of the Subject Property.

78.     All of the Church's activities are conducted at the Worthington Heights Property.

79.     To access the Worthington Heights Property, people must drive on Shawan Road and then onto Cuba Road, a narrow and winding neighborhood road that is not lit at night, before ultimately connecting to Worthington Heights Parkway.

80.     Most of the Church's congregants access Shawan Road from I-83 to the East and travel almost three miles to the Worthington Heights property, which is located well inside the area of the County known as the Valleys.

81.     This route means that most congregants drive past the Subject Property on Shawan Road, which is located approximately a quarter of a mile off of I-83, in order to attend services at the Worthington Heights Property.

82.     Even after moving to the Worthington Heights Property, the Church's Senior Pastor continued to visit the owner of the Subject Property on Shawan Road.

83.     In 2012, the Church's Senior Pastor visited the owner of the Subject Property, who asked the Church's Senior Pastor if the Church was still interested in the Subject Property, since the owner was going to move into a nursing home the next day.  The owner agreed to sell the Subject Property to the Church.

84.     The Church sincerely believes that God led them to the Subject Property and that the Church is meant to be located there.

85.     The Subject Property is uniquely suited for the Church's use because it is visible to the community and would permit the Church to evangelize as it believes that it must, is central to where its members live and can accommodate their worship needs, and is of sufficient size to

allow for the construction of their house of worship and related parking capacity.

86.     The property is 16.6 acres in size and improved with two single-family dwellings that would remain under the Church's site plan.

87.     Unlike other RC-4 zoned areas of Baltimore County, the immediate area around the property is not rural in nature.  There are a significant number of commercial, institutional and governmental use properties surrounding the Subject Property.

88.     The Subject Property is located in the center of the aerial photograph below:



89.     The Property is bordered to the north by Shawan Road, a busy two lane arterial road which feeds into Interstate 83 only a quarter-mile to the east of the Property.

90.     In a 2014 traffic study, the Average Daily Traffic Count for Shawan Road was

determined to be 21,161 cars.

91.     The nearby intersection of Shawan Road and Cuba Road was recently improved and enlarged to accommodate the increasing volume of traffic in the locale.

92.     Unlike many intersections in the RC-4 zone, the intersection is signalized, providing further traffic control and safety.

93.     Shawan Road is heavily used as commuter road to access Interstate 83, not only by local residents, but also by residents of western Baltimore County as well as Carroll County.

94.     Interstate 83 is a major interstate highway with two lanes in each direction that runs from Baltimore City to Harrisburg, PA.

95.     Immediately to the east of 83 along Shawan Road and approximately 2500 feet from the Subject Property are the Hunt Valley Industrial Park and the Hunt Valley Town Center.

96.     The Hunt Valley Industrial Park is a large industrial and commercial park consisting of many large structures.

97.     Directly across Interstate 83 from the Subject Property is a Wyndham Grand hotel and an Embassy Suites hotel.

98.     The Hunt Valley Town Center is an outdoor shopping complex with a Regal cinema complex, many retail stores including Sears, Marshalls, DSW and Pier One, restaurants of various types, and a Wegmans supermarket.

99.     Located north of the Subject Property and directly across Shawan Road is the Hayfields Country Club, an 18-hole golf course with a clubhouse, pro shop, the "Mansion at Hayfields" and "Redwood Grill" restaurants, a "Grand Ballroom" that provides banquet facilities and many residential homes situated on 475 acres.

100.    The Hayfields Country Club hosts weddings and various other large events.

101.     To the east of the Subject Property is a commuter parking lot.

102.     To the immediate west of the Hayfields Country Club is the University of Maryland Extension, Baltimore County, which maintains several large structures that host a variety of events throughout the year.

103.     To the West there are also recreational fields, which bring in large numbers of children and adults to play softball, soccer, lacrosse and to engage in other recreational activities.

104.     To the immediate west of the University of Maryland Extension is the Catholic Community of St. Francis Xavier, which is a large religious facility that hosts worship services, weddings, and other events.

105.     The Subject Property is bordered immediately to the West by the St. Mary Antiochian Orthodox Church which contains a 16,000-square foot house of worship and 79 parking spaces on a 3.96-acre property.

106.     Approximately 500 feet to the southeast of the Subject Property is the Oregon Ridge Dinner Theatre, which is the performing home of the Baltimore Actors' Theatre.

107.     The Oregon Ridge Dinner Theatre is part of the Oregon Ridge Park, and has a large paved parking lot, an outdoor pavilion and catering facilities which hosts events such as festivals and concerts.

108.     The Subject Property was acquired by the Church from the Kemp family.

109.     The Kemp family used the Subject Property for both residential and commercial purposes, conducting a contractor's business on the site.

110.     In or about 2006, the Kemp family filed an application for a minor residential subdivision plan with Baltimore County.

111.     The plan sought approval for three separate residential building lots, one a

conservancy lot of 11.99 acres and the other two lots 1.5 acres and 2.5 acres in size.

112.    In connection with this subdivision application, percolation tests were conducted on the Subject Property to determine if it supported wells and septic systems, which it did.

113.    The subdivision application for the Subject Property was approved by Baltimore County in 2012.

114.    In furtherance of the subdivision approval, several easements were created and recorded in the Land Records of Baltimore County.

115.    There were five easements consisting of a forest conservation easement, a forest buffer easement, a stream floodplain easement, a conservancy easement and a highway widening easement conveyed in fee simple to Baltimore County, Maryland.

116.    These easements addressed requirements for environmental protections, to allow future road widening and to meet certain applicable zoning/development requirements for residential development.

117.    To date, the Church has planted 1050 trees on the Subject Property in order to comply with the forest conservation plan created that was created when the County granted approval of the requested minor subdivision.

118.    There is a stream separating the Subject Property from the property to the immediate west, which is owned by St. Mary Antiochian Orthodox Church.

119.    The floodplain easement was established to prevent any development in the area of the Subject Property adjacent to the stream, where severe flooding could occur. The forest buffer easement is essentially duplicative, restricting development related activities within this area of the Subject Property for the same purpose.

120.    With the exception of relief relating to the conservancy easement, because the

Church's application did not concern residential development, the Church's proposed use of the Subject Property, as set forth below, complied in all respects with the existing easements on the site.

## The Applicable Land Use Regulations and Their Application

121.     The County regulates land use within its jurisdiction in part through the Baltimore County Zoning Regulations ("BCZR").

122.     The BCZR constitute an extremely complicated set of processes and requirements that a place of worship must navigate in order to engage in religious worship within the County, and which provide objecting residents a myriad of possibilities for attempting to delay and derail such religious land use development, even where such use is permitted in the relevant zoning district.

123.     Such regulations create unbridled discretion on the part of County decision makers as to whether or not religious land use will be permitted, and also impose many years of review and hundreds of thousands of dollars in costs to any such applicant.

124.     The portions of the BCZR that pertain to the development of religious land use creates substantial uncertainty, delay and expense for houses of worship.

125.     The Subject Property is located in the Resource Conservation - Watershed Protection Zone (RC-4).

126.     In an RC-4 Zone, churches are permitted by "special exception."

127.     The legislative determination by Baltimore County that churches are a permitted "special exception" use means that it is a conditional use that shares the legal presumption of validity, absent a showing that it should be denied because of particularly egregious impacts at

the locale considered.

128.    As such, it is presumed that churches located within the RC-4 zone are part of the comprehensive zoning plan and such churches therefore share a presumption that they are in the interest of the general welfare and are valid.

129.    The stated purpose of the RC-4 zone is:

> The County Council finds that major, high-quality sources of water supply for the entire Baltimore Metropolitan Area and for other neighboring jurisdictions lie within Baltimore County and that continuing development in the critical watersheds of those water supply sources is causing increased pollution and sedimentation in the impoundments, resulting in increasing water treatment costs and decreasing water storage capacity. The R.C.4 zoning classification and its regulations are established to provide for the protection of the water supplies of metropolitan Baltimore and neighboring jurisdictions by preventing contamination through unsuitable types or levels of development in their watersheds.

130.    Uses permitted by right in the RC-4 zone include "Public schools," "Transit facilities," and "Commercial film production."

131.    Other uses permitted by special exception in the RC-4 zone include "Camps, including day camps," "Antique shops," "Community buildings, swimming pools or other uses of a civic, social, recreational or educational nature," "Golf courses, country clubs," and "Rail passenger station."

132.    The property directly to the west of the Subject Property, owned by Saint Mary Antiochian Orthodox Church, was zoned RC-4 at the time that the Saint Mary Antiochian Orthodox Church sought and obtained approval for its church in May of 1995, when the Baltimore County Commissioners granted the special exception approval requested by the church in zoning case 95-354-X.

133.    Shortly after obtaining special exception approval, the Saint Mary property was rezoned by Baltimore County from RC-4 to RC-5.  The Saint Mary property is still zoned RC-5

today, which unlike the RC-4 zone permits churches, as a matter of right.

134.    Sections 500.2 and 500.5 of the BCZR provide that an applicant such as the Church shall apply for special exception by filing a petition seeking said relief with the Baltimore County Administrative Law Judge in a form prescribed by him.

135.    A hearing is then scheduled before the Baltimore County Administrative Law Judge.

136.    Section 502.1 of the BCZR governs applications for special exceptions and sets forth the nine criteria to be considered for the granting of same.

137.    Section 502.1 of the BCZR provides as follows:

> Before any special exception may be granted, it must appear that the use for which the Special Exception is requested will not:
>
> (a)    be detrimental to the health, safety or general welfare of the locality involved;
>
> (b)    tend to create congestion in the roads, streets or alleys therein;
>
> (c)    create a potential hazard from fire, panic or other danger
>
> (d)    tend to overcrowd land and cause undue concentration of population
>
> (e)    interfere with adequate provisions for schools, parks, water, sewage, transportation or other public requirements, conveniences or improvements;
>
> (f)    interfere with adequate light and air;
>
> (g)    be inconsistent with the purposes of the property's zoning classification nor in any other way inconsistent with the spirit and intent of these zoning regulations;
>
> (h)    be inconsistent with the impermeable surface and vegetative retention provisions of these Zoning Regulations nor
>
> (i)    be detrimental to the environmental and natural resources of the site and vicinity, including forest, streams, wetlands, aquifers, and floodplains in an RC-2, RC-4, RC-5, and RC-

7 zones.

138.    The phrase "spirit and intent" is not defined in the BCZR.

139.    Section 502.2 of the BCZR provides that, in granting any special exception, the Administrative Law Judge or the Board of Appeals, upon appeal, shall impose such conditions, restrictions or regulations as may be deemed necessary or advisable for the protection of surrounding and neighboring properties. The owners, lessees or tenants of the property for which a special exception is granted, if required by the Administrative Law Judge, or Board of Appeals, upon appeal, shall enter into an agreement in writing with said Administrative Law Judge and/or the County Commissioners of Baltimore County, stipulating the conditions, restrictions or regulations governing such special exception, the same to be recorded among the land records of Baltimore County. The cost of such agreement and the cost of recording thereof shall be borne by the party requesting such special exception. When so recorded, said agreement shall govern the exercise of the special exception as granted, as to such property, by any person, firm or corporation, regardless of subsequent sale, lease, assignment or other transfer.

140.    Both the Hayfields Country Club and the Saint Mary Antiochian Orthodox Church uses were permitted by grant of special exception by Baltimore County.

141.    The Hayfields Country Club is located on a former farm of international reputation.

142.    In 1995, the family that owned the Hayfields farm property applied for a special exception to permit the use of the property as a golf course country club development.

143.    The Hayfields property was and remains zoned Resource Conservation 2 (RC-2).

144.    Just as a church in the RC-4 zone, both churches and golf course country club uses are permitted by special exception in the RC-2 zone.

19

145.    The special exception was granted for the Hayfields property by the Baltimore County Zoning Commissioner, which has since been re-titled and is the same position now known as the Administrative Law Judge.

146.    The decision was appealed to the Baltimore County Board of Appeals, the Circuit Court for Baltimore County and ultimately the Court of Special Appeals resulting in a reported decision of *Hayfields v. Valley Planning Council*, 122 Md. App. 616 (1998).

147.    At each of these levels of review, the special exception approval sought in *Hayfields* was affirmed.

148.    In 1983, the Saint Mary Antiochian Orthodox Church, which shares a common property line with the Church, applied for a special exception to use the property as a church.

149.    At the time, the Saint Mary Antiochian Orthodox Church property was zoned RC-4 and a church was permitted as a use by special exception in the RC-4 zone.

150.    The special exception to permit a church use on the property was granted to Saint Mary Antiochian Orthodox Church by the Baltimore County Zoning Commissioner in 1983.

151.    The decision was appealed and the grant of approval of the special exception was affirmed by the Baltimore County Board of Appeals in 1984.

152.    Saint Mary Antiochian Orthodox Church delayed construction of its church on the property and in 1994 filed a second application for special exception to permit the church use on the property.

153.    The property was still zoned RC-4 and a church was a use permitted by special exception within the RC-4 zone.

154.    The Baltimore County Administrative Law Judge found that the special exception granted to Saint Mary Antiochian Orthodox Church in 1984 had lapsed.

155.    Saint Mary Antiochian Orthodox Church filed a third application for the grant of a special exception to permit a church use on the property, still zoned RC-4, in 1995.

156.    The special exception to permit a church use on the property was again granted to Saint Mary Antiochian Orthodox Church by the Baltimore County Administrative Law Judge in 1995.

157.    Saint Mary Antiochian Orthodox Church has subsequently expanded such that the present church building on its property is 16,000 square feet in size.

158.    There was no opposition from any members of the surrounding community at that point.  Teresa Moore, Executive Director of the Valleys Planning Council, Inc., appeared as an interested person with respect to the application of Saint Mary Antiochian Orthodox Church and had no objections.

<u>The Special Hearing and Special Exception Application to<br>Use the Subject Property as a Place of Worship</u>

159.    In or about September 2014, the Church filed an application for Special Exception and Special Hearing with the Office of Administrative Hearings for Baltimore County to use the Property as a church pursuant to BCZR 1A03.3.B.4, and to provide the Church five years from the date of the final Order in which to utilize the special exception.

160.    The Special Hearing request was filed pursuant to BCZR 500.7 seeking a determination that certain easement requirements associated with the prior subdivision approval for the Subject Property will be nullified if and when the new place of worship is built.

161.    By application of the BCZR, the Subject Property cannot be used as a place of worship without the granting of a special exception.

162.    The Church's plan proposed the construction of a 31,500-square foot sanctuary building on the Subject Property.

163.    Locating a 31,500 square feet facility on 16.6 acres would be significantly and proportionately a less intense use than that maintained by the Saint Mary Antiochian Orthodox Church development located directly next door (16,000 square feet on 3.96 acres).

164.    One of the two dwellings on the Subject Property will be retained as an accessory building and used as a parsonage.  The other smaller dwelling will be razed.

165.    The sanctuary building will have seating for 1,000, several classrooms for religious education of the congregation's children, a nursery area, warming kitchen, and offices for staff.

166.    The project would be built in two phases, with the first being construction of the sanctuary building and the second being construction of a fellowship hall that would also serve as a gymnasium.

167.    The existing well and proposed septic area would be sufficient to support the proposed house of worship on the Subject Property.

168.    The house of worship proposed on the Subject Property meets all of the setback requirements of the RC-4 zone.

169.    The proposed house of worship meets all building height requirements of the RC-4 zone.

170.    The requisite forest buffers and floodplain buffers will be fully maintained by the proposed house of worship use on the Subject Property as is required by the approved and recorded easements.

171.    The size of the building will not overcrowd the land, as it is compatible with other buildings in the area.

172.    The conservation deed of easement associated with the subdivision approval for

the Subject Property is not required for non-residential development in the RC-4 zone such as the proposed house of worship.

173.    The proposed house of worship meets the twenty-five-foot setback required for easements on the Property and none of the proposed improvements are located within the easement areas.

174.    The proposed house of worship did not require any bulk variances of any nature.

175.    The Church has agreed throughout the zoning application process that it would consent to a condition of approval that would prohibit it from renting out its facilities or allowing outside groups to use its facilities.

176.    The Church's Petitions for Special Hearing and Special Exception were scheduled for public hearing before the Administrative Law Judge on October 15, 2014, and there were three subsequent hearings conducted, with the last hearing concluding on November 21, 2014.

177.    There were five witnesses at the public hearing that provided testimony before the Administrative Law Judge.

178.    Only one, Pastor Gus Rodriguez, pastor at the Church, was a lay witness.  Pastor Rodriguez testified on behalf of the Church regarding the history of the Church and its operations.

179.    The other four witnesses included a licensed surveyor, a traffic engineer, a landscape architect, and a licensed architect, testified as experts at the hearing on behalf of the Church.

180.    Each of the witnesses was subject to cross-examination by a group of "Protestants" who attended the hearing and were opposed to the approvals sought by the Church.

181.    The Protestants did not present any expert testimony, documents or evidence in

support of their position at the hearing.

182.     On January 5, 2015, in a written Opinion and Order, the Administrative Law Judge granted the special hearing and special exception relief to the Church with the caveat that the special exception grant would expire in three and not five years as requested.

183.     On January 29, 2015, the Protestant Valley Planning Council filed an appeal of the January 5, 2015 Opinion and Order granting the Church's special hearing and special exception relief to the Board of Appeals for Baltimore County.

184.     The matter proceeded to public hearing before the Board over the course of seven non-consecutive days of hearings that collectively spanned nearly a year.  Hearings were held before the Board on May 5, 2015, May 11, 2015, May 13, 2015, October 21, 2015, November 16, 2015, November 17, 2015 and April 5, 2016.

185.     There was a total of 34 witnesses called at the hearings and three attorneys were present, two for the Protestants, and one of whom also gave lay testimony.  Of these witnesses, 27 were called by the Protestants, including seven expert witnesses and twenty lay witnesses.

186.     Cross-examination and testimony by the Protestants soon began inappropriately addressing the Church's religious practices and operations.

187.     At the first hearing, an Attorney for the Protestants engaged in lengthy cross-examination of the Church's assistant pastor that included such irrelevant questions as: "But does your church, as an independent church, have a philosophy or a, I guess philosophy, about home schooling?"

188.     In addition to the religious practice questioning, the Attorney for the Protestants inappropriately cross-examined the assistant pastor regarding the financial ability of the Church to fund the project, asking over the Church's attorney's interjected relevance objection:

a. "Am I correct that sitting here today, the church does not have the financial wherewithal to pay for this proposed new development?"

b. "Okay and by that I mean either in terms of cash on hand or loan in place to pay for it?"

c. "Do you have any idea what the cost of the proposed development will be?"

d. "Have you, has the church obtained costs as to this?"

e. "And I think you said at the last hearing that you had not yet started a capital campaign to raise money, correct?"

f. "Have you done so at this point in time?"

189.    Several of the other witnesses called by the Protestants made various irrelevant comments about the church's religious activities, including:

a. "[I]t's very difficult to actually figure out what Hunt Valley Baptist Church are actually planning to do because they, I believe that they have been somewhat secretive about . . . ."

b. "[T]here is potential for something to be going on in that church every day of the week, every day of the week and almost every day of the year, because, frankly, economics 101, and I'm not an expert on economics, but it tells me that if you actually put up a building, which I've heard from conservative estimates, is going to cost a minimum of $6 million to build . . . ."

c. "[T]his church will . . . be forced to . . . have activities, if it's to be economically viable, because of the size of the church and the fact that they have to keep the lights on and they have to keep the heart on and, therefore . . . they are going to have to have activities in this church every day to justify that . . . ."

d. "[T]here's a lot of available evidence . . . that show that not only . . . will they actually do activities like this to remain financially viable, but they also will try to expand . . . their activities in every which way they can . . . ."

e. "[T]he reality is is that it's no secret that the Hunt Valley Baptist Church is a small and only moderately funded at best organization that is undertaking what appears to be a . . . development, which clearly is going to be a huge financial strain.  It would be on any organization, particularly an independent church that doesn't have the backing of local diocese or national . . . church organization behind it."

f. "My concern is that the Hunt Valley Baptist Church may be given, may be given approval to actually proceed . . . with this building and find that it is financially . . . not within their means. . . .  [I]f they do not find the funds to do it, then they may actually elect to sell the property to another church group, who would have much larger . . . congregation and . . . much deeper pockets . . . ."

g. "They doubled the rent the day before the pre-school was supposed to open."

h. "There was also what I would characterize as an unsafe environment for the children. There wasn't a lot of respect given to our kids that were there.  They would often operate their lawn equipment.  [T]here were riding mowers, chain saws, . . . trees coming down literally during . . . recess."

i. "They installed a new surface on their walkway and the first day . . . my daughter slipped and fell . . . ."  "I confronted the pastor about it . . . because . . . they do all the work themselves, so . . . that was a big concern because kids were wiping out left and right."

j.  "Every Monday morning . . . we'd have to come in and help the teachers clean up the classrooms because the Sunday school activities . . . they'd just leave things a mess, toys went missing . . . ."

k.  "[I]n the Spring of 2012, they were doing some pretty significant construction to . . . the house that was next to it and they were building an apartment for the church employee, there were never any permits pulled, construction equipment going in and out, hazardous materials, . . . we just had to keep a very close eye on the children.  We could never let them out of our sight."

l.  "I interacted with David on number of occasions over some of these issues and, you know, I mean, it's just my opinion, you know, but I, it was uncomfortable, it was, I mean, judgment goes both ways, that's all I'm going to say and it was difficult. We, we were very reasonable, more than we needed to be, but because we were looking out for the kids, and it was, it was, 1 it just wasn't professional and for all the preaching of, you know, God and heaven and what have you, you know, my child almost practically broke her cheekbone that day that she fell and I confronted him the next day and I said what on earth did you put on your sidewalk? I said, the kids are wiping out left and right, my daughter, who moves a mile a minute, smacked her, she had a huge hematoma on her cheek, I had to take her to the doctor. And she's fine, thankfully, and he could have cared less about, you know, he never asked me how she was, how she did, he just said, well, do you think I need to put slippery when wet signs up?"

m.  "[S]o they would come set up for the Friday work nights and it would be kids of all ages and just doing yard work and what have you."

n. "[T]hat bus comes and goes multiple times on Sundays because . . . they go to the Cockeysville Apartments and pick up residents . . . ."

190. Such comments demonstrate hostility toward this particular Church for reasons unrelated to legitimate land use issues.

191. One witness called by the Protestants, Lynn Jones, resided eight miles from the Property, was not qualified as any type of expert, and over the Church's objection testified at length regarding the history of the area dating back to the 1700s which included discussion of Shawnee Indians.

192. Another neighbor testified on behalf of the Protestants, making statements such as:

a. "I've had the benefit of looking at the website that the church created before it was sanitized, about how beautiful this property was and how the, the minister was going to live there and they loved the bucolic property and the, and the animals and this is in direct, you know, directly opposite of what they're now proposing and, and that disturbs me.

b. "[T]his is God's country, a sense of wonder is what God's about.  You don't take that away just to, to bus people in. I mean, if, they're Christian..."

c. "I love the work you do.  There are lots of places where it's needed.  There are lots . . . there are places in . . . Owings Mills, there are abandoned buildings everywhere.  There is a community that needs to be served but this is not how you serve them..."

d. "But don't dream your dream, dream God's dream and I don't think this is God's dream for you. . . .  This is pristine, this is what we glorify."

e.  "On Tuesday night, families go out and they go to, to the Cranbrook corridor and they knock on doors and speak and bring people . . . and they want people to come by bus, buses come on Sunday to pick up the kids . . . to come worship."

f.  "The model is bus ministry, they want to grow so that is why I think you can say they're going to have two buses and fundamentalist Baptist Churches that I've seen have white buses . . ."

193.  There was significant community opposition to the Church and a Facebook Group called "Save Shawan" was formed.  Some of the posts on that site included:

a.  "This is awesome, they are only there and in it for the money."

b.  "Make sure you reference Hunt Valley Baptist Church and 14190SPHX and that you do not approve a special exception that will allow them to build a megachurch on property zoned rural that will also pollute our water source."

c.  "Tell me why they need to build this church in the first place? They're 150 members and 'have plans' to grow to over 1000. Why move now? Maybe they've got some ulterior motives with their current land and want to sell it?"

d.  "There are already 20 Baptist churches in Baltimore County, why keep building more . . . ."

e.  "We do NOT need another huge church next to a huge church on Shawan Road . . . .  The church buses in people to go to the church and does not use the full facility where it is. Let them stay where they are and keep the congregation smaller. They can start a satellite church somewhere else, but not a mega church and NOT on Shawan Road!!!"

f.  A link to a Youtube video of a CNN special entitled "Ungodly Discipline" and the

heading "Fundamental Baptist Church connected to the very controversial Fairhaven Baptist Church in Indiana."

194.    A Twitter account was established as @SaveShawan.  One post on Twitter was: "Plan of new fundamentalist church on Shawan Road up for review."

195.    The Valleys Planning Council described the Church as "a 'Big Box' church."

196.    Another individual that testified at the Board's hearings made the following statements: "I see it as a Pandora's Box. We know from Greek mythology that Pandora when her box was opened all the evils in the world were supposed to come out of it," and "It is a desecration . . . ."

197.    An online petition was created that described the Church as an "industrial use." Comments on this page included describing the Church as a "megachurch," stating "SAVE SHAWAN FROM CHURCHES," "a mega church...seriously...this is an URBAN area.....I'm pretty sure that Jesus would NOT Be ok with this!!!....when will the madness in the name of Christianity end???," "I love God but God does need a Mega Complex," and "Maybe if it was something we were in dire need of, but a megachurch? NO."

198.    Opposition to the Church's application was substantially motivated by hostility and animus toward the Church and its religious character, practices and denomination.

199.    The Defendant Board deliberated on the Church's application on July 7, 2016.

200.    The Church waited over ten (10) months for the Board to issue its written decision from the last hearing held in April, and by Order dated February 22, 2017, the Board of Appeals reversed the Administrative Law Judge's decision and, contrary to the recommendations of the Department of Planning, denied the Church a special exception to locate its place of worship on the Subject Property.

201.    In denying the Church's request for special exception approval, the Board was knowingly responsive to opponents who were hostile toward the Church.

202.    By denying the Application, the Board gave effect to the private biases of local residents.

203.    Board member James H. West was interviewed by the Baltimore Sun newspaper on July 7, 2016 and stated: "[W]hen members of the County Council allowed churches in resources conservation zones decades ago, they probably didn't contemplate churches on the scale of Hunt Valley Baptist Church's proposal."

204.    Board member West was quoted as saying "It's a church, but it's more than a church."

205.    Board member Meryl W. Rosen was quoted in the same article as saying "I don't think a church of this scope was envisioned . . . ."

206.    On February 22, 2017, the Defendant Board issued its written opinion and order on the Church's petition (the "Order").

207.    The written opinion and order also contained a dissenting opinion (the "Dissent"), the Board having been split 2-1 with respect to the majority denial of the Church's petition.

208.    The Order:

    a.  Denied the Church's Petition for Special Exception;

    b.  Determined that the Church's request to extend the period of utilization of its special exception under BCZR § 502.3 is moot; and

    c.  Determined that the Church's Petition for Special Hearing to nullify the requirements associated with the previously approved residential development plan on the Property if and when a building permit to construct

a church is issued by the County is also moot.

209.    The Order based the denial of the Special Exception on two criteria under § 502.1 of the BCZR, subsections (g) and (h), which require that the grant of the special exception not:

>    (g) be inconsistent with the purposes of the property's zoning classification nor in any other way inconsistent with the spirit and intent of these zoning regulations; and
>
>    (h) be inconsistent with the impermeable surface and vegetative retention provisions of these Zoning Regulations.

210.    The Order specifically found that the other seven criteria of § 502.1 of the BCZR regarding the grant of a special exception had been satisfied by the Church.

211.    The Board concluded that the Church's petition for special exception was not consistent with subsection (g) of Section 502.1 of the BCZR based on its conclusion that the one component of the house of worship, a gymnasium/fellowship hall, did not qualify "as a building for Christian worship" and was therefore not the type of use intended by the County Council to be permitted by special exception within the RC4 zone.

212.    The Board held that the proposed use of the Property, including a gymnasium, would "have an adverse effect in relation to the spirit and intent of the zoning regulations 'above and beyond' that which is inherently associated with churches and other buildings of religious worship in other locations in the County within the R.C.4 zone."

213.    Notwithstanding the Board's holding, the Board did not identify a single adverse impact upon the locale that would be caused by the Church's alleged failure to comply with the spirit and intent of the zoning regulations under BCZR Section 502.1(g).

214.    The Board likewise did not make any findings or offer any analysis of the

requirement that the specific adverse impacts that will be caused by the construction of the proposed church at the Subject Property, are non-inherent adverse impacts, which go above and beyond the adverse impacts that are inherently associated with churches and other buildings of religious worship located within the R.C.4 zone and other similar zones throughout the County.

215.    Under Maryland law, a denial of a request for special exception approval must be based on sufficient findings of non-inherent adverse impacts, based on the particular use proposed at the particular location proposed.

216.    Adverse effects that are inherently associated with churches and other buildings of religious worship cannot be the basis upon which a special exception can be denied under Maryland law.

217.    Uses that are allowed by special exception are presumed to be permitted at all locations within the zoning district, because there has already been a legislative determination as part of the comprehensive zoning scheme that certain uses are permissible notwithstanding the inherent impacts associated with such uses.

218.    The Board did not address the presumption of permissibility afforded to special exception uses under Maryland law.

219.    Several houses of worship contain gymnasia or fellowship halls in Baltimore County.

220.    Upon information and belief, the Board has never previously denied an application for special exception to a house of worship on the basis that its proposed use contains a gymnasium or fellowship hall.

221.    Upon information and belief, there exist houses of worship that contain a gymnasium and/or fellowship hall in the RC-4 zone.

222.   A fellowship hall/gymnasium is a common ancillary use of a house of worship.

223.   The Board further based its denial on its conclusion that the proposed use would be inconsistent with the impermeable surface and vegetative retention provisions of the Zoning Regulations pursuant to BCZR Section 502.1(h).

224.   Section 1A03.4.B.3 of the BCZR is the only applicable zoning provision regulating impermeable surface.

225.   The Church's proposed impermeable surface lot coverage will be 7.7%.

226.   The Church proposed that there be two parking areas at the Subject Property; a smaller one in the front to diminish its visual impact from Shawan Road and to accommodate the required number of handicapped parking spaces, and a larger one in the back, collectively providing a total of 246 spaces.

227.   The parking lot areas will be pervious and made of the same porous material, permeable pavement, that was approved by Baltimore County and installed on the Saint Mary Antiochian Orthodox Church's parking lot adjacent to the Subject Property.

228.   With the permeable pavement parking lot, the Church is in compliance with the requirement imposed by BCZR § 1A03.4.B.3 that no more than 10% of the Subject Property may be covered by impermeable surface.

229.   The soil at the Church's Property is classified as "class C," the same soil classification as the Saint Mary Antiochian Orthodox Church's property.

230.   The porous surface for the parking lot area of the proposed Church, permeable pavement, is permitted with "class C" soils.

231.   The permeable pavement for the parking lot area is a component of the stormwater management plan for the Property which was submitted for approval to the

Baltimore County Storm Water Management Division of the Department of Environmental Protections and Sustainability.

232.    The same permeable pavement for the parking lot area of Saint Mary Antiochian Orthodox Church was a component of its stormwater management plan approved by the Baltimore County Storm Water Management Division of the Department of Environmental Protections and Sustainability.

233.    Saint Mary Antiochian Orthodox Church was granted approval for a porous permeable pavement parking area of the same design proposed by the Plaintiff for the Subject Property to meet the 10% limitation for impervious lot coverage for a property in the RC-4 zone at the time of its grant of special exception.

234.    The special exception for Saint Mary Antiochian Orthodox Church's use was granted twice by the Board with the same proposal for a porous permeable pavement parking area to meet the 10% limitation for impervious lot coverage and with more density in terms of building-to-lot ratio than the Church.

235.    At the hearing on the Church's application, the Church's expert witness opined and provided evidence that the field tests at the Subject Property supported a finding that the soils at the Property have a high degree of probability of meeting the required minimum infiltration rates associated with the installation of the permeable pavement parking lot.

236.    Based on these field tests, the Church's expert witness designed the porous pavement parking lot facility to operate properly, which ultimately must pass rigorous County testing in order to prove that the facility will operate in compliance with Maryland law before building permits will be issued for construction.

237.    This testing is conducted after special exception zoning relief is obtained, during

the County's development review and approval process, which establishes a separate procedure and different requirements that must be met before a proposed project may move forward.

238.    When issuing its recommendations to the County Administrative Law Judge (and Board of Appeals on appeal) regarding the requested special exception relief, neither the Department of Environmental Protection and Sustainability or the Department of Planning averred that the proposed project was in violation of the 10% impermeable surface limitation imposed by BCZR § 1A03.4.B.3.

239.    The Department of Environmental Protection and Sustainability will be responsible, during the County's Development review and approval process, to ensure that the porous parking area will operate as designed.

240.    At the hearing on the Church's application, the Protestant's expert witness relied upon for his conclusions the contents of certain publications, including the 2000 Maryland Storm Water Design Manual, and ignored actual data from soil tests taken on the Subject Property.

241.    Without himself conducting any soil testing on the Subject Property or within the immediate area, the Protestant's expert witness opined that the proposed porous parking lot was not suitable under the 2000 Maryland Stormwater Design Manual, based upon the composition of the soils located on the Subject Property being a "C" classification.

242.    The 2000 Maryland Stormwater Design Manual specifically states: "Sandy and silty soils are critical to successful application of permeable pavements. The [Hydrological Soil Group] should be A, B or C."

243.    The infiltration rate for a standard sewerage disposal system must be greater than one inch in 30 minutes, which equates to two inches per hour.

244.    The infiltration rate for a sand mound sewerage disposal system must be greater

than one-quarter inch for every 15 minutes which equates to one inch per hour.

245.    The infiltration rate for a porous pavement application must be greater than 0.52 inches per hour, a lower standard to be met than that for either a standard or sand mound sewerage disposal system.

246.    Percolation tests for a sewerage disposal system require a higher infiltration rate than that required for porous pavement.

247.    Soil testing performed in 2007 indicated that the infiltration rates exceeded the requirement for a porous paving parking lot.

248.    Similarly, the testing done on the Subject Property in 1987 also demonstrated that the soils were suitable for a porous paving parking lot.

249.    Such testing resulted in the approval of the residential subdivision, which would have utilized a sand mound sewerage disposal system.

250.    All thirteen test locations in 2007 of the soils at the Subject Property indicated that the infiltration rate would have been satisfactory for a porous pavement application, with the infiltration rates ranging from 0.63 inches per hour to 10 inches per hour, except for one location that was not in the area of the proposed parking lot that measured 0.50 inch per hour.  The average infiltration rate was 3.63 inches per hour.

251.    No evidence was presented that contradicted these findings.

252.    As noted above, the same type of permeable pavement parking lot had been approved for the adjacent property owner, St. Mary Antiochian Orthodox Church, to meet the requirements set forth in BCZR Sections 1A03.4.B.3 and 502.1(h).

253.    The St. Mary Antiochian Orthodox Church property contains similar soils to the Church's Property.

254.     At the time the St. Mary Antiochian Orthodox Church property was developed, it was permitted to utilize a porous paving parking lot in order to satisfy the same impervious surface limitation regulation which applies to the Subject Property.  The soils on the St. Mary's property were determined to be suitable for a porous paving parking lot.

255.     Nevertheless, relying upon the testimony of the Protestants' expert witness and rejecting the testimony of the Church's expert witness, the Board majority concluded that the Church's petition for special exception was not consistent with subsection (h) of § 502.1 of the BCZR.

256.     The Board majority found that it "comes down to a battle of expert witnesses" and "the Board views this issue as a close call, particularly at this stage of the proceedings," but failed to either mention or apply the presumption of permissibility afforded to special exception uses.

257.     The Board reached this conclusion despite testimony and evidence before it that "what is being proposed has been already approved by the County and is in use for a property immediately next door" as set forth in the Dissent, referring to the adjacent St. Mary Antiochian Orthodox Church property.

258.     The Board also reached its conclusion despite the fact that the proper functioning of a permeable pavement parking lot is an issue reserved for review during the County development review process, and not during the special exception zoning process.

259.     The Board found that without the permeable pavement parking lot, the Church's Petition does not meet the impermeable surface requirements of BCZR § 1A03.4.B.3.

260.     During the zoning proceeding, the only relevant inquiry for determining if the requested relief is in compliance with the applicable zoning impermeable surface area

restrictions, is whether the Subject Property is less than 10% covered by impermeable surfaces, which was undisputed in this case.

261.    The Church met all of the objective standards under BCZR Section 502.1 for the grant of a special exception to construct its house of worship.

262.    The determinations of the Board were wholly subjective with respect to BCZR §§ 502.1(g) and(h).

263.    Baltimore County's development/subdivision review process is codified in Baltimore County, Article 32, Title 4.

264.    The Baltimore County development review process includes a required analysis of certain environmental impacts associated with development, including stormwater runoff and the suitability of a porous pavement parking lot proposed in order to reduce stormwater runoff.

265.    The Baltimore County development review process also requires an analysis of the suitability of soils, in order to accommodate a private waste disposal system and for other similar purposes.

266.    Such review normally takes place <u>after</u> the granting of a special exception.

267.    There are numerous other methods of achieving compliance with the Baltimore County Zoning Regulations with respect to the impermeable surface limitation.

268.    The Church would not be able to proceed with development of the Property if the relevant regulatory bodies charged with approving construction of the parking lot and use of permeable pavement or other acceptable solution would not permit such use.

269.    The Board treated the Church differently and worse than other applicants for special exception by denying the Church's application based on the permeable pavement issue.

270.    The Board discriminated against the Church by denying a special exception prior

to such determination being made.

271.    The Church had a reasonable expectation that its special exception would be granted.

272.    The Defendant Board agreed that the Church's application complied with the special exception conditions in all respects with the exception of the two issues described above.

273.    The Church further met the legal standard for its request for Special Hearing pursuant to BCZR Sect. 500.7 to permit the requirements associated with the previous approved residential development to be nullified if and when its house of worship is built.

274.    The Church's application met all applicable standards with respect to the size of its proposed worship and ancillary structure.

275.    There is no floor area ratio requirement in the RC-4 zone.

276.    Nevertheless, the Church's proposed house of worship would cover only 4.3% of the Property.

277.    By contrast, 10.5% of Saint Mary Antiochian Orthodox Church's property is covered by its house of worship.

278.    The Board discriminated against the Church by treating it differently and worse than a similarly situated applicant.

279.    The Board had the authority pursuant to BCZR § 502.2 to impose conditions upon approval of the Church's special exception application in order to mitigate any negative impacts.

280.    No witness for the Church ever indicated there would be a daycare or school at the Property and the Church represented that it would consent to a condition of approval that it would not operate a daycare or a school at the location.

281.    The Board could have imposed conditions on the Church's use, including

40

conditioning approval on obtaining the requisite permits to use permeable paving, constructing the future gymnasium/fellowship hall wing (approximately 6,000 square feet) as a second phase of the project, or granting the special exception without the gymnasium/fellowship hall.

282.   The Board could also have limited the current size of the Church and required another hearing for any future expansion including the proposed second phase of the project.

283.   The Board was aware that the second phase of the Church's proposed house of worship was "not critical to the operation of the church."

284.    The Board did not discuss any conditions or limitations pursuant to BCZR § 502.2 on the Church's project and failed or refused to do so.

285.   Saint Mary Antiochian Orthodox Church has a golden dome which dominates the visual landscape.

286.   Saint Mary Antiochian Orthodox Church required environmental variances for its construction.

287.   The Church does not require any environmental variances for its construction.

288.   The impact of Saint Mary Antiochian Orthodox Church upon the locale is far greater than that of the proposed Church.

289.   The Church's proposed house of worship will have less impact upon the surrounding area, especially given the significant development that has occurred since the approval of the special exception for Saint Mary Antiochian Orthodox Church.

290.   Upon information and belief, there are several churches in the immediate area that have houses of worship with gymnasia for social and recreational use, including Hunt Valley Baptist Church, Perry Hall Baptist Church, Rosedale Baptist Church, Grace Bible Baptist Church and Arlington Baptist Church, which has two gymnasia.

291.    The Board discriminated against the Church by treating it differently and worse than a similarly situated applicant.

292.    At the October 21, 2015 hearing, Board Chairman Belt, asked the Protestants' expert:

a.  "[I]f someone were to want a house that looked like that, that they could build that house there?"

b.  "Would we be here?"

c.  "[W]e basically could have a structure that wasn't proposing to be a house of worship?"

d.  "I could make it a really big tepee if I wanted to, right?"

293.    The Board failed to grant the Church's application subject to any conditions that would preserve the general purposes and intent of the County's land use regulations.

294.    The Board failed to grant the application for special exception subject to further county approval for the Church's stormwater management plan.

295.    The Board did not adopt a Decision and Order concerning the Church's application at its final hearing on the Church's application on April 5, 2016 nor at its hearing deliberating the application on July 7, 2016.

296.    It took the Board ten months to issue its Decision and Order following the last hearing conducted on the Church's application.

297.    The Board's decision was arbitrary and capricious under state and local law.

298.    The Board's denial was a complete denial, prohibiting any use of the Property for the Church's place of worship.

299.    There is no rational basis to deny the Church's Application and to prohibit the

Church from operating on the Subject Property.

300.    Upon information and belief, the Board has granted special exceptions to other religious institutions.

301.    Upon information and belief, the Board has granted special exceptions to other non-religious assembly and institutional uses.

302.    Upon information and belief, the Board has granted special exceptions from the County's impervious surface requirements to other applicants.

303.    The Board's denial of the Church's special exception severely impedes and prevents the Church's exercise of its religion.

304.    The denial of the Application was an individualized assessment of the proposed uses of the Subject Property.

305.    Various nonreligious assembly and institutional uses are permitted by right on the Subject Property, including "Public schools," "Transit facilities," and "Commercial film production."

306.    Such nonreligious assembly and institutional land uses are treated on better terms under the County's land use regulations than are churches, which need a "special exception" to locate on the Subject Property.

307.    Such nonreligious assembly and institutional land uses would have equal or greater negative effects on the stated purpose of the RC-4 zoning district.

308.    The County's land use regulations do not provide a reasonable opportunity to ascertain the standards that must be met with respect to the determination of whether a special exception would "be inconsistent with the purposes of the property's zoning classification nor in any other way inconsistent with the spirit and intent of these zoning regulations; . . . ."

309.    The Church's application met all requirements of the Subject Property's zoning classification and the Baltimore County Zoning Regulations.

310.    The County's land use regulations do not provide a reasonable opportunity to ascertain the standards that must be met with respect to the determination of whether a special exception would "be inconsistent with the impermeable surface and vegetative retention provisions of these Zoning Regulations . . . ."

311.    The Church's application met all requirements of the impermeable surface and vegetative retention provisions of the Baltimore County Zoning Regulations.

312.    Section 502.1 of the Baltimore County Zoning Regulations authorizes arbitrary and discriminatory enforcement by the Board with respect to review of special exception applications and does not provide explicit standards for the Board to avoid resolution on an ad hoc and subjective basis.

313.    The Board's decision was arbitrary and discriminatory with respect to Plaintiff.

314.    The construction of the Church's proposed place of worship, at an estimated cost of $5,000,000, will affect interstate commerce.  The construction's effect on interstate commerce will result from, amongst other things, the Church's fundraising activities related to the construction; the transfer of funds to those it engages to construct the church; the engagement of construction companies to construct the church; the employment of and payments to construction workers either by the Church or by companies engaged by it; the purchase of necessary materials to construct the church; the engagement of a landscaping company; the use of interstate highways for the transportation of persons and materials used to construct the church; the use of interstate communication related to the construction of the church; and other activities related to the construction of the church.

315.    The operation subsequent to the church's construction will affect interstate commerce.  The Church's operation will affect interstate commerce by or through, amongst other things, serving as a site for ongoing fundraising; its receipt of charitable donations from persons working or living outside of the State of Maryland; the use of means of interstate communication to facilitate the church's ongoing operations; the use of interstate travel related to the church's ongoing operations; the employment of any part-time or full-time employees; and the purchase of goods and services related to the church's ongoing operations and maintenance.

316.    The Defendants' actions described above all took place under color of state law.

317.    The Church had a reasonable expectation that its religious land use would be permitted by the Board.

318.    Defendants' laws and actions imminently threaten to substantially burden the Church's free exercise of religion.

319.    The Defendants possess no compelling interest that justifies denial of the special exception.

320.    Denial of the special exception is not the least restrictive means of achieving any governmental interest.

321.    There are no quick, reliable and viable alternative options for the Church's operations.

322.    The Church has also suffered significant financial damages as a result of the Defendants' laws and their application to the Church, such as costs related to the special exception application (including extraordinary expenditures not required of similarly situated applicants), preventing the Church from receiving revenues, required additional expenditures to operate at an alternative location, and increases in construction costs resulting from delay.

## COUNT I

### Violation of Religious Land Use and Institutionalized
### Persons Act of 2000 – "Substantial Burdens"
### 42 U.S.C. § 2000cc(a)

323.    Paragraphs 1 through 322 are incorporated by reference as if set forth fully herein.

324.    Defendants have deprived and continue to deprive the Church of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations on their face and as applied in a manner that places substantial burden on the Church's religious exercise without using the least restrictive means of achieving a compelling governmental interest.

## COUNT II

### Violation of Religious Land Use and Institutionalized
### Persons Act of 2000 – "Nondiscrimination"
### 42 U.S.C. § 2000cc(b)(2)

325.    Paragraphs 1 through 324 are incorporated by reference as if set forth fully herein.

326.    Defendants have deprived and continue to deprive the Church of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations on their face and as applied in a manner that discriminates against the Church on the basis of religion and religious denomination.

## COUNT III

### Violation of Religious Land Use and Institutionalized
### Persons Act of 2000 — "Equal terms"
### 42 U.S.C. § 2000cc(b)(1)

327.    Paragraphs 1 through 326 are incorporated by reference as if fully set forth herein.

328.    Defendants have deprived and continue to deprive the Church of its right to the free exercise of religion, as secured by RLUIPA, imposing and implementing land use

regulations on their face and as applied in a manner that treats the Church on terms that are less than equal to nonreligious assembly and institutional land uses.

## COUNT IV

**United States Constitution**
**42 U.S.C. § 1983: First Amendment**
**Free Exercise of Religion**

329.    Paragraphs 1 through 328 are incorporated by reference as if set forth fully herein.

330.    Defendants have deprived and continue to deprive the Church of its right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by imposing and implementing land use regulations on their face and as applied in a manner that substantially burdens the Church's religious exercise without using the least restrictive means of achieving a compelling governmental interest, and by discriminating against the Church on the basis of religion in a manner that is not the least restrictive means of achieving a compelling governmental interest.

## COUNT VI

**United States Constitution**
**42 U.S.C. § 1983: Fourteenth Amendment**
**Equal Protection**

331.    Paragraphs 1 through 330 are incorporated by reference as if set forth fully herein.

332.    Defendants have deprived and continue to deprive the Church of its right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by imposing and implementing land use regulations on their face and as applied in a manner that discriminates against it in the imposition and implementation of their land use regulations.

## COUNT VII

**United States Constitution
42 U.S.C. § 1983: Fourteenth Amendment
Due Process**

333.    Paragraphs 1 through 327 are incorporated by reference as if set forth fully herein.

334.    The County's land use regulations fail to provide members of the public, including Plaintiff and other churches, a reasonable opportunity to ascertain the standards that must be met with respect to the Baltimore County Zoning Regulations' requirement that a "special exception . . . will not . . . (g) be inconsistent with the purposes of the property's zoning classification nor in any other way inconsistent with the spirit and intent of these zoning regulations; [or] (h) be inconsistent with the impermeable surface and vegetative retention provisions of these Zoning Regulations . . . "; authorize arbitrary and discriminatory enforcement by the Board with respect to review of special exception applications; and do not provide explicit standards for the Board to avoid resolution on an ad hoc and subjective basis.  The constitutional flaws in these portions of the Baltimore County Zoning Regulations resulted in an arbitrary and discriminatory application with respect to Plaintiff.

## COUNT VIII

**Maryland Constitution
Declaration of Rights, Article 36
Free Exercise of Religion**

335.    Paragraphs 1 through 334 are incorporated by reference as if set forth fully herein.

336.    The Defendants' laws and actions targeting the Church amount to governmental discrimination upon the basis of religious conviction.

337.    Defendants have interfered with the Church's duty to worship God in such manner as they think most acceptable, denied the Church the protection of the religious liberty to which it is entitled, and have molested the Church in their person and their estate, on account of

their religious persuasion, profession, and religious practice, without justification.

## COUNT IX

### Judicial Review of Administrative Agency Decision

338.    Paragraphs 1 through 337 are incorporated by reference as if set forth fully herein.

339.    The Church requests judicial review of the Majority Opinion and Order of the Board of Appeals for Baltimore County, dated February 22, 2017, for the matter of Hunt Valley Baptist Church, Inc. Petition for Special Hearing and Special Exception on the property located at 821 Shawan Road, Case No. 14-190-SPHX.

340.    The Church was a party to the proceedings before the Board of Appeals, which culminated with the Board's denial of the special exception requested by the Church, which sought approval to use the Subject Property as a church and other buildings for religious worship pursuant to BCZR § 1A03.3.B.4.

341.    Once the Board denied the special exception request seeking approval of the proposed Church, the Church's request under BCZR § 502.3 to extend the period of utilization of the special exception from two years to five years, became moot.

342.    Similarly, the special hearing relief sought by the Church under BCZR § 500.7 also became moot upon denial of the special exception request by the Board. That relief sought approval to nullify certain restrictions, which had been imposed and were associated with the previously approved residential subdivision of the Subject Property, and that these restrictions would be required only to accommodate residential (non-institutional) development of the Subject Property.

343.    Notwithstanding the Board's holding, that the special exception was denied for non-compliance with BCZR § 502.1(g), the Board did not identify a single adverse impact upon

49

the surrounding locale that would be caused by the church's alleged failure to comply with the spirit and intent of the zoning regulations as provided under BCZR Section 502.1(g).

344.    Notwithstanding the Board's holding, that the special exception was denied for non-compliance with BCZR § 502.1(h), the Board did not identify a single adverse impact upon the surrounding locale that would be caused by the church's alleged failure to comply with the impermeable surface and vegetative retention provisions of these Zoning Regulations under BCZR § 502.1(h).

345.    During the County's development review and approval process, the determination will be made by Baltimore County as to the suitability of the porous paving parking area for the Subject Property.

346.    The Board likewise did not make any findings or offer any analysis of the requirement that the specific adverse impacts which will be caused by the construction of the proposed church at the Subject Property, are non-inherent adverse impacts, which go above and beyond the adverse impacts that are inherently associated with churches and other buildings of religious worship located within the RC-4 zone and other similar zones throughout the County.

347.    Under Maryland law, a denial of a request for special exception approval must be based on sufficient findings of non-inherent adverse impacts, based on the particular use proposed at the particular location proposed.

348.    Adverse effects that are inherently associated with churches and other buildings of religious worship cannot be a basis for the denial of a special exception under Maryland law.

349.    Uses that are allowed by special exception approval are presumed to be permitted at all locations within the zoning district, because there has already been a legislative determination as part of the comprehensive zoning scheme, that certain uses are permissible

notwithstanding the inherent impacts naturally associated with such uses.

350.    The Board did not address the presumption of permissibility afforded to special exception uses under Maryland law.

351.    The Board failed to properly apply the BCZR § 502.1 special exception standards when it improperly determined that the proposed church in this case fails to comply with the requirements of both BCZR § 502.1(g) and BCZR § 502.1(h), and the Board likewise failed to properly apply the well-established principles of Maryland law which act to govern the review of proposed special exception uses in the state of Maryland.

352.    The flaws in the Board's written analysis/Majority Opinion, as described herein above, and its incorrect application of the BCZR § 502.1 special exception standards to the proposed use at issue, are arbitrary and capricious and constitutes legal error as a matter of law.

## PRAYER FOR RELIEF

WHEREFORE, the HUNT VALLEY BAPTIST CHURCH, INC. respectfully requests that this Court grant the following relief:

1.    A declaration that the County of Baltimore's land use ordinances, to the extent that they substantially burden, unreasonably regulate, discriminate against the Church's land use, and fail to provide a reasonable opportunity to ascertain the standards that must be met to engage in religious land use, are void, invalid and unconstitutional on their face and as applied to the Church on the ground that they violate the Free Exercise Clause of the First Amendment to the United States Constitution and the Maryland Constitution, the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act;

2.    A declaration that the denial of the Church's land use application is void, invalid and unconstitutional on the ground that it violates the Free Exercise Clause of the First Amendment to the United States Constitution and the Maryland Constitution, the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act;

3.      An order reversing the decision of the Baltimore County Board of Appeals and an order declaring that the Church's application to use the Subject Property as a church is hereby approved;

4.      An order directing the Baltimore County Board of Appeals to reverse its denial of the special exception and grant the Church such special exception necessary to construct its church on the Property as applied for;

5.      An order preliminarily and permanently enjoining the Defendants, their officers, employees, agents, successors and all others acting in concert with them from applying their laws in a manner that violates the Free Exercise Clause of the First Amendment to the United States Constitution and the Maryland Constitution, the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act, or undertaking any and all action in furtherance of these acts, and specifically enjoining the Defendants to approve all plans and applications submitted by the Church in furtherance of its development of the Property without delay or unreasonable condition;

6.      An award of compensatory damages against Defendants in favor of the Church as the Court deems just for the loss of its rights under the First and Fourteenth Amendments to the United States Constitution, the Maryland Constitution, and the Religious Land Use and Institutionalized Persons Act incurred by the Church and caused by the Defendants' laws and actions;

7.      An award to the Church of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

8.      Such other and further relief as this Court may deem just and appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Respectfully submitted by the Plaintiff this 23th day of March, 2017.

STORZER & ASSOCIATES, P.C.

By: _____

Roman P. Storzer, Esq. 28285
Blair Lazarus Storzer, Esq. 18672
1025 Connecticut Avenue
Suite One Thousand
Washington, D.C. 20036
storzer@storzerlaw.com
bstorzer@storzerlaw.com
Tel: (202) 857-9766
Fax: (202) 315-3996


SMITH, GILDEA & SCHMIDT, LLC

By: _____

Lawrence E. Schmidt, Esq. 03274
600 Washington Avenue
Suite 200
Towson, Md. 21204
lschmidt@sgs-law.com
Tel: (410) 821-0070

*Attorneys for Plaintiff*