IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HUNT VALLEY BAPTIST
CHURCH, INC.,
    *Plaintiff*,

v.                                          Civil Action No. ELH-17-804

BALTIMORE COUNTY, MARYLAND,
et al.
    *Defendants*.

**AMENDED MEMORANDUM OPINION***

Plaintiff Hunt Valley Baptist Church ("HVBC" or the "Church") claims that it has been subjected to religious discrimination in connection with its zoning application for a "special exception" to construct a place of worship and related facilities on property located in Hunt Valley, Maryland. After the Board of Appeals of Baltimore County (the "Board") denied the Special Exception application, the Church filed suit in this Court against the Board and Baltimore County (the "County"), defendants.

The Complaint (ECF 1), which is 53 pages in length, contains eight counts, as follows:[1] violations of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc *et seq.* (Counts I, II, III); violation of the Free Exercise Clause of the First Amendment to the Constitution (Count IV); violation of the Equal Protection Clause (Count VI) and the Due Process Clause (Count VII) of the Fourteenth Amendment to the Constitution;

---

*The Court has made a correction to page 76. The original Order (ECF 17) remains unchanged.

[1] There is no "Count V" in the Complaint. *See* ECF 1 at 47. I shall cite to the pagination as it appears on CM/ECF. In some instances, the electronic pagination may not align with the page numbers that appear on the documents. For convenience, I will sometimes refer to the defendants collectively as the "County."

violation of Article 36 of the Maryland Declaration of Rights (Count VIII); and judicial review of the "Majority Opinion and Order of the Board of Appeals for Baltimore County, dated February 22, 2017, for the matter of Hunt Valley Baptist Church, Inc. Petition for Special Hearing and Special Exception . . . ." (Count IX). The federal constitutional claims are lodged pursuant to 42 U.S.C. § 1983.

The suit contains multiple prayers for relief (ECF 1 at 51-52), including:

1) A Declaration that the County's land use ordinances are unconstitutional on their face and as applied, because they violate the Free Exercise Cause of the First Amendment, the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment, and RLUIPA. ECF 1 at 51, ¶ 1.

2) A Declaration that the denial of the Church's land use application is unconstitutional. *Id.* ¶ 2.

3) An order reversing the Board and approving the Church's application. *Id.* at 52, ¶ 3.

4) An order directing the Board to reverse the denial of the special exception and to grant it. *Id.* ¶ 4.

5) An order enjoining defendant from violating plaintiff's rights. *Id.* ¶ 5.

6) Compensatory damages in an unspecified sum. *Id.* ¶ 6.; and

7) Attorneys' fees. *Id.* ¶ 7.

Defendants have moved to dismiss for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment, pursuant to Rule 56. ECF 8. The motion is supported by a memorandum of law (ECF 8-1) (collectively, "Motion") and the administrative

record of the zoning case. ECF 8-2. Plaintiff opposes the Motion (ECF 11, "Opposition"), with exhibits. ECF 11-1 thorough ECF 11-3. Defendants have replied. ECF 13 ("Reply").

Pursuant to Fed. R. Civ. P. 21, defendants have also moved "to drop" the Board as a defendant with respect to Counts IV, VI, VII, VIII, and IX (ECF 9), supported by a memorandum of law. ECF 9-1 (collectively, "Motion to Drop"). Plaintiff opposes the Motion to Drop. ECF 10. Defendants did not reply, and the time to do so has expired. *See* Local Rule 105.2(a).

The Court held a motions hearing on October 6, 2017, at which arguments were presented by counsel for the parties. For the reasons that follow, I shall grant the motions in part and deny them in part.

## I. Factual and Procedural Background[2]

### A.

Hunt Valley Baptist Church is an independent Baptist church that was established in 2004. ECF 1, ¶ 10. The Church is one of two independent Baptist churches located in Northern Baltimore County (*id.* ¶ 12), and most of its congregants reside in Baltimore County. *Id.* ¶ 11. The Church was "founded for the purpose of establishing and maintaining religious worship, evangelizing to the unsaved by proclaiming the Gospel of the Lord Jesus Christ, the educating of believers in a manner consistent with the requirements of Holy Scripture, establishing and maintaining a ministry to help reform those with harmful addictions, and maintaining missionary activities . . . ." *Id.* ¶ 14. Further, the Church "believes that it has a religious obligation to evangelize to nonbelievers so that they may be saved, which is encompassed in its mission to

---

[2] Given the procedural posture of this litigation, I must assume the truth of the allegations in the Complaint.

support 'a great commission to proclaim the Gospel to all nations' including its local community and supporting missionaries abroad." ECF 1, ¶ 16.

Initially, HVBC held services in a storefront located in a commercial shopping center in Timonium, Maryland. *Id.* ¶ 67. In 2008, the Church "began looking for a more permanent home." *Id.* ¶ 68. The Senior Pastor knew of the site located at 821 Shawan Road in Cockeysville, Maryland (the "Property"). *Id.* ¶ 69. However, the Property was not for sale in 2008. *Id.* ¶ 71.

In 2009, the Church moved to its current location at 1800 Worthington Heights Parkway in Cockeysville, Maryland (*id.* ¶¶ 18, 76), which is about three miles from the Property. *Id.* ¶ 77. According to the Church, its present location "does not permit it to adequately engage in its religious exercise." *Id.* ¶ 19. For example, to access the Church, congregants must drive for two miles along "a dark, unlit and winding local road" (*id.* ¶ 21), which is "dangerous at night." *Id.* ¶ 22. Furthermore, the current location is difficult to find (*id.* ¶ 24), as the building is only visible to people in the immediate area. *Id.* ¶ 23. Moreover, the Church cannot "proclaim anything to those who cannot find it." *Id.* ¶ 32.

HVBC also insists that its current facilities are inadequate because the building can no longer accommodate the size of the congregation and visitors. *Id.* ¶ 20. It explains that the current facility has seating for 350 people (*id.* ¶ 40), but up to 500 individuals attempt to attend religious services. *Id.* ¶ 41. And, the Church has only 84 parking spots, which is inadequate to meet its needs (*id.* ¶¶ 42-43), particularly during days of high attendance, such as Christmas and for Church events. *Id.* ¶ 52. The Church also hosts approximately 100 children for one week each summer for "Vacation Bible School." *Id.* ¶¶ 60-61. The Vacation Bible School uses the

Church's gymnasium and all of its existing classroom space (*id.* ¶ 61) but, because of limitations on space, the Church has to turn away participants. *Id.* ¶ 62.

In 2012, the owner of the Property agreed to sell his land to the Church for $900,000. ECF 1 ¶ 83; ECF 8-1 at 12. The Property is 16.6 acres in size and is improved with two single-family dwellings. ECF 1, ¶ 86.[3] Baltimore County had approved a subdivision application for the Property in 2012. ECF 1, ¶¶ 110-113; *see also* ECF 8-1 at 11-12; ECF 13 at 12.

The Property is bordered to the north by Shawan Road, a "busy" two lane road, which carries approximately 21,161 cars per day. ECF 1, ¶¶ 89, 90. Interstate 83 is about a quarter-mile to the east of the Property (*id.*¶ 89; ECF 11 at 5) and is also close to the Hunt Valley Town Center, Hunt Valley Industrial Park, and two hotels. ECF 1, ¶¶ 95-98. Located immediately north of the Property is the Hayfields Country Club ("Hayfields"), which has an 18-hole golf course, a clubhouse, banquet facilities and other amenities, as well as residential homes, located on 475 acres. *Id.* ¶ 99. Immediately to the West of the Property is the St. Mary Antiochian Orthodox Church ("St. Mary's"), a 3.96-acre property that contains a 16,000-square foot house of worship with 79 parking spaces. *Id.* ¶ 105. Also nearby are the University of Maryland Extension (*id.* ¶ 104), the Catholic Community of St. Francis Xavier (*id.*), the Oregon Ridge Dinner Theatre (*id.* ¶ 106), and Oregon Ridge Park, with a paved lot and an outdoor pavilion for festivals and events. *Id.* ¶ 107.

Notably, the Property is situated in a watershed resource conservation area and is zoned R.C.4. *Id.* ¶ 87.[4] However, "[u]nlike other RC-4 zoned areas of Baltimore County the

---

[3] Defendants claim the Property is improved by "a farm house and a tenant building." ECF 8-1 at 11.

[4] The Church identifies the zone as "RC-4." *See*, *e.g.*, ECF 1, ¶ 87. I shall use the designation that appears in the zoning regulations.

immediate area around the [P]roperty is not rural in nature. There are a significant number of commercial, institutional and governmental use properties surrounding the Subject Property." *Id.* And, unlike many intersections in R.C.4. zoned areas, an intersection close to the Property "was recently improved and enlarged to accommodate the increasing volume of traffic (*id.* ¶ 91), and the intersection is "signalized, providing further traffic control and safety." *Id.* ¶ 92.

According to the Church, "God led them to the Subject Property" and "the Church is meant to be located there." ECF 1, ¶ 84. The Church's Senior Pastor regards the Property as "well situated for the Church's use, since it was on a major road, was large enough to accommodate the Church's ongoing growth and need for expanded facilities, was next door to another church, and was in close proximity to Interstate 83 and other existing development." *Id.* ¶ 70. In addition, the Church claims that the location of the Property is optimal because "it is visible to the community and would permit the Church to evangelize as it believes that it must, is central to where its members live and can accommodate their worship needs, and is of sufficient size to allow for the construction of their house of worship and related parking capacity." *Id.* ¶ 85. And, most of the Church's congregants pass the Property on their way to the Church's current location. *Id.* ¶ 80.

**B.**

Maryland "delegates to local political subdivisions significant authority to regulate land use.[1]" *County Council of Prince George's Co. v. Zimmer Dev. Co.*, 444 Md. 490, 503, 120 A.3d 677, 685 (2015). And, local governments "are limited to the powers granted to them by the State." *Id.* at 504, 120 A.3d at 685.

Baltimore County has enacted various planning and zoning laws, pursuant to its status as a charter home rule county. *Security Mgmt. Corp. v. Baltimore County, Md.*, 104 Md. App. 234,

236, 655 A.2d 1326, 1327 (1995) (Wilner, C.J.); *see* Balt. Cnty. Charter ("County Charter"), Art. I; Md. Const. Art. XI-A; Article 25A of the Annotated Code of Maryland. Every four years, the County conducts a comprehensive review of its zoning plan. *See* Balt. Cnty. Code ("County Code"), § 32-4-261. In addition to the quadrennial rezoning process, the County Code allows individual landowners to petition the Board for reclassification of their properties. *Security Mgmt.*, 104 Md. App. at 237, 655 A.2d at 1327; *see* County Code, § 32-3-503. The Board is authorized by Md. Code (2013 Repl. Vol., 2016 Supp.), § 10-305 of the Local Government Article ("L.G.") and County Charter, Art. VI; *see also* Md. Code (2012), § 4-301 *et seq.* of the Land Use Article ("L.U.").[5]

In 1976, the County Council established four resource conservation zones. *Security Mgmt.*, 104 Md. App. at 237, 655 A.2d at 1327. These zones were created because the County Council "found" that

> development in the rural areas of the county had been taking place at an increasing rate and without the framework of a land use plan or other planning components; that, as a result, the development "has formed very undesirable land use patterns," that a significant amount of "urban sprawl" was occurring along highways in the rural areas as tracts immediately fronting along the highways were "lotted off;" and that such development was detrimental in a number of respects, including the loss of "critical watershed areas."

*Id.*; *see also* Baltimore County Zoning Regulations ("BCZR"), §1A00.1.

The BCZR now lists nine resource conservation zones. *See* BCZR §§ 1A01-1A09.

Section 1A00.2 of the BCZR provides that the purpose of the resource conservation zones is to:

A. Discourage present land use patterns of development and to create a framework for planned or orderly development;

B. Provide sufficient and adequate areas for rural-suburban and related development in selected and suitable areas;

---

[5] The Land Use Article applies on a limited basis to charter counties. *See* L.U. § 1-401; L.U. § 1-101(c).

C.  Protect both natural and man-made resources from compromising effects of specific forms and densities of development;

D.  Protect areas desirable for more intensive future development by regulating undesirable forms of development within these areas until such time as intensive development commences.

E.  Help achieve the goals of the Chesapeake Bay Critical Area Protection Law[] by enacting land use policies to control development within the Critical Area by conserving the land and water resource base for agriculture, forestry and other natural resource uses; minimizing adverse effects on water quality; and conserving fish, wildlife and plant habitat.

As indicated, the Property is located in the R.C.4. zone (ECF 1, ¶ 125), which is the "Watershed Protection" zone.  *Security Mgmt.*, 104 Md. App. at 237, 655 A.2d at 1327.  The County Council's findings and legislative policy for the R.C.4. zone are set forth in BCZR § 1A03.1:

> The County Council finds that major, high-quality sources of water supply for the entire Baltimore Metropolitan Area and for other neighboring jurisdictions lie within Baltimore County and that continuing development in the critical watersheds of those water supply sources is causing increased pollution and sedimentation in the impoundments, resulting in increasing water treatment costs and decreasing water storage capacity. The R.C.4 zoning classification and its regulations are established to provide for the protection of the water supplies of metropolitan Baltimore and neighboring jurisdictions by preventing contamination through unsuitable types or levels of development in their watersheds.

Notably, in *Security Mgmt.*, 104 Md. App. at 241, 655 A.2d at 1329, the Maryland Court of Special Appeals rejected "as absurd the contention that the creation of an RC-4 zone . . . and the inclusion within it of property in an important metropolitan watershed do not substantially advance a legitimate State interest."  The court added, *id.* at 242, 655 A.2d at 1329:  "Whether, to achieve that purpose and protect that interest, particular land in a watershed should remain free from intensive development is quintessentially a legislative judgment call."

In enacting the BCZR, the County Council made a legislative determination that certain types of uses are permitted as of right in an R.C.4. zone. Under BCZR § 1A03.3(A) (citations omitted), they are as follows:

1. Dwellings, one-family detached [with a minimum lot size generally ranging from three to six acres per house[6]].

2. Farms and limited-acreage wholesale flower farms (Section 404).

3. Open space, common.

4. Public schools.

5. Telephone, telegraph, electrical-power or other similar lines or cables, all underground; underground gas, water or sewer mains or storm drains; other underground conduits, except underground interstate and intercontinental pipelines.

6. Trailers or mobile homes, provided that any trailer or mobile home allowed under this provision must be used or stored in accordance with the provisions of Subsection B, C, E or F of Section 415.1 and Section 415.2.A.1, as applicable.

7. Antennas used by CATV systems operated by companies franchised under Article 25 of the Baltimore County Code, if situated on property owned by the county, state or federal government or by a governmental agency.

8. Transit facilities.

9. Accessory uses or structures, including, but not limited to the following:

   a. Excavations, uncontrolled.

   b. Farmer's roadside stand and produce stand, subject to the provisions of Section 404.4.

   c. Home occupations.

   d. Offices or studios of physicians, dentists, lawyers, architects, engineers, artists, musicians or other professional persons, provided that any such office or studio is established within the same building as that serving as the professional person's primary residence at the time of application; does

---

[6] *See* BCZR § 1A03.4(B).

-9-

not occupy more than 25% of the total floor area of that residence; and does not involve the employment of more than one nonresident employee.

    e.    Parking spaces, including recreational vehicles, subject to the provisions of Section 415A.

    f.    Swimming pools, tennis courts, garages, utility sheds, satellite receiving dishes (subject to Section 429) or other accessory structures or uses (subject to the height and area provisions for buildings as set forth in Section 400).

    g.    Signs, subject to Section 450.

10. Commercial film production, subject to Section 435.

11. Farmstead creamery, subject to the provisions of Section 404.13.

In addition, the BCZR provides that other types of uses in the zone are permitted by special exception. BCZR § 1A03.3(B). These conditional uses include, among other things, churches; community buildings; swimming pools and other uses of a civic, social, recreational or educational nature; golf courses, country clubs, and other outdoor recreation clubs; and certain professional offices. *Id. See* L.U. § 1-101(p) (defining "special exception" and stating, *inter alia*, that it "means a grant of a specific use that: 1) would not be appropriate generally or without restriction. . . .").

The case of *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981), is the seminal case in Maryland concerning special exceptions, sometimes called conditional uses. There, the Maryland Court of Appeals explained, *id.* at 11, 432 A.2d at 1325 (emphasis added):

The special exception use is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible *absent any fact or circumstance negating the presumption.*

*Accord Attar v. DMS Tollgate, LLC*, 451 Md. 272, 285, 152 A.3d 765, 772 (2017) (stating that a special exception is "presumed to be in the interest of the general welfare, and therefore a special exception enjoys a presumption of validity"); *Hayfields, Inc. v. Valleys Planning Council, Inc.*, 122 Md. App. 616, 638, 716 A.2d 311, 322 (1998) ("Within any given zoning classification, the BCZR prescribes two types of uses: certain uses are permitted as of right and others are conditionally permissible."); *see also 11126 Baltimore Blvd. v. Prince George's Cty., Md.*, 886 F.2d 1415, 1428 (4th Cir. 1989), *rev'd on other grounds*, 496 U.S. 901 (1990).

Of relevance here, the Maryland Court of Appeals explained in *People's Council for Baltimore County v. Loyola College in Maryland*, 406 Md. 54, 71, 956 A.2d 166, 176 (2008): "The special exception adds flexibility to a comprehensive legislative zoning scheme by serving as a 'middle ground' between permitted uses and prohibited uses in a particular zone . . . . A special exception . . . is merely deemed *prima facie* compatible in a given zone [and] requires a case-by-case evaluation . . . according to legislatively-defined standards." The presumption in favor of a conditional use derives from the legislative policy determination that such a use is permissible so long as certain conditions are satisfied. *Eastern Outdoor Advert. Co. v. Mayor & City Council of Baltimore*, 128 Md. App. 494, 525, 739 A.2d 854, 870 (1999). On the other hand, if a request for a special exception will create an adverse effect upon the neighboring properties, the request must be denied. *See, e.g.*, *Halle Companies v. Crofton Civic Ass'n*, 339 Md. 131, 141, 661 A.2d 682, 686 (1995); *Board of County Comm'rs. v. Holbrook*, 314 Md. 210, 217, 550 A.2d 664, 668 (1988); *Moseman v. County Council*, 99 Md. App. 258, 264, 636 A.2d 499, 502, *cert. denied*, 335 Md. 229, 643 A.2d 383 (1994).

A special exception is in contrast to a variance. *See* L.U. §§ 1-101(s); 4-206. A variance is "'an authorization for [that] . . . which is prohibited by a zoning ordinance . . . .'" *Cromwell v.*

*Ward*, 102 Md. App. 691, 699, 651 A.2d 424 (1995) (citation omitted).  Generally, "the specific need for the variance 'must be substantial and urgent and not merely for the convenience of the applicant[.]'" *Chesley v. City of Annapolis*, 176 Md. App. 413, 432, 933 A.2d 475 (2007) (quoting *Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355 Md. 259, 276, 734 A.2d 227 (1999)).

As the Fourth Circuit recently said, "zoning 'is an inherently discretionary system.'" *Siena Corp. v. Mayor and City Council of Rockville, Md.*, ___ F.3d ___, 2017 WL 4557505, at *4 (4th Cir. Oct. 13, 2017) (citing *Gardner v. Baltimore Mayor & City Council*, 969 F.2d 63, 67 (4th Cir. 1992)).  In the context of the issuance of a building permit, the Court observed that the matter is "not perfunctory," and an application must "'fully comply'" with applicable ordinances and regulations.  *Siena Corp.*, 2017 WL 4557505, at *4 (citing *Evans v. Burruss*, 401 Md. 586, 605, 933 A.2d 872, 883 (2007)).

So too with a special exception.  Despite the presumption in favor of a special exception, "'both the burden of production and the burden of persuasion on the issue of whether the special exception should be granted []' fall on the applicant . . . ." *Attar*, 451 Md. at 286, 152 A.3d at 774 (quoting *People's Counsel for Baltimore Cnty. v. Loyola Coll. in Maryland*, 406 Md. 54, 109, 956 A.2d 166, 199 (2008)) (alteration in *Attar*).  The applicant "must persuade the Board 'by a preponderance of the evidence that the special exception will conform to all applicable requirements.'"  *Attar*, 451 Md. at 286, 152 A.3d at 773.

In Baltimore County, a petition for special exception is governed by BCZR §§ 500.5 and 502.  Section 500.5 provides that a petition for a special exception must be submitted to the Zoning Commissioner, who must "hold a public hearing thereon after giving public notice of such hearing as above provided with respect to petitions for reclassification. After such a hearing

[the Zoning Commissioner] shall pass his order granting or refusing such special exception." *Id.* Moreover, Section 502.1 specifies particular conditions that must be satisfied to obtain a special exception, as follows:

> Before any special exception may be granted, it must appear that the use for which the special exception is requested will not:
>
> A. Be detrimental to the health, safety or general welfare of the locality involved;
>
> B. Tend to create congestion in roads, streets or alleys therein;
>
> C. Create a potential hazard from fire, panic or other danger;
>
> D. Tend to overcrowd land and cause undue concentration of population;
>
> E. Interfere with adequate provisions for schools, parks, water, sewerage, transportation or other public requirements, conveniences or improvements;
>
> F. Interfere with adequate light and air;
>
> G. Be inconsistent with the purposes of the property's zoning classification nor in any other way inconsistent with the spirit and intent of these Zoning Regulations;
>
> H. Be inconsistent with the impermeable surface and vegetative retention provisions of these Zoning Regulations; nor
>
> I. Be detrimental to the environmental and natural resources of the site and vicinity including forests, streams, wetlands, aquifers and floodplains in an R.C.2, R.C.4, R.C.5 or R.C.7 Zone.

Notably, the Zoning Commissioner or the Board, on appeal, may impose conditions protecting surrounding properties. Section 502.2 of the BCZR states:

> In granting any special exception, the Zoning Commissioner or the Board of Appeals, upon appeal, shall impose such conditions, restrictions or regulations as may be deemed necessary or advisable for the protection of surrounding and neighboring properties. The owners, lessees or tenants of the property for which a special exception is granted, if required by the Zoning Commissioner, or Board of Appeals, upon appeal, shall enter into an agreement in writing with said Zoning Commissioner and/or the County Commissioners of Baltimore County,[] stipulating the conditions, restrictions or regulations governing such special exception, the same to be recorded among the land records of Baltimore

County. The cost of such agreement and the cost of recording thereof shall be borne by the party requesting such special exception. When so recorded, said agreement shall govern the exercise of the special exception as granted, as to such property, by any person, firm or corporation, regardless of subsequent sale, lease, assignment or other transfer.

An appeal from the decision of the Zoning Commissioner is heard by the Board. County Code § 32-3-401(a) ("A person aggrieved or feeling aggrieved by a decision of the Zoning Commissioner . . . may appeal the decision or order to the Board of Appeals."). The Board consists of seven members who are appointed by the County Council. County Charter § 601. Under L.G. § 10-305(b)(1), the Board has "original jurisdiction," *inter alia*, to consider a zoning "variation or exception . . . ."

Under the County Charter, the Board must provide notice and the opportunity for a hearing prior to making a zoning decision. County Charter § 603. And, the Board's hearings are held *de novo*. *Id*. Thereafter, a party who is dissatisfied with the Board's decision may appeal to the Circuit Court for Baltimore County, which has authority "to affirm the decision of the board, or, if such decision is not in accordance with law, to modify or reverse such decision, with or without remanding the case for rehearing, as justice may require." *Id*. § 604; L.G. § 10-305(d); *see* L.U. § 4-401. And, a litigant may seek further appellate review in the Maryland Court of Special Appeals and, thereafter, certiorari to the Maryland Court of Appeals. *See* Md. Code (2013 Repl. Vol., 2016 Supp.), Courts and Judicial Proceedings Article ("C.J."), § 12-308 (Court of Special Appeals); C.J. § 12-201 (Court of Appeals).

## C.

On or about March 18, 2014, the Church filed a Petition for Special Hearing and Special Exception ("Petition") with the County Office of Administrative Law.[7]  *See* ECF 8-2 at 9-11 (Petition).[8]  In the Petition, the Church stated that it was seeking a special exception to "permit the property to be used as a church pursuant to BCZR § 1A03.3.B.4," and it sought five years in which to utilize the exception.  *Id.* at 10.  According to the Church, the Petition proposed "the construction of a 31,500-square foot sanctuary building" (ECF 1, ¶ 162), which would afford seating for 1,000 people, classrooms for religious education, a nursery area, a warming kitchen, and offices for staff.  *Id.* ¶ 165.  In addition, the Church sought to construct a "fellowship hall", which would serve as a gymnasium.  *Id.* ¶ 166.  In a comment dated May 30, 2014, the County Department of Planning "provided several recommended conditions, and . . . opined that if those conditions were satisfied the use would not be detrimental to the community."  ECF 8-2 at 13-14 (Opinion of County Administrative Law Judge, dated Jan. 5, 2015).

---

[7] In its Complaint, the Church states that it filed the Petition in or about September 2014. ECF 1, ¶ 159.  However, it appears that the Petition is dated March 18, 2014.  *See* ECF 8-2 at 9.

[8] "[A] court may properly take judicial notice of 'matters of public record' and other information that, under Fed. R. Evid. 201, constitute 'adjudicative facts.'"  *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  Pursuant to Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

And, a court may take judicial notice of publicly available records without converting a motion to dismiss to a motion for summary judgment.  *See, e.g. Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) ("[C]ourts are permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment.").

The Zoning Hearing was conducted by an Administrative Law Judge ("ALJ") in the County's Office of Administrative Law.  *See* ECF 8-2 at 9.  Four hearings were held between October 15, 2014, and November 21, 2014.  ECF 1, ¶ 176.  Five witnesses testified in support of the special exception, four of whom were expert witnesses.  *Id.* ¶¶ 177, 179; *see also* ECF 8-2 at 14.  Community members opposed to the special exception (the "Protestants") participated at the hearings, submitting an exhibit and cross-examining the Church's witnesses.  ECF 8-2 at 16-17.  But, the Protestants did not present any expert testimony or other witnesses.  *Id*. at 17.

In an Opinion and Order dated January 5, 2015, the ALJ approved the special exception.  ECF 8-2 at 13-20.  The ALJ noted that the Protestants had not produced "any expert testimony, documents or other evidence in their case."  *Id.* at 18.  He stated: "[G]iven the presumption under Maryland law, and the testimony of the [Church's] experts, I find the special exception requirements have been satisfied and the petition will be granted."  *Id.* at 19.  However, the ALJ reduced the time for construction from five years to three years.  *Id.*

On or about January 29, 2015, Valleys Planning Council, Inc. ("Council") noted an appeal to the Board  from the ALJ's decision.  ECF 8-2 at 22 (Notice of Appeal).[9]  The Board held public hearings over seven non-consecutive days that spanned a period of nearly one year, beginning in May 2015 and concluding in April 2016.  ECF 1, ¶ 184; ECF 8-2 at 8 (Board docket sheet).  A total of thirty-four witnesses testified at the hearings, twenty-seven of whom were called by the Protestants, including seven expert witnesses.  ECF 1, ¶ 185.

---

[9] On its website, the Council describes itself as a 501(c)(3) non-profit membership organization established to "conserve land and resources, preserve historic character and maintain the rural feel and land uses in the valleys."  *Valleys Planning Council*, About, *available at*: http://www.thevpc.org/about-the-vpc/ (last accessed, Sept. 5, 2017).

According to the Church, counsel for the Protestants asked improper questions concerning the Church's religious philosophy and financial position. ECF 1, ¶¶ 187-188. The Church also claims that witnesses testified as to a variety of inappropriate and irrelevant topics, including the Church's religious practices. *Id.* ¶¶ 189-192. In addition, the Protestants campaigned against the Petition in the community, which included creating a community Facebook group called "Save Shawan" (*id.* ¶ 193), establishing a Twitter account with the handle "@SaveShawan" (*id.* ¶ 194), and circulating an online petition opposing the project. *Id.* ¶ 197. In the Church's view, community opposition to the Church's Petition "was substantially motivated by hostility and animus toward the Church and its religious character, practices and denomination." *Id.* ¶ 198.

On February 22, 2017, some ten months after the Board's final hearing, the Board issued a fourteen-page Opinion and Order reversing the ALJ by a vote of 2-1. ECF 8-2 at 131-144 ("Opinion").[10] In its Opinion, the Board reviewed the nine factors outlined in BCZR § 502.1. It determined that the Church's proposal would not: be detrimental to the health, safety or general welfare of the locality involved (*id.* at 135-136); tend to create congestion in roads, streets or alleys therein (*id.* at 136-137); create a potential hazard from fire, panic or other danger (*id.* at 137); tend to overcrowd land and cause undue concentration of population (*id.* at 137-138); interfere with adequate provisions for schools, parks, water, sewerage, transportation or other public requirements, conveniences or improvements (*id.* at 138); interfere with adequate light and air (*id.* at 139); or otherwise be detrimental to the environmental and natural resources of the site and vicinity. *Id.* at 143.

---

[10] Defendants assert that the Board held public deliberations on July 7, 2016. ECF 8-1 at 19.

Nevertheless, the Board determined that the Church's proposal would "have an adverse effect in relation to the spirit and intent of the zoning regulations 'above and beyond' that which is inherently associated with churches . . . ." ECF 8-2 at 140. The Board majority said, *id.* at 138-140 (emphasis added):

> HVBC seeks a special exception under Section 1A03.3.B.4 of the BCZR to use the Property as a church or other building for religious worship. Although not specifically defined in Section 101.1 of the BCZR, Webster defines "church" as "a building for public and especially Christian worship."[ ] *The project proposed by HVBC is, however, more than just a building for Christian worship. A substantial portion of HVBC's proposed building includes a gymnasium with a basketball court and a fellowship hall. Even under the most liberal definition, it cannot seriously be contended that a gymnasium with a basketball court qualifies as a building for Christian worship* and is not the type of use that the County Council approved for the R.C.4 zone by special exception.
>
> HVBC expressly acknowledges the fact that its proposed gymnasium/ fellowship hall serves a qualitatively different purpose than that of a "church" since HVBC has planned to construct its proposed facility on the Property in two phases. The first phase of construction would include a sanctuary, classrooms, and offices, while the second phase would add the gymnasium and fellowship hall. In his testimony, Pastor Rodriguez admitted that the second phase is not critical to the operation of the church:
>
> > MR. MCCANN: Why the two phases?
> >
> > PASTOR RODRIGUEZ: Again, just prudence and we want to make sure that obviously the, the main core, the main function of the church is the sanctuary and the classrooms to support the Sunday School, that's the primary purpose, that's the main focus of the operation of the church and the fellowship hall and the gymnasium is, is not critical for the operation of the church. So we could and intend to phase that because it's not, it's not critical to the operation.
>
> (*See* Transcript, May, 6, 2015, at 90-91).
>
> Because (a) HVBC seeks a special exception to use the Property as a church under BCZR § 1A03.3.B.4 and (b) *the planned use of the Property presented to the Board includes more than just a church, the majority of the Board concludes that HVBC's proposal is inconsistent with the spirit and intent of the BCZR. The particular use of the Property proposed by HVBC, including a gymnasium, would thus have an adverse effect in relation to the spirit and intent*

*of the zoning regulations "above and beyond" that which is inherently associated with churches* and other buildings of religious worship in other locations in the County within the R.C.4 zone . . . . For this reason, HVBC's Petition for Special Exception must be denied.

In addition, the majority determined that the proposed parking lot did not conform with the standards in the 2000 Maryland Storm Water Design Manual, which was prepared for the Maryland Department of the Environment, and that the lot was not consistent with the impermeable surface requirements of the BCZR. *Id.* at 140-143. The majority explained, *id.* (emphasis added):

> Section 1A03.4.B.3 of the BCZR provides, in relevant part, that "no more than 10% of any lot in an R.C.4 Zone may be covered by impermeable surfaces (such as structures or pavement)." To meet the requirements of Section 1A03.4.B.3, HVBC's proposal includes the construction of a parking lot with porous material that will allow for the absorption of water. Whether HVBC's proposed porous pavement parking lot would allow for HVBC's proposed project to meet with the impermeable surface requirements of the BCZR comes down to a battle of expert witnesses - namely, Ken Wells on behalf of HVBC and Dan O'Leary on behalf of the Protestants.
>
> Dan O'Leary was accepted by the Board as an expert in stormwater management, water resources, and as a professional engineer. Mr. O'Leary explained in his testimony that the efficacy of a pervious pavement parking lot, like the one proposed by HVBC, depends on the characteristics of the soil below the pavement.
>
> *         *         *
>
> Because of the numerous indications of predominantly clay soils on the Property, and because clay soils have infiltration rates below the minimum threshold of 0.52 inches per hour, Mr. O'Leary concluded that porous pavements are not "the right application for this site." (*See* Prot. Ex. 62 at D.13.2 and Transcript, November 17, 2015, at 83).
>
> Ken Wells is a professional land surveyor and is certified to devise and submit storm water management plans. Mr. Wells opined that the Property was suitable for the installation of a porous paving parking lot and that soils thereon would satisfy the minimum infiltration requirements set forth above. In his testimony, Mr. Wells testified that the soil borings included on Protestants' Exhibit 67, taken from the Property in 2008, indicate an average infiltration rate

of 3.63 inches per hour – significantly more than the minimum 0.52 inches per hour infiltration rate required by the Manual. (*See* Pet. Ex. 31).

> *The Board views this issue as a close call, particularly at this stage of the proceedings. That said, the Board finds most persuasive the testimony of Mr. O'Leary based on his many years of experience as an engineer in the areas of stormwater management and water resources.* Considering the Custom Soil Resource Report completed by Mr. O'Leary, along with the other exhibits introduced by the Protestants demonstrating the predominant presence of clay in the soil throughout the Property, and not just in an isolated area, *the Board concludes that the porous paving parking lot proposed by HVBC would not be suitable under the standards set forth in the Manual. Without a porous parking lot, HVBC's proposal does not meet the impermeable surface requirements of BCZR § 1A03.4.B.3.* For this additional reason, the majority of the Board concludes that HVBC's Petition for Special Exception must be denied.

In his Dissent (ECF 8-2 at 145-149), Board member Andrew Belt disagreed with the majority's determination that the Church's entire proposal is irreparably inconsistent with the Property's zoning classification and that the proposed parking lot does not meet the impermeable surface requirements of BCZR § 1A03.4.B.3. *Id.* With respect to the sufficiency of the parking lot design, Belt said, in pertinent part, ECF 8-2 at 147-148 (emphasis added):

> As noted by the Majority Opinion, the Board views this issue as a close call, however, the Minority has to make the call the other way. While Mr. O'Leary's testimony provided interesting details regarding the nature of the soil, the overall effect on the efficiency of the porous pavement seemed too speculative. Consequently the Minority on the issue, finds the testimony of Mr. Wells to be more persuasive based on its practicality due to the fact that *what is being proposed has been already approved by the County and is in use for a property immediately next door.* Additionally, the Minority is inclined to take HVBC at its word that it will employ the necessary maintenance to insure that the porous pavement functions as designed. In short, the Minority dissents and finds that based on the testimony of Mr. Wells, HVBC's proposal is consistent with the impermeable surface and vegetative retention provisions of the BCZR.

However, Belt agreed with the majority that the Church's proposal exceeded the scope of a building for religious use. He said, ECF 8-2 at 148-49 (emphasis added):

> As was noted in the public deliberation on this matter, while undersigned generally concurs with the Board's decision as to whether HVBC's proposal is inconsistent with the purposes of the property's zoning classification or in any

way inconsistent with the spirit and intent of the zoning regulations, *the undersigned does believe that phase of 1 would pass muster as to this factor of review*.

HVBC seeks a special exception under Section 1A03.3.B.4 of the BCZR to use the Property as a church or other building for religious worship. *The undersigned concurs that the project proposed by HVBC is more than just a building for Christian worship*. It is clear that a large portion of HVBC's proposed building, particularly what they have delimitated at phase two of their project, includes a gymnasium with a basketball court and a fellowship hall. While the sanctuary, classrooms, and offices contemplated in phase one can be logically tied to the operation of the church, *a basketball court and fellowship hall are not*. Throughout the many days of testimony before the Board, much testimony was heard inferring that <u>no</u> church should be allowed on the property at issue, or if so, only a very small one. The undersigned is not persuaded by this testimony and does not believe that the R.C.4 Zone mandates such. Consequently, the undersigned does not conclude that alterations to the HVBC project would not make it acceptable to BCZR § 502.1. in the future.

The Church did not avail itself of the opportunity to appeal the Board's decision to the Circuit Court for Baltimore County. *See* ECF 8-1 at 26-28.

## II.    Motion to Drop

Defendants' Motion to Drop the Board as a defendant is predicated on Fed. R. Civ. P. 21. *See* ECF 9; ECF 9-1. Rule 21 provides, in pertinent part: "On motion or on its own, the court may at any time, on just terms, add or drop a party." The decision whether to grant or deny such a motion "lies in the discretion of the judge." C. Wright & A. Miller, FEDERAL PRACTICE & PROCEDURE (3d ed.) ("Wright & Miller"), § 1688 at 505.

Defendants claim that the Board should be dropped from the litigation only as to counts IV, VI, VII, VIII, and IX of the Complaint, but not as to the RLUIPA counts (counts I, II, III). Defendants argue that the Board "is not a legally cognizable entity," and therefore it is not "subject to suit in its own name." ECF 9-1 at 1. According to defendants, the Board is "one of a number of offices, departments, and agencies created under . . . the Baltimore County Charter", and Section 103 of the County Charter provides that all actions should be brought against the

County. *Id.* at 2. Defendants assert that they are not aware of any statute, other than RLUIPA, that confers independent legal capacity on the Board or other County offices, departments, or agencies. *Id.* However, the handful of cases cited by defendants to support their position are not entirely on point.

In its Opposition, the Church points out that county boards of appeals in Maryland have been successfully sued for violations of federal civil rights. ECF 10 at 6-7 (citing, *inter alia*, *O'Reilly v. Board of Appeals of Montgomery Cnty., Md.*, 942 F.2d 281 (4th Cir. 1991); *Moxley v. Town of Walkersville*, 601 F. Supp. 2d 648, 652-53 (D. Md. 2009); *Pathways Psychosocial v. Town of Leonardtown*, 223 F. Supp. 2d 699 (D. Md. 2002)). Plaintiff states that it "seeks specific injunctive and declaratory relief against the Board", including an order directing the Board to reverse its denial of the special exception and to grant the Church a special exception. ECF 10 at 7. Furthermore, plaintiff notes that, with respect to its count for judicial review, Maryland courts have permitted the Board to be named as a defendant. *Id.* at 9-10 (citing, *inter alia*, *Burke v. Bd. of Appeals for Baltimore Cnty.*, No. 1324 Sept. Term 2014, 2016 WL 4591531, at *1 (Md. Ct. Spec. App. Sept. 2, 2016)).

Under L.G. § 9-201(2), charter counties of Maryland, including Baltimore County, may "sue and be sued." Moreover, § 103 of the County Charter provides, in part: "The corporate name *shall* be 'Baltimore County, Maryland,' and it *shall* thus be designated in *all* actions and proceedings touching its rights, powers, properties, liabilities and duties." (Emphasis added). As indicated, the Board is established under Article VI of the County Charter.

In *Prince George's Cnty. v. Skillman*, 2017 WL 2981871 (Md. Ct. Spec. App. July 13, 2017) (unpublished), the court was presented with the question of whether the Prince George's County Department of Planning, Inspection, and Enforcement ("DPIE"), an agency created

under the Prince George's County Charter, was a suable entity separate from Prince George's County. *Id.* at *3-4. The *Skillman* Court reviewed the Prince George's County Charter, which has language nearly identical to § 103 of the Baltimore County Charter. *Id.* at *3.[11] Based on the language of the charter, the Maryland Court of Special Appeals said: "There is no separate legal entity known as the Prince George's County Department of Permitting, Inspection, and Enforcement. DPIE is an agency of the County. Indeed, the County Charter establishes DPIE and assigns its functions . . . ." *Id.* at *4.

However, the Board and its counterparts in other jurisdictions have been sued. For example, the Maryland Court of Special Appeals recently decided *Priester v. Bd. of Appeals of Baltimore Cnty.*, ___ Md. App. ___, ___ A.3d. ___, 2017 WL 3185675 (Md. Ct. Spec. App. July 27, 2017), in which the Board was a named party. *Id.* at *1. There is no indication that the County claimed that the Board was an improper party in that case, nor did the appellate court address the issue. *See also Burke*, *supra*, 2016 WL 4591531; *Riffin v. Bd. of Appeals of Baltimore Cnty.*, No. 2785, Sept. Term 2008, 2015 WL 5824032, at *1 (Md. Ct. Spec. App. July 9, 2015) (unpublished). Similarly, in *Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548 (4th Cir. 2013), the Montgomery County Council was named as a defendant, along with Montgomery County, Maryland, with respect to various constitutional and RLUIPA claims. The Court did not discuss the propriety of the Council as a defendant, presumably because the issue was not raised.

The Motion to Drop is a technical one, albeit an important one. Yet, as plaintiff's counsel acknowledged at oral argument, whether the Board remains as a named defendant is

---

[11] The Prince George's County Charter provides: "The corporate name shall be 'Prince George's County, Maryland,' and it shall thus be designated in all actions and proceedings touching its rights, powers, properties, liabilities, and duties." *Skillman*, 2017 WL 2981871, at *3 (quoting PRINCE GEORGE'S CNTY. CHARTER, § 103).

seemingly of no significant consequence. Notably, the creation of the Board is expressly authorized, in the first instance, by Maryland statute, *i.e.*, L.G. § 10-305. Therefore, at this juncture, I shall deny the Motion to Drop, without prejudice to defendant's right to renew their motion.

### III.    Standard of Review

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, ___ U.S. ____, 133 S. Ct. 1709 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide a defendant with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not

countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, ___ U.S. ____, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotations omitted).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011).  But, a court is not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).  "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

In general, courts do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999); *accord King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 533 F.3d 334, 336 (4th Cir. 2009); *see also Meridian Investments, Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 577 (4th Cir. 2017) ("A defendant's claim that an action is time-barred is an affirmative defense that it can raise in a motion to dismiss when the 'face of the complaint includes all necessary facts for the defense to prevail.'") (citation omitted). However, because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman* ).

Under limited exceptions, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). A court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits . . . ." *Goines*, 822 F.3d at 166 (citations omitted); *see U.S. ex rel. Oberg*, 745 F.3d at 136 (quoting *Philips v. Pitt Cty Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am.*

*Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id*.

As indicated, *supra* n.7, a court may consider matters of public record in resolving a motion made under Rule 12(b)(6). *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015). Here, the defendants submitted, without objection, documents comprising the

public record with respect to plaintiff's petition for special exception, which are integral to the Complaint. Accordingly, I may consider them under either Rule 12(b)(6) or Rule 56.

Defendants' motion is predicated on Rule 12(b)(6) or, in the alternative, under Rule 56(a). A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). As indicated, a court is ordinarily "not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. Cty of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. 2016) (per curiam). Where, as here, the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." Wright & Miller, § 1366. This discretion "should be exercised with great caution and attention to the parties' procedural rights . . . ." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action[]"

and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *Kolon Industries*, 637 F.3d at 448-49; *see Putney v. Likin*, 656 Fed. Appx. 632, 638-640 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp.

2d 414, 420 (D. Md. 2006), *aff'd*, 266 Fed. Appx. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

Plaintiff contends that conversion to summary judgment is inappropriate because it has not had an opportunity for discovery. ECF 11 at 12. In support of its contention, the Church has submitted the Declaration of Sieglinde K. Rath, Esq., under Rule 56(d). *See* ECF 11-1. Ms. Rath, who is co-counsel, avers, in part, *id.*, ¶ 8:

8. Some of the areas of inquiry for discovery to be conducted by the Plaintiff will include:

a. The asserted governmental interests of the Defendants supporting the challenged decision and/or Baltimore County Zoning Regulations ("B.C.Z.R.");

b. Any alternative means considered or available to the Defendants to achieve such asserted governmental interests;

c. The existence, regulation and differential treatment of religious land uses within Baltimore County's jurisdiction;

d. The existence, regulation and differential treatment of assembly and institutional land uses within Baltimore County's jurisdiction;

e. The application of the B.C.Z.R. as applied to the Plaintiff and other religious and nonreligious assembly and institutional uses in Baltimore County;

f. Issues related to hostility toward Plaintiff and/or religious uses in Baltimore County;

g. Communications among or between Defendants and staff, other elected and/or appointed officials, and third parties concerning Plaintiffs application and use of its property in Baltimore County;

h. Criteria of the Special Exception Provisions of the B.C.Z.R. and their application to the Plaintiffs application;

i. The basis of the Baltimore County Board of Appeals' (the "Board") decision that the proposed church was found "inconsistent with the purposes of the property's zoning classification nor in any other way inconsistent with the spirit and intent" of the B.C.Z.R.;

j. The basis of the Baltimore County Board of Appeals' (the "Board") decision that the proposed church was found "inconsistent with the impermeable surface and vegetative retention provisions" of the B.C.Z.R.;

k. The basis of the County's preferential zoning treatment of "Public schools," "Transit facilities," and "Commercial film production," which are permitted by right in the RC-4 zone;

l. The targeted discrimination of the Plaintiff by Baltimore County officials through ordering removal of the sign directing parishioners to the property that had stood for 20 years; and

m. The disputed factual allegations in the Complaint.

Although it may not be necessary for plaintiff to explore each of its proposed discovery topics, I agree that plaintiff is entitled to conduct discovery relevant to its claims. A party "needs an 'adequate opportunity' to present its case and 'demonstrate a genuine issue of material fact.'" *Adams Housing, LLC*, 2016 WL 6958439, at *2. As the Fourth Circuit stated in *McCray*, 741 F.3d at 483, "[s]ummary judgment before discovery forces the non-moving party into a fencing match without a sword or mask." And, I note that in cases raising similar claims, discovery has been conducted. *See, e.g.*, *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 554 (4th Cir. 2013); *Moxley*, *supra*, 601 F. Supp. 2d at 669.

Accordingly, I decline to convert the Motion to one for summary judgment. Instead, I shall construe it as a motion to dismiss.

## IV.    Discussion

### A. *Burford* Abstention

The County asks the Court to abstain under the doctrine adopted by the Supreme Court in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). *See* ECF 8-1 at 23-26. In its view, the Complaint "involves a regulatory scheme concerning important matters of local concern, namely the Baltimore County Zoning Regulations." *Id.* at 25. The County also points out that there is a fair

and expeditious process by which plaintiff could have sought judicial review, including in the Circuit Court for Baltimore County. *Id.*

The Church insists that *Burford* abstention is inappropriate in a RLUIPA case. ECF 11 at 14-18; *id.* at 16 n.3. It points out that courts routinely hear matters involving land use challenges where an important federal right is implicated. *Id.* at 15-16. In addition, the Church argues that the case does not involve important issues of state sovereignty but rather involves "the determination of whether the Church's religious exercise is burdened, whether it was treated differently and worse than other religious and nonreligious institutions, whether churches can have fellowship halls or a parking lot that is the same as the church next door, and whether a land use board can exercise standardless discretion to prevent religious assembly and expression that is otherwise permitted by law." *Id.* at 15.[12]

Pursuant to *Burford*, 319 U.S. 315, a federal court may, in its discretion, use its equitable powers to abstain from consideration of cases over which it has jurisdiction in order to show "'proper regard for the rightful independence of state governments in carrying out their domestic policy.'" *Id.* at 318 (citation omitted). Because abstention is a threshold issue, I shall consider it before advancing to defendants' other contentions.

In *Burford*, Sun Oil Company challenged the validity of an order of the Texas Railroad Commission ("Commission") granting Burford a permit to drill four oil wells on land in east Texas. *Id.* at 317. The Supreme Court noted that the case was arguably an "'appeal' from the Commission." *Id.* Moreover, it observed that the order was "part of the general regulatory system devised for the conservation of oil and gas in Texas, an aspect of 'as thorny a problem as has challenged the ingenuity and wisdom of legislatures.'" *Id.* at 318.

---

[12] Defendants did not address abstention in their Reply. *See* ECF 13.

In view of the sophistication of the state administrative process, the Supreme Court determined: "Insofar as we have discretion to do so, we should leave these problems of Texas law to the State court where each may be handled as 'one more item in a continuous series of adjustments.'" *Id.* at 332. It concluded, *id.* at 333-34:

> The state provides a unified method for the formation of policy and determination of cases by the Commission and by the state courts. The judicial review of the Commission's decisions in the state courts is expeditious and adequate. Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts. On the other hand, if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal questions is fully preserved here. Cf. Matthews v. Rodgers, 284 U.S. 521. Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand.

The Court clarified its *Burford* decision in *New Orleans Pub. Serv., Inc. v. Council of Cty. of New Orleans*, 491 U.S. 350 (1989) ("*NOPSI*"). In *NOPSI*, an electrical utility brought suit challenging the decision of a local rate-making body concerning a proposed electricity rate increase. *Id.* at 352-53. The district court dismissed the case, finding, *inter alia*, that abstention was proper under *Burford*. *Id.* at 355-56, 357. The Fifth Circuit affirmed. *Id.* at 358.

The case was heard by the Supreme Court, which explained, *id.* at 361:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

Although the *NOPSI* Court recognized that *Burford* is "concerned with protecting complex state administrative processes from undue federal interference" (*id.* at 362), it explained that *Burford* "does not require abstention whenever there exists such a process, or even in all

cases where there is a 'potential for conflict' with state regulatory law or policy." *Id.* (citation omitted).  Because the facts in *NOPSI* did not "demand significant familiarity with, and will not disrupt state resolution of, distinctively local regulatory facts or policies", the Supreme Court determined that *Burford* abstention was not appropriate.  *Id.* at 364.

The Fourth Circuit has "applied *Burford* abstention to land use and zoning cases." *Pomponio v. Fauquier Cnty. Bd. of Supervisors*, 21 F.3d 1319, 1327 (4th Cir. 1994), *overruled in part on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728-31 (1996); *see Browning-Ferris, Inc. v. Baltimore County, Md.*, 774 F.2d 77 (4th Cir. 1985).  According to the Fourth Circuit, cases involving questions of state and local land use and zoning law are "classic example[s] of situations in which 'the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'"  *Pomponio*, 21 F.3d at 1327 (quoting *NOPSI*, 491 U.S. at 361); *see MLC Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 282 (4th Cir. 2008) ("[W]e have repeatedly indicated 'cases involving questions of state and local land use and zoning law are a classic example of situations' where *Burford* should apply . . . .") (quoting *Pomponio*, 21 F.3d at 1327); *see also Browning-Ferris, Inc.*, 774 F.2d at 79-80 (reiterating that state and local zoning and land use law is especially a local matter).

Further, the Fourth Circuit stated in *Pomponio*, 21 F.3d at 1327: "Over frequent objections and challenges and in practically every instance, we have held that, absent unusual circumstances, a district court should abstain under the *Burford* doctrine from exercising its jurisdiction in cases arising solely out of state or local zoning or land use law, despite attempts to disguise the issues as federal claims."  The Court noted that cases involving "unusual circumstances" had, to that point, included claims of religious prejudice, federal statutory

preemption, and First Amendment rights.  *Id.* at 1328.  *Cf. Siena Corp.*, 2017 WL 4557505, at *6

(recognizing that "displeasure with State democratic outcomes does not ordinarily rise to the

level of a federal constitutional violation").  The *Pomponio* Court ruled, 21 F.3d at 1328:

> We now make plain our decisions: In cases in which plaintiffs' federal
> claims stem solely from construction of state or local land use or zoning law, not
> involving the constitutional validity of the same and absent exceptional
> circumstances not present here, the district courts should abstain under
> the *Burford* doctrine to avoid interference with the State's or locality's land use
> policy.

However, other considerations require courts to proceed with caution before abstaining

from a case.  Notably, "when a federal court has jurisdiction, it also has a 'virtually unflagging

obligation . . . to exercise' that authority."  *Mata v. Lynch*, ___ U.S. ___, 135 S. Ct. 2150, 2156

(2015) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817

(1976)); *accord Washington Gas Light Co. v. Prince George's Cnty. Council*, 711 F.3d 412, 418

(4th Cir. 2013).  Thus, "[a]bstention from the exercise of federal jurisdiction is the exception, not

the rule."  *Colorado River*, 424 U.S. at 813; *accord United States v. South Carolina*, 720 F.3d

518, 526 (4th Cir. 2013).  Moreover, dismissal based on abstention is "appropriate only where

the relief sought is equitable."  *I-77 Properties, LLC v. Fairfield Cnty.*, 288 Fed. App'x 108, 110

(4th Cir. 2008) (per curiam) (citing *Quackenbush*, 517 U.S. at 728-31).  In other words, "[w]here

the plaintiff seeks damages, federal courts may not dismiss an action . . . ."  *I-77 Properties,
LLC*, 288 Fed. App'x at 110.

To be sure, there are aspects of this case that bear the hallmarks of a local zoning case,

appropriate for resolution by a Maryland State court.  Defendants understandably suggest that the

federal claims constitute an attempt to make an end run around the County's land use process.

*Cf. Siena Corp.*, 2017 WL 4557505, at *7 (rejecting an "invitation . . . to undertake an empirical

inquiry and in effect to redo the local zoning decision from the ground up").  However, the

defense has failed to cite a single case concluding that *Burford* abstention is appropriate in the context of a claim under RLUIPA. *See* ECF 8-1. Moreover, the Fourth Circuit has declined to abstain from cases involving a "valid claim of religious prejudice . . . ." *Pomponio*, 21 F.3d at 1328; *see also Reaching Hearts Intern., Inc. v. Prince George's Cnty.*, 584 F. Supp. 2d 766 (D. Md. 2008), *aff'd,* 368 Fed. App'x 370 (4th Cir. 2010) ("*Burford* abstention does not apply in this case because this action did not fall within the narrow exception of federal jurisdiction, but rather is squarely within the province of the federal courts because the complaint raises important issues of religious discrimination."); *Chase v. City of Portsmouth*, No. 2:05CV446, 2005 WL 3079065, at *3 (E.D. Va. Nov. 16, 2005) (stating, in the context of RLUIPA, that "[a]bstention is highly inappropriate in this case"); *Stuart Circle Par. v. Bd. of Zoning Appeals of City of Richmond, Va.*, 946 F. Supp. 1225, 1233 (E.D. Va. 1996) ("The mere fact that the Code section at issue here may be found to conflict with [RLUIPA] is no reason to abstain under *Burford* . . . .").

In addition, the Supreme Court's decision in *Quackenbush* dictates that the Court must decline abstention as to all counts concerning claims at law. *Quackenbush*, 517 U.S. at 730; *see also MLC Auto.*, 532 F.3d at 276, n.3 ("Because Leith's complaint requested damages under 42 U.S.C.A. § 1983 (West 2003), the district court correctly stayed the matter rather than dismissing it."). Rather, abstention would be available only as to claims for relief that are equitable in nature. *I-77 Properties, LLC*, 288 Fed. App'x at 110. Because plaintiff seeks damages as to all claims, other than Count IX (*see* ECF 1 at 52, ¶ 6), *Burford* abstention does not apply.

As I see it, abstention is inappropriate as to plaintiff's RLUIPA claims (Counts I-III). Similarly, abstention is inappropriate as to Counts IV, VI, and VII, because in those counts plaintiff seeks to vindicate important constitutional rights. However, I shall abstain from

consideration of Count IX of the Complaint, which seeks judicial review of the Board's decision. ECF 1, ¶¶ 338-52. Count IX is a seminal example of the kind of claim that the *Burford* Court instructed lower federal courts to avoid, so as to prevent disruption of a state's efforts to establish a coherent policy as to a matter of substantial public concern. *See NOPSI*, 491 U.S. at 361. Indeed, the Fourth Circuit has said that it could "conceive of few matters of public concern more substantial than zoning and land use laws." *Pomponio*, 21 F.3d at 1327. Therefore, I shall dismiss Count IX, without prejudice.[13]

## B. Exhaustion of Administrative Remedies

The County contends that dismissal is appropriate because plaintiff has failed to exhaust its administrative remedies. ECF 8-1 at 26-28. It argues that, with respect to zoning appeals, the Board's order "is final unless an appeal is taken to the Circuit Court for Baltimore County," pursuant to L.G. § 10-305(d) and County Charter § 604. *Id.* at 26-27. The County states: "Because the [Board] has primary and exclusive jurisdiction over zoning appeals, Plaintiffs were required to exhaust the above remedies." *Id.* at 27.

As to plaintiff's request for declaratory relief, the County posits that the Maryland Court of Appeals "has made it clear that where, as here, there is a special statutory remedy for a specific type of case and that remedy is intended to be exclusive and primary, a party may not circumvent those special statutory proceedings by a declaratory judgment action." *Id.* at 27-28

---

[13] Judicial review of the Board's ruling must be sought in the Circuit Court for Baltimore County, consistent with County Charter § 604 and L.G. 10-305. Section 604 of the County Charter provides that an appeal must be sought within 30 days of the decision of the Board. The Board issued its Opinion on February 22, 2017. Suit was initiated in federal court on March 23, 2017 (ECF 1), 29 days after the Board rendered its decision. ECF 1; ECF 8-2 at 144.

The County asserts that HVBC has waived its right to appeal to the Circuit Court for Baltimore County. *See* ECF 13 at 6. This Court expresses no opinion as to the question of whether the filing of the federal suit tolled the Church's appeal period.

(citing *Sprenger v. Pub. Serv. Comm'n*, 400 Md. 1, 24, 926 A.2d 238, 251 (2007)).  Because the Maryland General Assembly has granted jurisdiction to the Board with regard to zoning matters, the County maintains that the Church may not circumvent the statutory and administrative requirements by pursuing this case.  ECF 8-1 at 28.

According to the Church, it is "black letter law" that it need not exhaust administrative remedies to pursue its constitutional claims brought under 42 U.S.C. § 1983 and RLUIPA.  ECF 11 at 19; *see id.* at 18-22 (citing, *inter alia*, *Patsy v. Bd. of Regents of State of Florida*, 457 U.S. 496, 516 (1982); *Talbot v. Lucy Corr Nursing Home*, 118 F.3d 215, 218 (4th Cir. 1997); *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 191 (4th Cir. 1994); *Congregation Rabbinical Coll. Of Tartikov, Inc.*, 138 F. Supp. 3d 352, 447 (S.D.N.Y. 2015); *Sager v. Hous. Comm'n of Anne Arundel Cnty.*, 855 F. Supp. 2d 524, 551 (D. Md. 2012); *Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury*, Civ. No. 09-5195, 2012 WL 1392365, at *6-7 (E.D.N.Y. Apr. 23, 2012); *Eagle Cove Camp & Conf. Ctr. v. Town of Woodboro*, Civ. No. 10-00118, slip op. at 6-10 (W.D. Wisc. Mar. 24, 2011)).

In *Patsy*, the Supreme Court said, 457 U.S. at 516: "[W]e conclude that exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983."  *See also Porter v. Nussle*, 534 U.S. 516, 523 (2002) ("Ordinarily, plaintiffs pursuing civil rights claims under 42 U.S.C. § 1983 need not exhaust administrative remedies before filing suit in court."); *Talbot v*, 118 F.3d at 218 ("Since *Patsy*, the Supreme Court, this court, and other circuit courts of appeals have confirmed that, as a general rule, exhaustion of state administrative remedies is not required prior to bringing suit under § 1983.").

Nor is exhaustion required before pursuit of a claim under RLUIPA.  However, courts have determined that there must be some degree of finality before a RLUIPA claim is ripe for

review. *See Guatay Christian Fellowship v. Cty. of San Diego*, 670 F.3d 957, 979 (9th Cir. 2011) ("This circuit's district courts have likewise required finality (but not exhaustion of administrative remedies) . . . before finding RLUIPA claims ripe."); *see also Dilaura v. Ann Arbor Charter Twp.*, 30 Fed. App'x 501, 507 (6th Cir. 2002) ("[E]xhaustion of administrative remedies is not required for RLUIPA claims when brought as part of a § 1983 action."); *Diocese of Rockville Ctr.*, 2012 WL 1392365, at *7 ("The Diocese's failure to commence [a state court] proceeding to request review of the Resolution does not render its claims unripe for judicial review given that the administrative process, per se, had run its course.").

The Board, as the "initial decisionmaker," has ruled on the Church's application for special exception. Clearly, the Church could have appealed to the Circuit Court for Baltimore County. And, if the Church were dissatisfied with the outcome, it could have sought further judicial review in the Maryland appellate courts. *See* C.J. §§ 12-308, 12-201. The County zoning process certainly contemplates that process. But, it does not appear that Congress intended to create an exhaustion requirement as to RLUIPA. *See* 42 U.S.C. §§ 2000CC *et seq.* The Church was not required to exhaust the County or State appellate process before pursuing its federal constitutional claims under § 1983 or its statutory claim under RLUIPA.

### C. RLUIPA

As discussed, *infra*, the County contends that plaintiff has failed to state a claim under RLUIPA (Counts I, II, and III). ECF 8-1 at 21-23, 28-3. Before analyzing this contention, it is helpful to outline the purpose and history of RLUIPA.

### 1.

On July 27, 2000, RLUIPA passed both the House of Representatives and the Senate by unanimous consent, and it was signed into law by President Clinton on September 22, 2000, as

P.L. 106-274. *Taylor v. Cockrell*, No. CIV.A. H-00-2809, 2002 WL 34423557, at *4 n.3 (S.D. Tex. Sept. 25, 2002). Congress enacted RLUIPA "'in order to provide very broad protection for religious liberty.'" *Holt v. Hobbs*, ___ U.S. ___, 135 S. Ct. 853, 859 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, ___ U.S. ___, ___, 134 S.Ct. 2751, 2760 (2014)). Indeed, "Congress intended [to] do more than merely codify First Amendment jurisprudence." *Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548, 556 (4th Cir. 2013) ("*Bethel*"); *see also Madison v. Riter*, 355 F. 3d 310, 314-15 (4th Cir. 2003).

RLUIPA's origin can be traced to the Supreme Court's decisions concerning the Free Exercise Clause in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). *See Holt*, 135 S. Ct. at 859. In *Sherbert* and *Yoder*, the Supreme Court developed "a balancing test that took into account whether the challenged action imposed a substantial burden on the practice of religion, and if it did, whether it was needed to serve a compelling government interest." *Hobby Lobby*, 134 S. Ct. at 2760. However, in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990), the Supreme Court "rejected 'the balancing test set forth in *Sherbert*.'" *Burwell*, 134 S. Ct. at 2760 (citation omitted). In *Smith*, the Court ruled that, "under the First Amendment, 'neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest.'" *Id.* (quoting *Cty. of Boerne v. Flores*, 521 U.S. 507, 514 (1997)).

In response to the Supreme Court's ruling in *Smith*, Congress passed the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.* It provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least

restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb-1(a), (b); *see also Holt*, 135 S. Ct. at 860. "The Congressional findings accompanying RFRA specifically repudiated the Court's decision in *Smith*, *see* 42 U.S.C. § 2000bb(a)(4), with Congress stating that the purpose of RFRA was 'to restore the compelling interest test as set forth in *Sherbert v. Verner* and *Wisconsin v. Yoder* and to guarantee its application in all cases where free exercise of religion is substantially burdened.'" *DeHart v. Horn*, 390 F.3d 262, 274 (3d Cir. 2004) (quoting 42 U.S.C. § 2000bb(b)(1)).

Congress made RFRA applicable to states and localities using its power under Section 5 of the Fourteenth Amendment. *Cty. of Boerne*, 521 U.S. at 529. However, in *City of Boerne* the Supreme Court determined that Congress exceeded its power under Section 5 because, in its view, the statute was not remedial. *Id.* at 529-36. Thus, the Court determined that RFRA was unconstitutional as applied to state and local governments. *Holt*, 135 S. Ct. at 860. "Congress responded to *City of Boerne* by enacting RLUIPA, which applies to the States and their subdivisions and invokes congressional authority under the Spending and Commerce Clauses." *Id.* RLUIPA provides a narrower range of protection than RFRA, applying only in the context of land use and institutionalized persons, such as prisoners. *See* 42 U.S.C. § 2000cc *et seq.*

In considering RLUIPA and its predecessor, the Religious Liberty Protection Act of 1998, Congress created a substantial record "replete with zoning actions, in the form of individualized decisions, which adversely affect religious institutions." *Congregation Kol Ami v. Abington Twp.*, No. CIV.A. 01-1919, 2004 WL 1837037, at *10 (E.D. Pa. Aug. 17, 2004); *see* H.R. REP. 106-219 (July 1, 1999) (Report of the Judiciary Committee). For example, at one hearing before the House Subcommittee on the Constitution, the Subcommittee heard testimony concerning "a pattern of abuse that exists among land use authorities who deny many religious

groups their right to free exercise, often using mere pretexts (such as traffic, safety, or behavioral concerns) to mask the actual goal of prohibiting constitutionally protected religious activity." H.R. Rep. 106-219, at 20. Based on the testimony, the Subcommittee concluded: "Many cities overtly exclude churches, others do so subtly. The motive is not always easily discernible, but the result is a consistent, widespread pattern of political and governmental resistance to a core feature of religious exercise: the ability to assemble for worship." *Id.* at 24.

RLUIPA contains three provisions that are pertinent here, which limit governmental regulation of land use with respect to religious exercise: substantial burden (42 U.S.C. § 2000cc(a)); equal terms (42 U.S.C. § 2000cc(b)(1)); and nondiscrimination (42 U.S.C. § 2000cc(b)(2)). "Religious exercise" includes "[t]he use, building, or conversion of real property for the purpose of religious exercise." 42 U.S.C. § 2000cc-5(7).

The "substantial burden" provision is found in 42 U.S.C. § 2000cc(a)(1). It states:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

RLUIPA's equal terms and nondiscrimination provisions state, *id.* §§ 2000cc(b)(1) and (b)(2):

(1) Equal terms

No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

(2) Nondiscrimination

No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

**2.**

The County contends that the Church has not set forth a substantial burden claim, in that the special exception was denied because the Church's proposal failed to comply with applicable zoning regulations. ECF 8-1 at 29-30. In the County's view, the Church's Complaint is "predicated on the erroneous notion that it is not required to follow the state and local laws governing the special hearing and special exception process which Plaintiff itself initiated." *Id.* at 21.

According to the County, the Church has brought this suit "in the apparent hope that this Court will find that RLUIPA exempts it from land use regulation." *Id.* at 21. But, it contends that such a suit is not appropriate under the Fourth Circuit's decision in *Andon,* 813 F.3d 510. *See* ECF 8-1 at 21-22. Citing *Andon*, the County insists that "the law is clear that religious uses are not exempt from zoning." *Id.* at 22.

In addition, defendants claim that the Church has not pleaded plausibly that the County's denial of the special exception caused it to suffer a substantial burden with respect to its religious exercise. ECF 8-1 at 30 (citing *Living Water Church of God v. Charter Twsp. of Meridian*, 258 Fed. App'x 729, 739 (6th Cir. 2007)). They assert: "In this case, the [Board's] denial of the special exception because of the proposed non-religious gymnasium and the failure to meet the impermeable surface requirements of BCZR §1A03.4.B3 likewise does not constitute a substantial burden under RLUIPA." ECF 8-1 at 30.

The Church counters that it does not claim that it is exempt from land use requirements. ECF 11 at 13. Indeed, it points out that "the Church has already spent over two years completing

the administrative proceedings as required by the B.C.Z.R. to obtain the necessary approvals."
*Id.* But, it argues that the BCZR is constitutionally deficient and that "the denial of the special exception by the Board was burdensome and discriminatory." *Id.* (emphasis omitted).

As to the arguments concerning substantial burden, the Church contends that its allegations demonstrate "the Church's need for an adequate place of worship (Dkt. #1 ¶¶ 10-85), its reasonable expectation for approval (*see infra*), and the appropriateness of the Property and its location demonstrating the lack of any compelling governmental interest requiring denial. (*Id.* ¶¶ 86-107.)" ECF 11 at 23. The Church claims that these facts "support Plaintiff's claims that Defendants' laws and actions substantially burden its religious exercise under RLUIPA and the Free Exercise Clause." *Id.* (citing *Bethel*, 706 F.3d at 556). In addition, the Church notes that the denial was "absolute rather than allowing <u>some</u> religious use or imposing conditions to mitigate any impacts." ECF 11 at 24 (emphasis in original).

In Reply, the County argues that the Church lacked a reasonable expectation of approval to build on the Property. According to the County, the Church knew that it needed a special exception; it knew that the Property was in the R.C.4. zone; and it knew that no more than 10% of any lot in an R.C.4. zone may be covered by impermeable surfaces. ECF 13 at 4. It posits: "The fact that [the Church] had to resort to the proposed use of porous paving demonstrates its recognition that it would otherwise exceed the 10% impermeable limitation." *Id.*

The substantial burden provision "combats 'subtle forms of discrimination' by land use authorities that may occur when 'a state delegates essentially standardless discretion to nonprofessionals operating without procedural safeguards.'" *Chabad Lubavitch of Litchfield Co., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 193 (2d Cir. 2014) ("*Chabad*") (quoting *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d

895, 900 (7th Cir. 2005)). Of import here, a substantial burden claim "does not require a showing of discriminatory governmental conduct." *Andon, LLC v. City of Newport News, Va.*, 813 F.3d 510, 514 (4th Cir. 2016) ("*Andon*"); *Bethel*, 706 F.3d at 557 (recognizing that substantial burden provision protects against both discriminatory and non-discriminatory conduct that imposes a substantial burden on religion).

To state a substantial burden claim, a plaintiff "must show that a government's imposition of a regulation regarding land use, or application of such a regulation, caused a hardship that substantially affected the plaintiff's right of religious exercise." *Andon*, 813 F.3d at 514. The governmental action must satisfy strict scrutiny. *Bethel*, 706 F.3d at 557 (citing 42 U.S.C. § 2000cc(a)(1)).

In assessing the viability of plaintiff's substantial burden claim, I am guided by the Fourth Circuit's decisions in *Andon*, 813 F.3d 510, and *Bethel*, 706 F.3d 548. I pause to review those cases.

In *Bethel*, a Christian church purchased a 119-acre property in Montgomery County, Maryland, because the church was experiencing significant overcrowding at its worship services, for which it needed two facilities and multiple services on Sundays. 706 F.3d at 552. It also lacked facilities for various programs. *Id.* In 2004, the church acquired the property on which it planned to build a larger church. *Id.* The property was located in an area designated as "an agricultural reserve." *Id.* Most of it was in a "rural density transfer zone." *Id.* at 552-53. Property of a landowner who sells development rights in that zone was subject to an easement that restricted the density of residential development. *Id.* at 553. However, at the time of the church's purchase of the property in 2004, it was not subject to an easement affecting institutional use. Rather, a church was a "permitted use." *Id.*

In 2005, the County Council denied Bethel's application for public water and sewer service in conjunction with its request to build a 3,000-seat church and related facilities.  *Id.*  The Council also amended its water and sewer plan to prohibit public water and sewer service to private institutional facilities in the rural density transfer zone.  *Id.*  The Council again amended the water and sewer plan in 2006, restricting the size of new private well and septic systems in rural density transfer zones.  *Id.*

Thereafter, in 2007, the church applied for a private well and septic system to support construction of a smaller, 800-seat church.  *Id.* at 554.  While the application was pending, the County Council adopted a zoning amendment that barred a landowner from building a facility on a property subject to a transferable development rights easement, which included Bethel's property.  *Id.* at 554.

In the interim, the church pursued an appeal in the Maryland courts, without success.  *Id.* at 553 (citing *Bethel World Outreach Church v. Montgomery Ctny.*, 184 Md. App. 572, 967 A.2d 232 (2009)).  The church also brought suit in federal court, asserting claims under RLUIPA as well as federal and State constitutional claims.  *Id.* at 554-55.  The district court granted summary judgment in favor of Montgomery County on all claims, and the church appealed.  *Id.*

The Fourth Circuit reversed as to the substantial burden claim.  The *Bethel* Court noted that, in the land use context, "a plaintiff can succeed on a substantial burden claim by establishing that a government regulation puts substantial pressure on it to modify its behavior."  *Id.* at 556.  The Court said, *id.* at 557: "When a religious organization buys property reasonably expecting to build a church, governmental action impeding the building of that church may impose a substantial burden."  *See also Petra Presbyterian Church v. Vill. Of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007).  Moreover, the Court emphasized that a key aspect of RLUIPA's

substantial burden restriction is to protect a plaintiff's reasonable expectation to use real property for religious purposes. *Id.* at 536-37. The Court observed that this principle applies "even though other suitable properties might be available, because the 'delay, uncertainty, and expense' of selling the current property and finding a new one are themselves burdensome." *Id.* at 557 (quoting *Saints Constantine & Helen Greek Orthodox Church v. City of New Berlin*, 396 F.3d 895, 899–901 (7th Cir. 2005)).

The Court recognized that landowners "are rarely guaranteed approvals", but it was of the view that the church generated a dispute of material fact "as to whether it had a reasonable expectation of being able to build a church." *Bethel*, 706 F.3d at 558. The Court pointed out that churches were permitted in the rural density transfer zone when Bethel bought the property. *Id.* at 558. Moreover, the Court found it "significant that the County has completely prevented Bethel from building any church on its property, rather than simply imposing limitations on a new building." *Id.*

In addition, the Fourth Circuit determined that if the church's evidence were believed, "a fact finder could certainly conclude that Bethel's current facilities do not adequately serve its religious purposes, and that the planned 800-seat church would alleviate Bethel's burden." *Id.* The Court explained that its decision was not altered by the fact that the church owned an existing facility. *Id.* Further, the Court concluded that the county failed to demonstrate that it used the least restrictive means to further a compelling interest. *Id.* Thus, the Court concluded that the district court erred in granted summary judgment to the county as to the substantial burden claim. *Id.* at 559.

In *Andon*, a small church sought to lease property from Andon, LLC ("Andon") in Newport News, Virginia (the "City"). 813 F.3d at 512. The City's zoning ordinance permitted

the property to be used as a "place of worship" if four conditions were satisfied, including a 100-foot "setback" requirement for single-family residential property lines. *Id.* The property satisfied three of the conditions, but it did not comply with the setback requirement. *Id.* Although the church knew of this problem, it "entered into a written lease agreement with Andon that was contingent on Andon obtaining 'City approval' allowing operation of a church facility on the property." *Id.* at 512-13.

Andon sought a zoning variance as to the setback requirement. *Id.* at 513. The Compliance Department recommended denial of Andon's application for a zoning variance, finding that the property could be used for other purposes without a variance and that denial of the variance would not cause plaintiff to "suffer a hardship unique among other commercial property owners in the vicinity." *Id.* The Board of Zoning Appeals ("BZA") adopted that recommendation. *Id.* On appeal, a Virginia court upheld the BZA's decision. *Id.* Thereafter, Andon and the church filed suit, alleging substantial burden on the plaintiffs' "religious exercise", in violation of RLUIPA. *Id.* The district court granted a motion to dismiss filed by the City, denied plaintiffs' request to file an amended complaint, and entered judgment in favor of the City. *Id.*

On appeal, the Fourth Circuit affirmed. In reaching its conclusion, the Fourth Circuit distinguished *Bethel* on the basis that the *Andon* plaintiffs "never had a reasonable expectation that the property could be used as a church." *Id.* at 515. It noted that "Congress did not intend for RLUIPA to undermine the legitimate role of local governments in enacting and implementing land use regulations." *Id.* at 516. And, the Court observed that "the property was not a permitted site for . . . a church, and had not met applicable setback requirements for that type of use for at least 14 years." *Id.* at 515. In the Court's view, plaintiffs "assumed the risk of an unfavorable

decision" when they "knowingly entered into a contingent lease agreement for a non-conforming property . . . ." *Id.* The Court reasoned that "the alleged burdens they sustained were not imposed by the BZA's action denying the variance, but were self-imposed hardships." *Id.*

Unlike in *Bethel*, the denial of the variance "did not alter any pre-existing expectation that the plaintiffs would be able to use the property for a church facility . . . ." *Id.* As the Court observed, in *Bethel* it "emphasized that a critical function of RLUIPA's substantial burden restriction is to protect a plaintiff's *reasonable* expectation to use real property for religious purposes." *Id.* (citing *Bethel*, 706 F.3d 556-57) (emphasis added).

Of import, the Court said, *id.* at 515-16 (citations omitted):

A self-imposed hardship generally will not support a substantial burden claim under RLUIPA, because the hardship was not imposed by governmental action altering a legitimate, pre-existing expectation that a property could be obtained for a particular land use. *See Bethel*, 706 F.3d at 556–58; *Petra Presbyterian Church*, 489 F.3d at 851. Therefore, we hold that under these circumstances, the plaintiffs have not satisfied the "substantial burden" requirement of governmental action under RLUIPA.[] *See Bethel*, 706 F.3d at 556; *Guru Nanak Sikh Soc'y of Yuba City [v. County of Sutter]*, 456 F.3d [978] at 988–89 [9th Cir. 2006]; *Civil Liberties for Urban Believers [v. City of Chicago]*, 342 F.3d [752] at 761 [7th Cir. 2003].

*        *        *

[I]f we agreed with the plaintiffs that the BZA's denial of a variance imposed a substantial burden on their religious exercise, we effectively would be granting an automatic exemption to religious organizations from generally applicable land use regulations. Such a holding would usurp the role of local governments in zoning matters when a religious group is seeking a variance, and impermissibly would favor religious uses over secular uses . . . .

The plain language of RLUIPA, however, prevents such a result. By requiring that any substantial burden be imposed by governmental action and by carefully balancing individual rights and compelling governmental interests, the language of RLUIPA demonstrates that Congress did not intend for RLUIPA to undermine the legitimate role of local governments in enacting and implementing land use regulations.

The facts here do not align precisely either with *Bethel* or *Andon*.  Unlike in *Bethel*, the Property here could not be used for the construction of a place of worship as a matter of right when the Church purchased the land.  BCZR §1A03.3(A).  But, unlike in *Andon*, the Church's proposal was not categorically contrary to law.  As noted, under Maryland law a special exception is presumed to be a valid use, subject to the satisfaction of prescribed conditions. *Attar*, 451 Md. at 285, 152 A.3d at 772.  Nonetheless, to obtain a special exception the Church must satisfy the multiple conditions outlined in BCZR § 502.1.  Approval is not automatic.  *Cf. Siena Corp.*, 2017 WL 4557505, at *4 ("To hold that the issuance of something as important as a building permit is wholly nondiscretionary even before the necessary conditions have been met would handcuff local land use decision-makers to an extraordinary extent.  Indeed, it would leave them at the mercy of whatever plans a developer might devise . . . .").  However, plaintiff alleges that its proposal met each condition.  ECF 1, ¶ 261.

In my view, the Church has stated a substantial burden claim under 42 U.S.C. § 2000cc(a)(1) because it has plausibly alleged that it had a reasonable expectation that it could build a house of worship on the Property if it satisfied the conditions.  Moreover, the Church alleges that it complied with all of the objective standards under BCZR § 502.1 for the grant of a special exception.  ECF 1, ¶¶ 261, 309.  And, as demonstrated by the administrative record, the ALJ and one Board member agreed that the Church met all nine requirements, at least as to the portion pertaining to the construction of the structure.  *See* ECF 8-2 at 13-20; ECF 8-2 at 145-49.

The County's argument that the Church could not reasonably have expected to build its "fellowship hall" is not frivolous.  Arguably, a gymnasium does not fall into the category of

"[c]hurches or other buildings for religious worship." BCZR ¶ 1A02.2(A)(1). Even the Board's dissenter did not agree that this portion of the structure constituted a valid special exception.[14]

Nevertheless, as the Fourth Circuit observed in *Bethel*, it is "significant that the County has completely prevented [the Church] from building any church on its property, rather than simply imposing limitations on a new building." *Bethel*, 706 F.3d at 558. Notably, BCZR § 502.2 specifically provides a mechanism by which the ALJ and/or the Board can impose "conditions, restrictions or regulations as may be deemed necessary or advisable for the protection of surrounding and neighboring properties." Here, there is no indication that the Board considered a conditional or contingent approval of a portion of the proposal.

Based on the foregoing, and viewing the facts in the light most favorable to the plaintiff, as I must, the Church has plausibly alleged that it reasonably expected to build a house of worship on the Property. The fact that the Church lacked any *guarantee* from the County does not preclude this conclusion. *See Bethel*, 706 F.3d at 558 ("[M]odern zoning practices are such that landowners are rarely *guaranteed* approvals.") (emphasis in original). Accordingly, I shall deny the Motion as to Count I.[15]

### 3.

I shall consider together defendants' arguments concerning the Church's nondiscrimination and equal terms claims under 42 U.S.C. § 2000cc(b).

---

[14] The BCZR provides that "[c]ommunity buildings, swimming pools or other uses of a civic, social, recreational or educational nature" may be constructed in the R.C.4. by special exception, BCZR § 1A09.3(B)(3), but the Church did not request such an exception. At this juncture, I take no position as to whether the "fellowship hall" would have satisfied this requirement.

[15] In the Motion and in the Reply (ECF 8-1; ECF 13), defendants did not discuss the issue of compelling interest and least restrictive means. Accordingly, I do not address those issues.

With respect to the nondiscrimination claim, the County argues that the Church "has failed adequately to plead the manner in which the Board's decision discriminated against it on the basis of religion or religious denomination." ECF 8-1 at 30. Further, it contends that the Church "has failed to show that any such difference in treatment was 'for the purpose of discriminating' against it" and that the Complaint does not "raise any inference of religious hostility to Plaintiff by the County or the CBA." *Id.* The County asserts: "Rather, the denial of the special exception was based on the proposed non-religious gymnasium and the failure to meet the impermeable surface requirements of BCZR §1A03.4B3." *Id.* The County also claims that the "Equal Terms claim fails for the same reasons as discussed above", and because the Church's primary comparator is itself a church. *Id.* at 31.

As to plaintiff's claim under RLUIPA's equal terms provision (42 U.S.C. § 2000cc(b)(1)), the Church explains that a government violates the equal terms provision if it "'treats religious assemblies or institutions less well than secular assemblies or institutions that are similarly situated *as to the regulatory purpose.*'" ECF 11 at 28 (quoting *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 266 (3d Cir. 2007)) (emphasis in *Lighthouse*). In this case, the Church notes that the purpose of the R.C.4. zone is "'the protection of the water supplies of metropolitan Baltimore and neighboring jurisdictions by preventing contamination through unsuitable types or levels of development in their watersheds.'" ECF 11 at 28 (quoting BCZR § 1A03.1). But, the Church alleges that "various nonreligious assembly and institutional land uses are not required to obtain a special exception to locate in the RC-4 zone" and may build in the zone as a matter of right, including public schools, transit facilities, and commercial film production, even though such uses "may have equivalent or greater impacts on the regulatory purpose or zoning criteria as described above." ECF 11 at 28. Furthermore,

the Church observes that the County has granted special exceptions to similarly situated nonreligious assembly and institutional land uses, including Hayfields, a country club located across the street from the Property. *Id.* at 28-29.

With respect to plaintiffs' nondiscrimination claim under 42 U.S.C. § 2000cc(b)(2), the Church relies on the County's conduct with respect to St. Mary's, which is adjacent to the Property. ECF 11 at 29. According to the Church, St. Mary's was granted a special exception to the R.C.4. zone "using the same porous pavement that was the basis for denial of the Church's application." *Id.* And, the Church has alleged that after St. Mary's received the special exception, the County rezoned St. Mary's property as RC-5, which allows the construction of houses of worship as a matter of right. ECF 11 at 29. According to the Church, these actions demonstrate the County's denominational preference for St. Mary's, an Antiochian Orthodox Church. *Id.*

Furthermore, the Church maintains that the denial of the fellowship hall demonstrates discrimination on the basis of denomination. *Id.* The Complaint identifies five churches that have been permitted to construct such facilities, and alleges that the Board "has never previously denied an application for special exception to a house of worship on the basis that its proposed use contains a gymnasium or fellowship hall . . . ." *Id.*[16] According to the Church, the Board denied the petition "to appease various local residents who opposed the Church on the basis of its denomination." *Id.*

In the Reply (ECF 13), the County asserts: "Based on Plaintiff's Opposition arguments, it needs to be remembered that administrative decision makers, like members of the Board in this case, are entitled to a 'presumption of honesty and integrity.'" *Id.* at 15 (quoting *Morris v. City*

---

[16] Conversely, one could argue that the County's approvals of the construction of other churches undercuts plaintiff's claim that the County discriminates based on religion.

*of Danville*, 744 F.2d 1041, 1044 (4th Cir. 1984)).  According to the County, plaintiff has put forth no arguments to rebut that presumption.  ECF 13 at 15.

Defendants also maintain that plaintiff's claims are implausible in view of the Board's disposition.  *Id.* at 15-16.  In their view, the Board's order "clearly shows that the Board's rationale is supported by the substantial evidence referenced in the Order and that the Board's interpretation of the applicable BCZR provisions is correct as a matter of law."  *Id.*  Thus, defendants claim that the Church's allegations fail to satisfy the pleading standards of *Iqbal* and *Twombly. Id.* at 16.

With respect to both the equal terms and nondiscrimination claims, "the plaintiff bears the burden of establishing a prima facie claim . . . ."  *Chabad*, 768 F.3d at 198.  Thereafter, "the government bears the burden of persuasion . . ." as to the elements of each claim.  *Id.* (citing 42 U.S.C. § 2000cc-2(b)).  Moreover, in contrast to a substantial burden or equal terms claim, "evidence of discriminatory *intent*   is required to establish a claim" under RLUIPA's nondiscrimination provision.  *Chobad*, 768 F.3d at 198 (emphasis in original) (citing 42 U.S.C. § 2000cc(b)(2)).

Various courts have explained that RLUIPA's nondiscrimination provision incorporates elements of an equal protection analysis.  *Chabad*, 768 F.3d at 198; *Church of Scientology of Georgia, Inc. v. Cty. of Sandy Springs, Ga*., 843 F. Supp. 2d 1328, 1360 (N.D. Ga. 2012) (collecting cases); *cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (concerning Free Exercise Clause).  In the context of equal protection in regard to a zoning matter, the Fourth Circuit has explained: "To prove that a statute has been administered or enforced discriminatorily, more must be shown than the fact that a benefit was denied to one person while conferred on another."  *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 819

(4th Cir. 1995); *accord Quinn v. Bd. of Cnty. Comm'rs for Queen Anne's Cty., Md.*, 124 F. Supp. 3d 586, 598 n.9 (D. Md. 2015), *aff'd*, 862 F.3d 433 (4th Cir. 2017).[17]

Although "an equal protection claim must be rooted in an allegation of unequal treatment for similarly situated individuals, a showing of such disparate treatment, even if the product of erroneous or illegal state action, is not enough by itself to state a constitutional claim." *Sylvia Development Corp*, 48 F.3d at 825. Indeed, the Court has said, *id.*: "If disparate treatment alone were sufficient to warrant a constitutional remedy, then every blunder by a local authority . . . would rise to the level of a federal constitutional claim."

Ultimately, plaintiff must establish that any difference in treatment was the result of intentional or purposeful discrimination. *Sylvia Dev. Corp.*, 48 F.3d at 819; *see also Reaching Hearts*, 584 F. Supp. 2d at 781 ("To demonstrate an Equal Protection claim successfully in the Fourth Circuit, a plaintiff must show intentional or purposeful discrimination; it is not enough to prove that a benefit was denied to one party while conferred on another."). With respect to a contention that the discrimination was purposeful or intentional, Judge Titus explained in *Reaching Hearts*, 584 F. Supp. 2d at 781 (citing, *inter alia*, *Sylvia Dev. Corp.*, 48 F.3d at 819):

> The Fourth Circuit has recognized several factors that are probative of whether a decision-making body was motivated by discriminating intent, and they were included in the jury instructions:
>
> (1) evidence of a 'consistent pattern' of actions by the decision-making body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decision-making body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from

---

[17] The Second Circuit has recognized three types of equal protection violations: 1) a facially discriminatory law; 2) a facially neutral law that was adopted with a discriminatory intent and applied with a discriminatory effect; 3) a facially neutral law that is enforced in a discriminatory way. *Chabad*, 768 F.3d at 199.

normal procedures; and (4) contemporary statements by decision-makers on the record or in minutes of their meetings.

At this early juncture, however, actual proof is not required. HVBC has adequately alleged that it was treated less favorably than other religious denominations, and that the rejection of its application for a special exception "was substantially motivated by hostility and animus toward the Church and its religious character, practices and denomination." ECF 1, ¶ 198.

For example, the Church has alleged that the County approved a special exception for a church on an adjacent property, with the same kind of parking lot that was deemed unacceptable here, because the other church is a preferred denomination. ECF 1, ¶¶ 132, 140, 148-158, 227-257. According to the Church, St. Mary's contains a 16,000-square foot house of worship with 79 parking spaces on the same kind of parking surface proposed here, and with a 3.96 acre property. ECF 1, ¶ 105. Furthermore, HVBC has alleged that the church building on the St. Mary's property covers 10.5% of the property, whereas the Church's proposed "house of worship" would cover only 4.3% of the property. *Id.* ¶¶ 276, 277.[18] And, the Church has alleged that some houses of worship located in the R.C.4. zone contain a gymnasium. *Id.* ¶¶ 219, 221; *see also id.* ¶ 290 (listing local churches that have a gymnasium).

Moreover, the Church asserts that the Board was influenced by various members of the public, who made inappropriate statements before the Board based on hostility to the Church's beliefs. *Id.* ¶¶ 189, 192, 196. The Church has pointed to public comments by opponents in which the Church was called "fundamentalist" and in which the project was described as a "megachurch." *Id.* ¶¶ 193, 197. According to the Church, "the Board was knowingly responsive

---

[18] It is not clear whether the "house of worship" includes the proposed fellowship hall or only the church building.

to opponents who were hostile toward the Church" (*id.* ¶ 201) and it "gave effect to the private biases of local residents." *Id.* ¶ 202.

Further, the Church has pointed to the public statements of two Board members who voted to deny the special exception. ECF 1, ¶ 203; *cf. Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 599 (4th Cir. 2017) (en banc) (considering statements outside of the record that "are closely related in time, attributable to the primary decisionmaker, and specific and easily connected to the challenged action"), *cert. granted*, ___ U.S. ___, 137 S. Ct. 2080 (2017). As indicated, one of those Board members, James West, was interviewed by the Baltimore Sun newspaper on July 7, 2016, and allegedly stated: "'[W]hen members of the County Council allowed churches in resources conservation zones decades ago, they probably didn't contemplate churches on the scale of Hunt Valley Baptist Church's proposal.'" *Id.* ¶ 203 (alteration in original). West also allegedly said: "'It's a church, but it's more than a church.'" *Id.* ¶ 204. Meryl Rosen, the other Board member voting against the special exception, allegedly said for the same article: "'I don't think a church of this scope was envisioned . . . .'" *Id.* ¶ 205.

In *Bethel*, 706 F.3d 548, the district court granted summary judgment to Montgomery County with respect to a RLUIPA nondiscrimination claim. On review, the Fourth Circuit observed that the zoning amendment in issue was facially neutral, because it applied to all private institutional facilities. *Id.* at 559. The Court also stated that Bethel "failed to put forth any evidence that the County took . . . measures because Bethel [and another church that had sought approval] are religious organizations." *Id.* at 559-60. To be sure, the county was concerned about the size of the facilities, and considered them "incompatible with the character of the agricultural reserve." *Id.* at 560. However, Bethel offered no evidence that the county's

concern as to size was "pretextual." Given the lack of evidence that the county discriminated on the basis of religion, the Fourth Circuit upheld the grant of summary judgment. *Id.*

Unlike in *Bethel,* this case is not at the summary judgment stage. Therefore, I must assume the truth of plaintiff's allegations. I am satisfied that the Church has set forth allegations sufficient to withstand the motion to dismiss as to the RLUIPA claim based on the nondiscrimination provision.

As to the equal terms provision, the Church explained at oral argument that it has presented a "facial challenge" as well as an "as applied" challenge. It alleges that the BCZR allows nonreligious assembly and institutional uses, such as public schools, to be constructed as a matter of right in the R.C.4. zone, whereas houses of worship, along with other uses, are subject to a special exception. *See* ECF 1, ¶¶ 130, 305; *see also* BCZR § 1A03.3.[19] The Church has also alleged that the legislative purpose of the R.C.4. zone is to "provide for the protection of the water supplies of metropolitan Baltimore and neighboring jurisdictions by preventing contamination through unsuitable types or levels of development in their watersheds." ECF 1, ¶ 129; *see also* BCZR § 1A03.1. Yet, according to the Church, the "nonreligious assembly and institutional land uses would have equal or greater negative effects on the stated purpose of the RC-4 zoning district." ECF 1, ¶ 307. For example, at oral argument, plaintiff pointed to the

_____

[19] The issue of whether public schools are suitable comparators has not been briefed. *See Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Brow and County*, 450 F.3d 1295, 1311 (11th Cir. 2006) (suggesting that a church and school are insufficiently comparable to establish an equal terms claim). *Cf. Siena Corp.*, 2017 WL 4557505, at *6 (noting, in the context of a zoning amendment prompted by a concern for the safety of school children, that "[i]f this interest is not legitimate, one would be hard pressed to conceive of an interest that is"). Moreover, it is noteworthy that houses of worship are not the only use for which a special exception is required in the watershed zone; many uses require a special exception. *See* BCZR § 1.403.3(B).

adverse environmental impact in a watershed district caused by chemicals used to care for Hayfield's golf course.

The Church has adequately alleged that defendants treat non-religious entities different from religious entities. And, it contends that the reason for doing so is not traceable to the purpose of the zone. The County's choice to permit use as of right by certain institutions, while subjecting houses of worship to the special exception process, is sufficient at this stage to withstand dismissal. In *Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, 226 F. Supp. 3d 320, 349–50 (D.N.J. 2016), the court said: "Where a municipality enforces an ordinance against a plaintiff in a manner that does not conform to the stated goals of the ordinance, such that the enforcement is inconsistent as applied to the comparators, there is sufficient discriminatory intent . . . ." Therefore, plaintiff has stated a claim under RLUIPA's equal terms provision. *See Midrash Shephardi, Inc. v. Twn. of Surfside*, 366 F.3d 1214, 1234 (11th Cir. 2004).[20]

### D. Section 1983

The County has moved to dismiss Counts IV, VI, and VII of the Complaint, which are brought pursuant to 42 U.S.C. § 1983. It alleges, respectively, violations of the Free Exercise

---

[20] There is a circuit split as to whether a plaintiff states a claim under RLUIPA's equal terms provision by alleging that a zoning law is not facially neutral. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 291–92 (5th Cir. 2012) (identifying the circuit split and examining the sides); *see also Chabad*, 768 F.3d at 196 ("Division exists among our sister circuits concerning whether the equal terms provision invariably requires evidence of a "similarly situated" secular comparator to establish a claim and, where such evidence is necessary, on what ground the comparison must be made."). Under the stricter standard, a plaintiff must show that a similarly situated non-religious "comparator" would be treated different than the religious entity. *See River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 373 (7th Cir. 2010) (en banc); *Lighthouse Inst. for Evangelism, Inc.*, 510 F.3d at 268.

To my knowledge, the Fourth Circuit has not addressed the issue. Because plaintiff's allegations are sufficient under the stricter standard, I need not resolve the matter at this juncture.

Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment.

In particular, in Count IV, the Church argues that defendants violated the First Amendment by "imposing and implementing land use regulations on their face and as applied in a manner that substantially burdens the Church's religious exercise without using the least restrictive means of achieving a compelling governmental interest, and by discriminating against the Church on the basis of religion in a manner that is not the least restrictive means of achieving a compelling governmental interest." ECF 1, ¶ 330. In Count VI, the Church contends that the defendants violated the Equal Protection Clause of the Fourteenth Amendment by "imposing and implementing land use regulations on their face and as applied in a manner that discriminates against it in the imposition and implementation of their land use regulations." *Id.* ¶ 332. And, in Count VII, the Church alleges that portions of the BCZR are unconstitutionally vague, in violation of the Due Process Clause of the Fourteenth Amendment. *Id.* ¶ 334.

Defendants advance several grounds in support of dismissal. ECF 8-1. They argue that in order to prevail on a § 1983 claim, plaintiff must show that the County's "law, policy or custom contributed to the violation of federal constitutional or statutory rights." *Id.* at 31 (citing *Monell v. Dept. of Social Servs. of Cty. of New York*, 436 U.S. 658, 690-95 (1978)). In defendants' view, the Church "cannot, under any circumstances, establish that the County was the moving force behind the alleged violation of its rights." ECF 8-1 at 32. Moreover, defendants observe that the Fourth Circuit has "repeatedly rejected Fourteenth Amendment due process claims brought against local governments under § 1983 for refusing zoning permits." *Id.* (citing, *inter alia*, *Sylvia Dev. Corp.*, 48 F.3d at 826).

The Church did not specifically respond to the defense arguments pertaining to *Monell*. And, at oral argument, HVBC's counsel asserted that plaintiff has filed a direct action for violation of constitutional rights, not a *Monell* claim.

The Church maintains that it has made a facial challenge to the constitutionality of the BCZR provisions regarding special exception applications on the grounds that there are no meaningful standards under the BCZR and decisions are made on an *ad hoc* and subjective basis. *Id.* at 31. In particular, the Church notes that it has challenged BCZR § 502.1(G), which provides that a special exception cannot be granted where the proposal would "[b]e inconsistent with the purposes of the property's zoning classification nor in any other way inconsistent with the spirit and intent of these Zoning Regulations." ECF 11 at 32. And, the Church challenges BCZR § 502.1(H), which provides that a special exception cannot be granted where the proposal would "[b]e inconsistent with the impermeable surface and vegetative retention provisions of these Zoning Regulations." ECF 11 at 32. The Church argues, *id.*:

> Neither "spirit and intent" nor "inconsistent" are defined in the B.C.Z.R. (*id.* ¶ 138) and there are no standards or restrictions on the Board's authority to prevent it from determining that a fellowship hall or porous pavement, for example, are "inconsistent with the spirit and intent" or "inconsistent with the impermeable surface and vegetative retention provisions" of the B.C.Z.R., respectively, for one church but not for another.

Local governments and municipalities are subject to suit under § 1983. *See Monell*, 436 U.S. at 690. But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *Cty. of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 Fed. App'x. 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___ U.S. ___, 135 S. Ct. 1342 (2017).

A viable *Monell* claim has two elements: (1) the municipality had an unconstitutional "policy or custom"; and (2) the unconstitutional "policy or custom" caused a violation of the

plaintiff's constitutional rights. *See, e.g., Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). Therefore, "[s]ection 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994); *see also Holloman*, 661 Fed. App'x at 799.

"Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403-04. "An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*) (citations omitted).

In *Monell*, 436 U.S. 658, the Supreme Court determined that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only if those defendants were executing an official policy or custom of the local government that resulted in a violation of the plaintiff's rights. *Monell*, 436 U.S. at 690-91. The Court said that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694; *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).

However, as plaintiff recognized at oral argument, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94. Rather, "[l]iability arises only where the constitutionally offensive acts of city employees are taken in furtherance of some municipal 'policy or custom.'" *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (citing *Monell*, 436 U.S. at 694). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); *see Moore v. Howard Cnty. Police Dep't*, CCB-10-1430, 2010 WL 4722043 at *2 (D. Md. Nov. 15, 2010). In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained, *id.* at 1359 (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692[ ] (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479[ ] (1986) (citing *Monell*, 436 U.S. at 665-683[ ]). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691 [ ]; *Canton*, 489 U.S. at 392 [ ]; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 [ ](1997) (collecting cases).

Of relevance, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Semple*, 195 F.3d at 712; *see also Pembaur v. Cty. of Cincinnati*, 475 U.S. 469, 480 (1986) (observing that "a municipality may be liable under § 1983 for a single decision" by an official "'whose acts or edicts may fairly be said to represent official policy . . . .'"). To establish municipal liability under § 1983 based on a single official's decision, that official must have final decisionmaking and policymaking authority. *Pembaur*, 475 U.S. at 485; *see also Brown*, 520 U.S. at 406. And, "[t]o qualify as a 'final policymaking official,' a municipal official must have the responsibility

and authority to implement *final* municipal policy with respect to a particular course of action."

*Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000) (emphasis in original); *see also Liverman v. Cty. of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016) ("Municipal liability 'attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'") (quoting *Pembaur*, 475 U.S. at 483).

In sum, a plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).

There can be little doubt that the BCZR is composed of written regulations and constitutes the official policy of the County. Notably, § 32-3-103(1) of the County Code provides that the BCZR is "in full force and effect." Because plaintiff lodges facial challenges to the BCZR, the County is subject to suit as to those challenges.

With respect to plaintiff's as-applied challenges, the parties have not briefed the issue of whether the Board has final authority as defined by *Pembaur*, nor am I aware of any cases resolving the question. In considering municipal liability under *Pembaur*, whether an entity has the requisite decisionmaking and policymaking authority is a question of state law. *Liverman*, 844 F. 3d at 412.

Under L.G. § 10-305, a charter county or a code county may enact local laws establishing a county board of appeals. And, § 602 of the County Charter provides that an "order of the county board of appeals shall be *final*", *unless* a party appeals to the Circuit Court for Baltimore County. *Id.* (emphasis added); *see* County Charter § 604. Although the decisions of the

Board are subject to review by the State's judicial branch, the Board's decisions are the last word of the County itself. Notably, the Board's decisions are not reviewable by another official or entity within the executive or legislative branch of the County. *Cf. Cty. of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (explaining that where a "subordinate's decision is subject to review by the *municipality's* authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies") (first emphasis added, second in original).

Section 604 of the County Charter is distinguishable from cases in which the decisions of local government officials and agencies were subject to further administrative review by the local government. *See, e.g.*, *Riddick*, 238 F.3d at 523 (affirming grant of summary judgment as to *Monell* claim against certain school officials because defendants' actions were "subject to final review by the [School] Board"). Because the Board has final decisionmaking and policymaking authority under the County Charter as to the matter of a special exception, its decisions may subject the County to *Monell* liability.

As to plaintiff's claim under the Free Exercise Clause of the First Amendment, the Supreme Court has said that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 531. Conversely, a law is not neutral "if the object of a law is to infringe upon or restrict practices because of their religious motivation . . . ." *Id.* at 533.

In *Bethel*, 706 F.3d at 548, the Fourth Circuit upheld the grant of summary judgment to Montgomery County with respect to the church's claim of a violation of its free exercise rights, because the church "failed to present evidence tending to show that the object of [the zoning law

in issue] was to burden practices because of their religious motivation." *Id.* at 561. The Court determined that the zoning law in issue was neutral on its face, and it applied rational basis scrutiny, "which requires merely that the law at issue be 'rationally related to a legitimate governmental interest.'" *Id.* (citation omitted). It concluded that "[l]imiting the development of the agricultural reserve is a legitimate interest" and the zoning law furthered that interest. *Id.* Thus, the church could not show that the zoning law "is not rationally related to a legitimate governmental interest." *Id.*

As the Fourth Circuit has explained, "the Equal Protection Clause limits *all* state action, prohibiting any state from denying a person equal protection through the enactment, administration, or enforcement of its laws and regulations." *Sylvia Development Corp.*, 48 F.3d at 818. And, even if a state law is facially neutral, "its administration or enforcement can effect an unequal application by favoring one class of persons and disfavoring another." *Id.* at 819. However, in the equal protection context, a showing of disparate treatment is not enough to prevail. *Id.* at 825. A violation of the Equal Protection Clause "requires a showing of clear and intentional discrimination." *Id.*; *see also id.* at 819 (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)).[21] Moreover, "[a] State is perfectly within its rights to chip away at a problem piece-by-piece, so long as it does not unlawfully discriminate in the process." *Siena Corp.*, 2017 WL 4557505, at *6.

---

[21] In *Sylvia Development Corp.*, 768 F.3d at 819, the Court identified several factors that are probative of whether a decisionmaking body was motivated by discriminatory intent. But, the Fourth Circuit has also said "that when no fundamental right or suspect classification is at issue, the Equal Protection Clause allows a legislative body wide latitude in drawing classifications." *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 438 (4th Cir. 2002); *see also Siena Corp.*, 2017 WL 4557505, at *6. Moreover, such classifications are permissible as long as they are "rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985). As noted in *Siena Corp.*, 2017 WL 4557505, at *6: "This analysis looks not to the subjective motivations of the local officials."

Of relevance here, the *Bethel* Court upheld the award of summary judgment in favor of Montgomery County as to the Church's equal protection claim. 706 F.3d at 561. The Court noted that the Church failed to present evidence that the County discriminated on the basis of religion. It said, *id.*: "Bethel's 'class of one' claim must fail because the County's actions survive rational basis scrutiny." (Citing generally *Willis v. Town of Marshall*, 426 F.3d 251, 263 (4th Cir. 2005)); *see Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). *Cf. Siena Corp.*, 2017 WL 4557505, at *6 ("That some alternative commercial use might present similar safety concerns is beside the point. 'It is no requirement of equal protection that all evils of the same genus be eradicated or none at all.'") (Citation omitted).

At this juncture, plaintiff need not present evidence to prove its claims. Rather, it must adequately allege the claim in issue. It has done so.

However, as to Count VII, I conclude that the Church has failed to state a claim under the Due Process Clause based on its vagueness argument.[22] The Fourth Circuit has said that a statute is "unconstitutionally vague under the Due Process Clause if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) (quoting *United States v. Williams*, 554 U.S. 285, 304 (2008)). "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

---

[22] In their Reply, defendants argue, for the first time, that plaintiff failed to raise a vagueness challenge to the Board and therefore the Church is judicially estopped form asserting the claim in this litigation. ECF 13 at 17.

Nevertheless, "'[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 3 (2010) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495 (1982)) (alteration in *Holder*). And, because the vagueness doctrine "amounts to a due process challenge based on lack of notice, a court may not reach the merits of a plaintiff's void for vagueness claim unless the plaintiff first shows that state action deprived him or her of 'a constitutionally protected liberty or property interest.'" *M.B. by & through Brown v. McGee*, No. 3:16CV334, 2017 WL 1364214, at *7 (E.D. Va. Mar. 24, 2017) (quoting *Stone v. Univ. of Md. Med Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988)).

In my view, plaintiff's claim is deficient because the Church has not adequately pleaded either that it has a property interest or a liberty interest in obtaining a special exception.

"'Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law.'" *Nelson v. Colorado*, ___ U.S. ___ 137 S. Ct. 1249, 1264 (2017) (quoting *Phillips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998)). The Fourth Circuit has specifically rejected the suggestion that under Maryland law an owner of land has a property interest in obtaining a special exception to zoning regulations. *Biser v. Town of Bel Air*, 991 F.2d 100 (4th Cir. 1993), *cert. denied*, 510 U.S. 914 (1993).

In *Biser*, plaintiff owned a piece of property in Bel Air, Maryland (the "Town") and sought to construct an office building. *Id.* at 102-103. Although the property was in a residential zone, Biser contacted the Town's Director of Planning and Community Development to seek information on procuring a special exception. *Id.* at 103. The official told Biser that his plans required a setback variance, and suggested that Biser "apply for the setback variances, obtain

building permits, construct the buildings, and then request the special exception." *Id.*  The Town official also noted that Biser would have to construct the building before a special exception could be approved.  *Id.*  Biser presented his plans at a meeting of the Town Board of Appeals, which expressed no objections.  *Id.*  The Town approved the building permits.  *Id.*

After the building was constructed, the Town Board of Appeals denied Biser's application for special exception.  *Id.*  Biser appealed to the Circuit Court for Harford County, which reversed the board, finding that the regulations were ambiguous and that Biser had relied to his detriment on the Town's approval of his building permits.  *Id.*

Biser then brought suit in federal court under § 1983, alleging, *inter alia*, that he had been denied due process by the Town's delay in granting his special exception.  *Id.*  The district court dismissed for failure to state a claim, and Biser appealed.  *Id.*  The Fourth Circuit affirmed.

The Court explained that a property interest "requires more than a 'unilateral expectation' that a permit or license will be issued; instead, there must be a 'legitimate claim of entitlement.'" *Id.* at 104 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  The Court said: "In applying this standard of entitlement, we have held that if a local agency has '[a]ny significant discretion' in determining whether a permit should issue, then a claimant has no legitimate entitlement and, hence, no cognizable property interest."  *Biser*, 991 F.2d at 104 (quoting *Gardner v. Baltimore Mayor & City Council*, 969 F.2d 63, 68 (4th Cir. 1992)); *accord Horne v. Mayor & City Council of Baltimore*, RDB-07-1110, 2008 WL 8882751, at *4 (D. Md. Feb. 27, 2008).

With respect to a special exception, the Court said: "[T]he Board of Appeals had significant discretion in deciding whether to grant Biser's application . . . ."  *Biser*, 991 F.2d at 104.  It continued, *id.*:

In making its decision, the Board had to determine whether granting the exception "would adversely affect the public health, safety, security, morals or general welfare, or would result in dangerous traffic conditions or would jeopardize the lives or property of people living in the neighborhood." Town of Bel Air Zoning Ordinance, No. 208 art. 16.042. It is difficult to imagine a more flexible standard. Moreover, the ordinance requires the Board to consider eighteen separate factors in making this determination.

Given these features, the Fourth Circuit concluded that Biser had only a unilateral expectation that he would receive the special exception because "[i]n every respect . . . , the Board of Appeals possessed significant discretion under *Gardner* in deciding whether to grant special exceptions." *Id.* at 104.

*Biser* controls here. Although State law gives rise to a presumption of validity with regard to a special exception, plaintiff nevertheless had the burden to persuade the Board that it satisfied the nine conditions or prerequisites to approval. BCZR § 502.1. As in *Biser*, the Board had discretion to determine, *inter alia*, whether the exception would "[b]e detrimental to the health, safety or general welfare of the locality involved"; "[t]end to create congestion in roads, streets or alleys therein"; or "[b]e detrimental to the environmental and natural resources of the site . . . ." BCZR § 502.1. Because the Board had significant discretion in deciding whether to grant the special exception, the Church cannot assert that it had a property interest in a special exception. *See also Sylvia Development Corp*, 48 F.3d at 825-829 (upholding summary judgment in favor of defendants; concluding that plaintiff's rights to procedural and substantive due process were not violated by a zoning decision).

The recent case of *Siena Corp.*, 2017 WL 4557505, is also informative. In that case, the plaintiff corporation purchased property zoned "Light Industrial" and, at the time of the purchase, the property could be used for a self-storage facility. *Id.* at *1. However, the property was in the immediate vicinity of an elementary school, and residents were concerned that a

storage facility would generate traffic that would endanger the safety of the school children. *Id.* Their concern culminated in a zoning text amendment passed by the Council. *Id.* at *2.

Thereafter, Siena Corp. filed suit under 42 U.S.C. § 1983. To be sure, Siena Corp. did not lodge a RLUIPA claim or a claim under the Free Exercise Clause of the First Amendment. But, it did allege that the zoning amendment violated its constitutional rights to due process and equal protection. The district court disagreed and the Fourth Circuit affirmed.

Notably, Siena Corp. never applied for a building permit, nor had it satisfied the conditions that serve as a prerequisite to such approval. *Id.* at *3. Relying, *inter alia*, on *A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 370-71 (4th Cir. 2008), and *Gardner*, 969 F.2d at 68, the Fourth Circuit determined that Siena lacked a protected property interest because it never satisfied the conditions for the permit. 2017 WL 4557505, at *3-*4. Noting that a permit is "far from a foregone conclusion," the Court said that the "'significant discretion' that remained with the zoning authorities 'defeats the claim of a property interest[.]'" *Id.* at *4 (citation omitted). It also rejected the plaintiff's substantive due process claim. *Id.* at *5. Among other things, the Court observed: "A single facility may provide the impetus for a general zoning enactment, but that does not mean that the enactment is aimed solely at that facility." *Id.* Rather, said the Court, "What matters is that the zoning text amendment applied to all developers. . . ." *Id.*

I am also satisfied that the Church lacks a liberty interest in obtaining a special exception. Although the Free Exercise Clause of the First Amendment is implicated in the construction of places of worship, the Court in *Smith*, 494 U.S. at 878-80, narrowed the scope of the Free Exercise Clause. *See Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 529 ("According to *Smith,* if prohibiting the exercise of religion results from enforcing a 'neutral, generally

applicable' law, the Free Exercise Clause has not been offended.") (citing *Smith*, 494 U.S. at 878-80).

Even if plaintiff has alleged that parts of the BCZR are unconstitutionally vague, it cannot allege plausibly that those sections facially target religion. To the extent that plaintiff claims that the BCZR has been applied in a non-neutral way, that allegation is more appropriately reviewed under RLUIPA, the Free Exercise Clause, and the Equal Protection Clause. In this circumstance, the due process claim is effectively "subsumed" into the free exercise claim. *Doswell v. Smith*, 139 F.3d 888, at *6 (4th Cir. 1998) (table). Therefore, I shall dismiss Count VII.

### E. Supplemental Jurisdiction – Maryland Declaration of Rights

Finally, defendants ask the Court to decline to exercise supplemental jurisdiction with respect to the Church's claim under Article 36 of the Maryland Declaration of Rights, which provides certain protections for religious liberty. ECF 8-1 at 33. In defendants' view, because "there is a question as to whether a private cause of action exists for a violation of Article 36, that issue is better suited for resolution by the Maryland courts." *Id*. The Church counters that defendants' argument is "disingenuous at best, as [defendants] have not challenged Plaintiff's Complaint on this basis in either of their two motions." ECF 11 at 36-37 n.9.

Under 28 U.S.C. § 1367, federal courts may decline to exercise supplemental jurisdiction over a claim if the claim "raises a novel or complex issue of State law." *Id*. § 1367(c)(1). Various federal trial courts have applied §1367(c) in declining to exercise jurisdiction over state law claims where there was no guidance from state appellate courts on challenging questions of state law. *See Green v. Zendrian*, 916 F. Supp. 493, 498 (D. Md. 1996) (declining to exercise jurisdiction over a claim made under Article 26 of the Maryland Declaration of Rights because it

involved a serious, unresolved issue of state constitutional law); *see also Thompson v. Alston*, PWG-16-1096, 2017 WL 1684617, at *3 (D. Md. May 3, 2017) (declining to consider an issue of state law under § 1367(c) because, *inter alia*, the issue had not "been squarely addressed by Maryland's courts"); *Wilson v. PFS, LLC*, 493 F. Supp. 2d 1122, 1126 (S.D. Cal. 2007) (dismissing state law count under § 1367(c)(1) because it involved an unsettled area of state law "more appropriately resolved by state courts"); *Rockey v. Courtesy Motors, Inc.*, 199 F.R.D. 578, 596 (W.D. Mich. 2001) (dismissing a case under § 1367(c)(1), explaining that "there is not a single published state-court opinion on point"). However, § 1367(c) is permissive; a court need not dismiss a case merely because it presents a novel or difficult issue of state law. *Isaac v. N. Carolina Dep't of Transp.*, 192 Fed. App'x 197, 200 (4th Cir. 2006).

In 2009, the Fourth Circuit observed: "Whether Article 36 of the Maryland Declaration of Rights provides a private cause of action is undecided." *Booth v. Maryland*, 337 Fed. App'x 301, 311 (4th Cir. 2009). It does not appear that the question has been resolved by Maryland appellate courts in the time since *Booth* was decided. *See Wood v. Bd. of Educ. of Charles Cnty.*, GJH-16-00239, 2016 WL 8669913, at *11 (D. Md. Sept. 30, 2016) ("[I]t is not clear that there is a private right of action for damages under Article 36 . . . .").[23] But, as the *Booth* Court recognized, Maryland appellate courts have decided cases brought under Article 36, assuming that "Article 36 and the First Amendment of the United States Constitution have the same effect." *Booth*, 337 Fed. Appx. at 311 (citing *Stover v. Prince George's Cnty.*, 132 Md. App. 373, 389, 752 A.2d 686, 695 (2000); *Supermarkets Gen. Corp. v. State of Maryland*, 286 Md. 611, 625, 409 A.2d 250, 258 (1979)).

---

[23] It is surprising that plaintiff charges defense counsel with being disingenuous, yet plaintiff cites only a single twenty-year old case for the proposition that there *is* a private right of action under Article 36, and omits that various recent opinions observe that the issue is unresolved or, at the very least, difficult.

Here, the parties have provided nothing more than the most cursory analysis of Article 36. However, because the Church's Article 36 claim is effectively the same as its First Amendment claim, consideration of plaintiff's Article 36 claim will not require additional discovery. Accordingly, I see no reason to decide at this juncture whether dismissal under § 1367(c)(1) is appropriate as to Count VIII.

The parties have not discussed the Maryland Local Government Tort Claims Act ("LGTCA"), C.J. 5-301 *et seq*. But, it is relevant because plaintiff seeks compensatory damages under the Maryland Declaration of Rights. The LGTCA generally applies, *inter alia*, to "claims seeking redress for government violations of the state constitution where unliquidated damages are sought." *Rounds v. Md.-Nat. Capital Park & Planning Comm'n*, 441 Md. 621, 641-42, 109 A.3d 639, 651 (2015).

"'It is a longstanding principle of Maryland jurisprudence that the LGTCA notice provision is a condition precedent to maintaining an action directly against a local government or its employees.'" *Rounds*, 441 Md. at 642, 109 A.3d at 651 (quoting *Hansen v. City of Laurel*, 420 Md. 670, 682, 25 A.3d 122, 130 (2011)). The "purpose of the notice requirement is 'to apprise a local government of its possible liability at a time when it could conduct its own investigation, *i.e.*, while the evidence was still fresh and the recollection of the witnesses was undiminished by time, sufficient to ascertain the character and extent of the injury and its responsibility in connection with it.'" *Id*. at 642-43, 109 A.3d at 651 (quoting *Prince George's Cnty. v. Longtin*, 419 Md. 450, 466, 19 A.3d 859, 869 (2011)) (additional citation omitted).[24]

The LGTCA provides, in relevant part, C.J. § 5-304:

---

[24] When Baltimore County is the defendant, the LGTCA provides that the notice must be given "in person or by certified mail" to the County Solicitor or County Attorney. C.J. § 5-304(c).

(b)(1) Except as provided in subsections (a) and (d) of this section, an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 1 year after the injury.[25]

       (2) The notice shall be in writing and shall state the time, place, and cause of the injury.

Section 5-304(d) governs when there is a failure to provide the requisite notice:

(d)  Notwithstanding the other provisions of this section, unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and for good cause shown the court may entertain the suit even though the required notice was not given.

Notably, during the 2016 legislative session, the General Assembly added subsection (e). *See* 2016 Md. Laws, ch. 624; *see Coleman*, 2017 WL 2180635, at *7 n.9.  It provides, C.J. § 5-304(e):

       (e) This section does not apply if, within 1 year after the injury, the defendant local government has actual or constructive notice of:

       (1) The claimant's injury; or

       (2) The defect or circumstances giving rise to the claimant's injury.

Defendants have not raised the LGTCA as an issue.  Therefore, I decline to address it further, except to say that it may be relevant to the viability of the claim under Article 36.

### V.  Conclusion

To be sure, a religious institution is not immune from reasonable land use regulation. 146 Cong. Rec. S776 (Dailey ed., July 27, 2000); *see, e.g.*, *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 652 (10th Cir. 2006).  But, the Church has lodged allegations of religious discrimination by Baltimore County and the Board.  And, it has adequately stated the

---

[25] During the 2015 legislative session, the Maryland General Assembly extended the time for a plaintiff to provide notice from 180 days to one year.  *See* 2015 Md. Laws Ch. 131; *see also Coleman v. Mayor & City Council of Baltimore*, 2017 WL 2180635, at *7 n.9 (Md. Ct. Spec. App. May 18, 2017) (unreported).

Church's claims under RLUIPA (Counts I-III); the Free Exercise Clause (Count IV); the Equal

Protection Clause (Count VI); and the Maryland Declaration of Rights (ECF VIII). I shall,

however, dismiss plaintiff's claim under the Due Process Clause of the Constitution (Count VII),

because plaintiff has not adequately alleged that it has been deprived of a liberty or property

interest. And, I shall abstain from consideration of plaintiff's request for judicial review (Count

IX). Finally, I shall deny the Motion to Drop, without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date: October 24, 2017                                    _____/s/_____
                                                         Ellen Lipton Hollander
                                                         United States District Judge