# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|                                              |   |                          |
|----------------------------------------------|---|--------------------------|
| HUNT VALLEY BAPTIST CHURCH, INC.,            | * |                          |
|                                              | * |                          |
| Plaintiff,                                   | * |                          |
| v.                                           | * | Civil Case No. SAG-17-0804 |
|                                              | * |                          |
| BALTIMORE COUNTY, MARYLAND, *et al.*,        | * |                          |
|                                              | * |                          |
| Defendants.                                  | * |                          |
|                                              | * |                          |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Hunt Valley Baptist Church, Inc., ("Hunt Valley" or the "Church") filed this lawsuit against Baltimore County, Maryland, and the Board of Appeals of Baltimore County, Maryland (collectively, the "County"). ECF 1. Pending before this Court are the parties' cross-Motions for Summary Judgment. ECF 108, 114. The motions have been fully briefed, ECF 117, 126, 140, and a hearing was held on October 17, 2019. Additionally, the parties submitted separate briefing regarding the constitutionality of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). ECF 172, 173, 174. The United States of America intervened to defend the constitutionality of RLUIPA, ECF 176, and the County responded to these arguments, ECF 179. A second hearing is not necessary. *See* Loc. R. 105.6 (D. Md. 2018).[1] For the reasons stated below, Hunt Valley's Motion for Summary Judgment will be GRANTED as to Count III, and the County's Motion is DENIED.

---

[1] As stated in this Court's October 2, 2019 Order, ECF 149, the parties' other filings in connection with the County's Motion to Strike Declarations were also considered, as supplemental filings, in connection with these motions. ECF 125, 138, 143.

# I.  FACTUAL BACKGROUND

## A.  Hunt Valley Baptist Church

The facts underlying the case are largely undisputed.  Hunt Valley is an independent Baptist Church that has been located in Baltimore County, Maryland since 2004.  ECF 1 ¶ 10.  Although Hunt Valley currently operates at 1800 Worthington Heights Parkway, *id.* ¶ 18, this space does not adequately satisfy the Church's needs.  Hunt Valley's Assistant Pastor, Gustavo Rodriguez ("Pastor Rodriguez"), submitted an affidavit, explaining that the current location does not provide enough space to accommodate the Church's parishioners, and will not allow for Hunt Valley to expand its activities.  *See generally* ECF 114-111.  For instance, the current fellowship hall is not large enough to hold the entire congregation.  *Id.* ¶ 31.  Pastor Rodriguez stated that "500 visitors sometimes show[] up for 350 seats and 84 parking spaces."  *Id.* ¶ 8.  Moreover, Hunt Valley has hoped to construct a fellowship hall and gymnasium, in order to support larger ministry activities, and to accommodate the more substantial crowds at weddings and funerals.  *Id.* ¶ 50, 53.  In addition to inadequate space, the Church's current location has poor visibility.  For example, travel to the Church requires that parishioners drive for two miles on a dark, unlit local road.  *Id.* ¶ 56.  The County also insisted that Hunt Valley remove the physical sign that had stood on the corner, directing people to the Church, for over twenty years.  *Id.* ¶ 57.  Hunt Valley has consistently maintained that a new facility is necessary to meet the Church's needs, and to fulfill its mission to serve the Baltimore community.  *See, e.g.*, Declaration of Louis Silver, ECF 114-133 ("The facilities of Hunt Valley Baptist Church are not only inadequate in terms of size, but also not at all visible to the community.").

**B. Shawan Road Location**

With the goal of alleviating the issues detailed above, Hunt Valley identified a property at 821 Shawan Road in Cockeysville, Maryland (the "Property"), as a site to build a more appropriate facility. ECF 114-111 ¶ 75. The site has several large buildings as immediate neighbors. A 16,000-square foot Saint Mary Antiochian Orthodox Church is located directly to the west of the Property. *Id.* ¶ 77. Oregon Ridge Park is located to the southeast of the Property, and Hayfields Country Club is located directly across Shawan Road. *Id.* ¶¶ 78–79.

In March, 2014, Hunt Valley filed its Petition for a Special Exception ("Petition"). ECF 114-3. It sought approval for a two-phase project. The first phase would involve construction of a "sanctuary building," which would provide a nursery area, classrooms for religious education, offices for staff members, and general seating for 1,000 people. ECF 114-111 ¶ 84. For the second phase, Hunt Valley planned to construct a fellowship hall, which would also include a gymnasium. *Id.* ¶ 85. The entire project was expected to consume 31,500 square feet of dedicated space. *Id.* ¶ 86.

**C. Baltimore County Conservation Zones**

Because the Property is located in a conservation zone, Hunt Valley was required to navigate the County's intricate zoning regime. I will provide necessary background on the County's scheme, before detailing Hunt Valley's application for the Shawan Road location.

In 1976, Baltimore's County Council (the "County Council") established four resource conservation zones. *Security Mgmt. Corp. v. Baltimore Cnty., Md.*, 104 Md. App. 234, 237 (1995). These zones were created based on the County's findings that,

> Development in the rural areas of the county had been taking place at an increasing rate and without the framework of a land use plan or other planning components; that, as a result, the development "has formed very undesirable land use patterns," that a significant amount of "urban sprawl" was occurring along highways in the

rural areas as tracts immediately fronting along the highways were "lotted off;" and that such development was detrimental in a number of respects, including the loss of "critical watershed areas."

*Id*.  The zones are codified in the Baltimore County Zoning Regulations ("BCZR").  Currently, and at the time of Hunt Valley's application, the BCZR lists nine resource conservation zones.  *See* BCZR §§ 1A01-1A09.  The regulatory purpose of these resource conservation zones is set out in §1A00.2 of the BCZR:

> A.  Discourage present land use patterns of development and to create a framework for planned or orderly development;
>
> B.  Provide sufficient and adequate areas for rural-suburban and related development in selected and suitable areas;
>
> C.  Protect both natural and man-made resources from compromising effects of specific forms and densities of development;
>
> D.  Protect areas desirable for more intensive future development by regulating undesirable forms of development within these areas until such time as intensive development commences.
>
> E.  Help achieve the goals of the Chesapeake Bay Critical Area Protection Law by enacting land use policies to control development within the Critical Area by conserving the land and water resource base for agriculture, forestry and other natural resource uses; minimizing adverse effects on water quality; and conserving fish, wildlife and plant habitat.

The objective of each particular resource conservation zone is also set forth in the BCZR.

Pertinent here, the Property is located in an "R.C.4" zone, which was established because:

> The County Council finds that major, high-quality sources of water supply for the entire Baltimore Metropolitan Area and for other neighboring jurisdictions lie within Baltimore County and that continuing development in the critical watersheds of those water supply sources is causing increased pollution and sedimentation in the impoundments, resulting in increasing water treatment costs and decreasing water storage capacity. The R.C.4 zoning classification and its regulations are established to provide for the protection of the water supplies of metropolitan Baltimore and neighboring jurisdictions by preventing contamination through unsuitable types or levels of development in their watersheds.

BCZR § 1A03.1.

As detailed in the BCZR, the County Council determined that certain types of uses will be permitted as of right in an R.C.4 zone, while other uses are allowed only by "special exception." Uses that are permitted as of right are:

1. Dwellings, one-family detached;

2. Farms and limited-acreage wholesale flower farms;

3. Open space, common;

4. Public schools;

5. Telephone, telegraph, electrical-power or other similar lines or cables, all underground; underground gas, water or sewer mains or storm drains; other underground conduits, except underground interstate and intercontinental pipelines;

6. Trailers or mobile homes;

7. Antennas used by CATV systems operated by companies franchised under Article 25 of the Baltimore County Code, if situated on property owned by the county, state or federal government or by a governmental agency;

8. Transit facilities;

9. Accessory uses or structures, including, but not limited to the following:
   a. Excavations, uncontrolled;
   b. Farmer's roadside stand and produce stand;
   c. Home occupations;
   d. Offices or studios of physicians, dentists, lawyers, architects, engineers, artists, musicians or other professional persons, provided that any such office or studio is established within the same building as that serving as the professional person's primary residence at the time of application; does not occupy more than 25 percent of the total floor area of that residence; and does not involve the employment of more than one nonresident employee;
   e. Parking spaces, including recreational vehicles;
   f. Swimming pools, tennis courts, garages, utility sheds, satellite receiving dishes … or other accessory structures or uses;

g.  Signs;

10. Commercial film production;

11. Farmstead creamery.

*See* BCZR § 1A03.3(A).[2]

Whereas the uses above are allowed as of right, the BCZR codified a more arduous process for other intended uses, in which applicants must request a special exception.  For instance, pertinent here, "churches and other buildings for religious worship" cannot be constructed in an R.C.4 zone without a special exception.  *See* BCZR § 1A03.3(B).  The County also requires special exceptions for, *inter alia*, community buildings, fish hatcheries, golf courses, country clubs, and wireless telecommunications towers.  *Id.*  Several Maryland cases have expounded upon the goals of the County Council's conservation zone scheme, and the special exception process in particular. *See, e.g.*, *Attar v. DMS Tollgate, LLC*, 451 Md. 272, 285 (2017) ("A special exception is presumed to be in the interest of the general welfare, and therefore a special exception enjoys a presumption of validity."); *People's Counsel for Baltimore Cty. v. Loyola College in Md.*, 406 Md. 54, 71 (2008) ("The special exception adds flexibility to a comprehensive legislative zoning scheme by serving as a 'middle ground' between permitted uses and prohibited uses in a particular zone."); *Schultz v. Pritts*, 291 Md. 1, 11 (1981) ("The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible").

---

[2] For clarity, some of the specific conditions imposed for each category are omitted.

Importantly, those applying for special exceptions bear the burden of persuasion, and must demonstrate, by a preponderance of the evidence, that the permit should be granted. *See Attar*, 451 Md. at 286. Specifically, an applicant must establish that the intended use will not:

A.  Be detrimental to the health, safety, or general welfare of the locality involved;

B.  Tend to create congestion in roads, streets or alleys therein;

C.  Create a potential hazard from fire, panic or other danger;

D.  Tend to overcrowd land and cause undue concentration of population;

E.  Interfere with adequate provisions for schools, parks, water, sewerage, transportation or other public requirements, conveniences or improvements;

F.  Interfere with adequate light and air;

G.  Be inconsistent with the purposes of the property's zoning classification nor in any other way inconsistent with the spirit and intent of these Zoning Regulations;

H.  Be inconsistent with the impermeable surface and vegetative retention provisions of these Zoning Regulations; nor

I.  Be detrimental to the environmental and natural resources of the site and vicinity including forests, streams, wetlands, aquifers and floodplains in an R.C.2, R.C.4, R.C.5 or R.C.7 Zone.

*See* BCZR § 502.1. In granting a special exception, the Zoning Commissioner or the Board of Appeals ("Board") may impose conditions on the intended use:

the Zoning Commissioner or the Board of Appeals, upon appeal, shall impose such conditions, restrictions or regulations as may be deemed necessary or advisable for the protection of surrounding and neighboring properties.

BCZR § 502.2. A decision of the Zoning Commissioner can be appealed to the Board, which consists of seven members that are appointed by the County Council. *See* Baltimore County Code § 32-3-401(a), County Charter § 601.

### D. Hunt Valley's Application for the Property

A hearing on Hunt Valley's Petition was conducted by an Administrative Law Judge ("ALJ") in October and November of 2014. *See generally* ECF 114-4. Five witnesses (including four experts) testified in support of Hunt Valley's Petition. *Id.* at 2–5 (ALJ decision recounting Hunt Valley's witnesses). Community members opposed to the Petition also testified at the hearings, and cross-examined Hunt Valley's witnesses. *Id.* Some community members expressed their disapproval of Hunt Valley's proposed project on social media, with a Facebook group and Twitter account labeled "Save Shawan." ECF 114-111 ¶ 70–71. The social media platforms are replete with derisive comments about the proposed church, most commonly referring to it as a "megachurch." *See, e.g.*, ECF 114-114. At the conclusion of the hearings, the ALJ granted the special exception in an Opinion and Order dated January 5, 2015. *Id.* at 9.

In January, 2015, a non-profit membership organization, Valleys Planning Council, Inc., appealed the ALJ's decision to the Board. *See* Declaration of Lawrence Schmidt, ECF 114-90 ¶ 31. In May, 2015 and April, 2016, the Board held public hearings over seven non-consecutive days. *Id.* ¶ 32. More than thirty witnesses testified, including expert witnesses that opposed Hunt Valley's Petition. ECF 1 ¶ 185.

On February 22, 2017, the Board reversed the ALJ's decision by a vote of 2-1. *See* ECF 114-5, Board's Majority Opinion. As its rationale, the Board determined that Hunt Valley's proposal was inconsistent with two subsections of BCZR § 502.1: subsections (g) and (h). Specifically, a majority of the Board found that the Petition did not comply with subsection (g) because construction of a gymnasium with a basketball court is "not the type of use that the County Council approved for the R.C.4 zone by special exception." *Id.* at 8–10. Regarding subsection (h), the majority found that Hunt Valley's proposed parking lot would not comply with the

impermeable surface requirement. *Id.* at 10–13. One member dissented, and specifically agreed with testimony from Hunt Valley's expert, Ken Wells, stating that the proposed construction would meet the impermeable surface requirement. *Id.* at 16–18.

### E. Procedural History

Hunt Valley filed its Complaint on March 23, 2017, alleging eight counts: violations of the "Substantial Burdens," "Nondiscrimination," and "Equal Terms" provisions of RLUIPA (Counts I-III); claims under 42 U.S.C. § 1983 for violations of the Free Exercise Clause of the First Amendment to the Federal Constitution (Count IV), the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution (Count VI), the Due Process Clause of the Fourteenth Amendment to the Federal Constitution (Count VII); violation of Article 36 of the Declaration of Rights in the Maryland Constitution (Count VIII); and Judicial Review of Administrative Agency Decision (Count IX). ECF 1. On October 17, 2017, United States District Judge Ellen L. Hollander granted in part, and denied in part, the County's Motion to Dismiss and/or for Summary Judgment. ECF 16. Judge Hollander dismissed Counts VII and IX, and denied the remainder of the Motion. ECF 17. The instant motions were filed after discovery concluded.

## II.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure states that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad,* 823 F. Supp. 2d 334, 348 (D. Md. 2011). If the moving party establishes that there is no evidence to support the non-movant's case, the burden then shifts to the non-movant to proffer specific facts to show a genuine issue exists for trial. *Id*. The non-movant must provide enough

admissible evidence to "carry the burden of proof at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-movant's position is insufficient; rather, there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Casey*, 823 F. Supp. 2d at 349. Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. The non-movant "must produce competent evidence on each element of his or her claim." *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999). If the non-movant fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Casey*, 823 F. Supp. 2d at 348-49. In ruling on a motion for summary judgment, a court must view the facts and inferences "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## III. ANALYSIS

### A. Constitutionality of RLUIPA

Before analyzing Hunt Valley's underlying claims, this Court will address the County's constitutional argument. The County has challenged the constitutionality of RLUIPA, both on its face and as applied in this matter. As described in detail later in this Opinion, this Court concludes only that the County's zoning regime is in violation of RLUIPA's Equal Terms provision, 42 U.S.C. § 2000cc(b)(1). Since this decision does not rely on RLUIPA's Substantial Burdens section, or its Nondiscrimination section, the Court will not address the constitutionality of those

provisions. *See Matal v. Tam*, 137 S. Ct. 1744, 1755 (2017) ("We ought not to pass on questions of constitutionality … unless such adjudication is unavoidable") (quoting *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944)).

### 1. Federalism

The County's brief primarily challenges the Substantial Burdens section of RLUIPA, 42 U.S.C. § 2000cc(a)(1). However, the County's arguments, based on general notions of federalism, potentially apply to the Equal Terms section. The Equal Terms provision prohibits the imposition or implementation of a land use regulation "in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." *Id.* § 2000cc(b)(1). The County contends that RLUIPA inherently infringes upon the authority of states and local jurisdictions. *See, e.g.*, ECF 172 at 7 (referring to Hunt Valley's claim as a "demand[] to avoid and suppress the local land use law").

Importantly, "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, 505 U.S. 144, 156 (1992); *see also Fed. Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 759 (1982). Here, because RLUIPA was enacted pursuant to Congress's constitutional "power to enforce, by appropriate legislation, the provisions of this article," *see* U.S. Const., amend. XIV, the statute is consistent with the Tenth Amendment. *See United States v. Maui Cty.*, 298 F. Supp. 2d 1010, 1015 (D. Hawaii 2003) ("[A]ssuming for the moment that RLUIPA is a proper exercise of either the Commerce Clause or Section 5 of the Fourteenth Amendment (or both), then the federal government would be constitutionally permitted to regulate some aspects of land use."); *see also United States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000) ("[I]f Congress acts under one of its enumerated powers, there can be no violation of the Tenth Amendment.").

In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court explained that "Congress can enact legislation under § 5 enforcing the constitutional right to the free exercise of religion." *Id.* at 519. In that case, however, the Court found that the Religious Freedom Restoration Act ("RFRA") constituted a "substantive change in constitutional protections." *See id.* at 532. Because of RFRA's expansive reach, the majority distinguished RFRA from other laws that were passed pursuant to Congress's Fourteenth Amendment enforcement power. Namely, RFRA applied "to every agency and official of the Federal, state, and local Governments" and subjected any law to challenge whenever individuals alleged a substantial burden on their free exercise of religion. *Id.* Thus, RFRA not only exceeded existing constitutional protections, but also lacked proportionality and congruence with the harm Congress intended to alleviate. *Id.* at 533 ("The stringent test RFRA demands of state laws reflects a lack of proportionality or congruence").

With the Equal Terms provision, on the other hand, Congress codified existing rights protected by three different parts of the United States Constitution: the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause. The Free Exercise Clause prohibits the government from enacting laws that specifically target religious conduct. Thus, in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the Court invalidated several ordinances, passed by Florida legislators, that individually targeted the Santeria faith, and its practice of animal sacrifice. *Id.* at 533–36. More recently, in *Trinity Lutheran Church v. Comer*, 137 S. Ct. 2012 (2017), the Court reaffirmed that "The Free Exercise Clause 'protect[s] religious observers against unequal treatment.'" *Id.* at 2019 (quoting *Lukumi*, 508 U.S. at 533). That case concerned a "Scrap Tire program," operated by Missouri's Department of Natural Resources. *Id.* at 2017. Although Trinity Lutheran, a religiously-affiliated daycare center, was eligible to

participate in the program, Missouri's Department denied its application, because of Trinity Lutheran's connection to a church. *Id.* at 2018. The Court found that denying this public benefit to an entity, "solely because of its religious character," violated the Free Exercise Clause. *Id.* at 2024.[3] Turning to RLUIPA, the Equal Terms provision is intended to prevent governments from singling out religious institutions for disfavored treatment in zoning schemes. Accordingly, other federal courts have concluded that Equal Terms codifies rights inherently protected by the Free Exercise Clause. *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1238 (11th Cir. 2004) ("A survey of Free Exercise cases indicates that government action that specifically targets religion or religious conduct for distinctive treatment can be an impermissible intrusion on an individual's free exercise rights."); *see also Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 264 (3d Cir. 2007) ("It is undisputed that, when drafting the Equal Terms provision, Congress intended to codify the existing jurisprudence interpreting the Free Exercise Clause."); *Centro Familiar Christiano Buenas Nuevas v. City of Yuma*, 615 F. Supp. 2d 980, 993 (D. Ariz. 2009) ("There is also wide agreement that the equal terms provision codifies the Supreme Court's Free Exercise Clause jurisprudence regarding neutral laws of general applicability."), *rev'd on other grounds*, 651 F.3d 1163 (9th Cir. 2011).[4] This Court agrees.

Similarly, with RLUIPA, Congress has also codified the protections of the Establishment Clause. For nearly 50 years, courts have applied the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), which assesses whether government action advances or inhibits religion, or fosters excessive government entanglement with religion. The Supreme Court has long explained that the

---

[3] However, the majority expressly limited its decision to the particular facts of that case.

[4] The County argues that the United States attempted to mislead by invoking *Centro Familiar Cristiano* without noting that the Ninth Circuit reversed that decision. ECF 179 at 7. While the County is correct about that case's procedural history, the Ninth Circuit reversed because it *found* a RLUIPA violation on appeal. 651 F.3d at 1175. The Court did not in any way suggest that RLUIPA's Equal Terms provision is unconstitutional.

Establishment Clause requires neutrality toward religion. *See, e.g.*, *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005) ("The touchstone for our analysis is the principle that the First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."). Critically, embedded within the mandate of neutrality is the notion that governments are prohibited from favoring non-religious entities over religious ones. *See, e.g.*, *Zorach v. Clauson*, 343 U.S. 306, 314 (1952) (explaining that the government may not "prefer[] those who believe in no religion over those who do believe"). Thus, in the context of public benefits, for example, the Establishment Clause is "not offended, when the government, following neutral criteria and evenhanded policies, extends benefits" to religious entities. *See Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 839 (1995). RLUIPA's Equal Terms provision merely effectuates, in the context of land use, the Establishment Clause's dictates regarding neutrality. The Equal Terms section does not mandate that religious institutions are given any preferential treatment or special permissions in zoning schemes; rather, it mandates that the government acts neutrally towards religion when making land use decisions.

Finally, the Equal Protection Clause provides a third basis to find that RLUIPA's Equal Terms provision merely codified existing constitutional rights. States are prohibited from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. When adjudicating First Amendment challenges, courts have frequently invoked the Equal Protection Clause as a separate rationale for the constitutional requirement of neutrality toward religion. *See, e.g.*, *Lukumi*, 508 U.S. at 539 ("In determining if the object of a law is a neutral one under the Free Exercise Clause, we can also find guidance in our equal protection cases."). As one component of "equal protection," individuals should not be deprived of legal rights or benefits as a result of their religious affiliation. *See Board of Educ. of Kiryas Joel Vill.*

*School Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring). Moreover, the Equal Protection Clause dictates that similarly situated persons and entities should be treated alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 601–03 (2008). RLUIPA's Equal Terms provision is an embodiment of this longstanding constitutional principle. In somewhat different words, the statute prescribes that when religious institutions are similarly situated with secular institutions, it is unjustifiable for the government to make land use determinations that accommodate only the secular entities.

Accordingly, since RLUIPA's Equal Terms section codifies existing rights under the Free Exercise Clause, Establishment Clause, and Equal Protection Clause, it is a constitutional use of Congress's authority pursuant to Section 5 of the Fourteenth Amendment. The County cites no case, nor is this Court aware of any case, that has reached a different result. *See Midrash Sephardi*, 366 F.3d at 1239 ("Simply put, to deny equal treatment to a church or a synagogue on the grounds that it conveys religious ideas is to penalize it for being religious. Such unequal treatment is impermissible based on the precepts of the Free Exercise, Establishment and Equal Protection Clauses."); *Freedom Baptist Church of Del. Cty. v. Tp. of Middletown*, 204 F. Supp. 2d 857, 870 (E.D. PA. 2002) ("Thus, §§ 2(b)(1) and (2) of RLUIPA are constitutional because they codify existing Free Exercise, Establishment Clause and Equal Protection rights against states and municipalities that treat religious assemblies or institutions 'on less than equal terms' than secular institutions").

Importantly, the County also mounts an as-applied challenge to RLUIPA. *See* ECF 172 at 7 ("Plaintiff's Demands to Avoid and Suppress the Local Land Use Law Would Constitute an Unconstitutional Application of RLUIPA."). However, applying the Equal Terms section here

will not "undermine the very foundations" of Baltimore County's zoning scheme, as the County contends. *See id.* at 23–24 (describing Baltimore County's land use process). In analyzing Hunt Valley's claims, this Court in no way intends to nullify the intricate system developed to pursue the County's legitimate and admirable regulatory goal. Rather, imposing RLUIPA's Equal Terms standard merely prevents the County from subjecting religious institutions to a more burdensome process than that is required of comparable, secular entities. While adjudication of any RLUIPA claim will almost certainly involve the probing of a state's or a locality's zoning scheme, Congress determined that the need to secure religious institutions' First and Fourteenth Amendment rights merits a slight infringement on areas traditionally reserved to local governments. *See, e.g.*, *Midrash Sephardi*, 366 F.3d at 1239 (describing Congress's findings on widespread discrimination against religious institutions).

### 2. Establishment Clause

The County contends that sustaining a RLUIPA claim in this case "would be an as-applied violation of the Establishment Clause." ECF 174 at 18. As an initial matter, the Supreme Court rejected an Establishment Clause challenge to section three of RLUIPA, *i.e.*, applying to institutionalized persons. *See generally Cutter v. Wilkinson*, 544 U.S. 709 (2005). While the Court specifically limited its ruling to the portion of the statute governing institutionalized persons, *id.* at 716 n.3, other courts have subsequently extended this analysis to RLUIPA's land use provisions, *see Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 355 (2d Cir. 2007) ("RLUIPA's land use provisions plainly have a secular purpose, that is, the same secular purpose that RLUIPA's institutionalized persons provisions have").

Government conduct is consistent with the Establishment Clause if the particular action (1) has a secular purpose, (2) has a primary effect that neither advances nor inhibits religion, and (3)

does not excessively entangle government with religion. *See Wood v. Arnold*, 915 F.3d 308, 315–18 (4th Cir. 2019) (applying test from *Lemon v. Kurtzman*, 403 U.S. 602 (1971)).[5] The County neglected to identify which prong of the *Lemon* test it believes has been violated and, instead, vaguely states that, "Giving religious landowners privileges to avoid neutral, generally applicable local land use processes while forcing all other landowners to go through such processes also violates *Lemon v. Kurtzman*." ECF 174 at 19. This Court, nevertheless, concludes that none of *Lemon*'s prongs is implicated by RLUIPA, nor by application of the statute in this case.

First, RLUIPA's land use provisions have a secular purpose. Few courts have addressed an Establishment Clause challenge to the Equal Terms section. *But see Chabad Lubavitch v. Borough of Litchfield, Conn.*, 796 F. Supp. 2d 333, 341–42 (D. Conn. 2011) (explaining that targeting unequal treatment between religious and secular organizations is a "permissible secular purpose"), *rev'd on other grounds*, 768 F.3d 183 (2d Cir. 2014).[6] Nonetheless, numerous courts have found, in the context of RLUIPA's "Substantial Burdens" provision, that inhibiting government interference with religion is a viable secular purpose. *See Westchester Day*, 504 F.3d at 355 (explaining that lifting government-created burdens on private religious exercise is "compatible with the Establishment Clause"); *Rocky Mountain Christian Church v. Bd. of Cty.*

---

[5] A plurality of the Supreme Court expressed doubt about the *Lemon* test's viability in *Am. Legion v. Am. Humanist Assoc.*, 139 S. Ct. 2067, 2080 (2019) ("[I]f the *Lemon* Court thought that its test would provide a framework for all future Establishment Clause decisions, its expectation has not been met."). Further, the Court opined that the *Lemon* test "presents particularly daunting problems" in cases involving "the use, for ceremonial, celebratory, or commemorative purposes, of words or symbols with religious associations." *Id.* at 2081. This case does not implicate similar issues. *See Freedom from Religious Found., Inc. v. Cty. of Lehigh*, 933 F.3d 275, 281 (3d Cir. 2019) ("*American Legion* confirms that *Lemon* does not apply to 'religious references or imagery in public monuments, symbols, mottos, displays, and ceremonies.'"); *see also Dale Arnold v. Tracy Smith, et al.*, No. 19-cv-750, 2020 WL 362691, at *4 (M.D. Pa. Jan. 22, 2020) (applying *Lemon* test to adjudicate an Establishment Clause challenge to RLUIPA).

[6] The County asserts that "the *entire* [*Chabad*] decision was vacated on standing grounds." ECF 179 at 7 (emphasis added). However, the Second Circuit explicitly limited its ruling to the analysis of standing. *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 188 (2d Cir. 2014) ("[W]e vacate the district court's June 20, 2011 ruling insofar as it concerns Rabbi Eisenbach's standing under RLUIPA and remand for consideration").

*Comm'rs of Boulder Cty.*, 612 F. Supp. 2d 1163, 1178 (D. Colo. 2009) ("A legislative enactment whose purpose is to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions does not violate the legislative purpose prong of *Lemon*") (citation omitted); *Midrash Sephardi*, 366 F.3d at 1240–41 ("Where, as here, a law's purpose is to alleviate significant governmental interference with the exercise of religion, that purpose does not violate the Establishment Clause.").  Hunt Valley's claims are consistent with the secular purpose identified by previous courts.  In fact, Hunt Valley contends that the County, itself, has departed from religious neutrality by unjustifiably allowing public schools as of right in the R.C. 4 zone, while requiring churches to navigate a more arduous process.

Second, by definition, the Equal Terms provision neither advances nor inhibits religion.  The statute merely prescribes that governments should not *disfavor* religious institutions in their land use determinations and general zoning schemes.  *See Chabad Lubavitch*, 796 F. Supp. 2d at 342 ("RLUIPA does not act to advance religion."); *see also Westchester Day*, 504 F.3d at 355 ("Under RLUIPA, the government itself does not advance religion").  As applied in this case, Hunt Valley has not argued that it, or any church, should be treated better than secular entities.  For instance, Hunt Valley does not suggest that the County must carve out a process to assist religious institutions in securing space for their expansion projects.  Rather, Hunt Valley argues that, given the stated regulatory goal of protecting the watershed, the BCZR unjustifiably distinguishes public schools from churches.

Finally, the Equal Terms provision does not excessively entangle government with religion.  In *Mellen v. Bunting*, 327 F.3d 355 (4th Cir. 2003), the Court found that the former Superintendent of the Virginia Military Institute ("VMI") violated the Establishment Clause, by requiring cadets to participate in a "supper prayer."  According to the Court, VMI took "a position

on what constitutes appropriate religious worship" by mandating daily prayer. *Id.* Here, by contrast, Hunt Valley has not requested that the government take any position on religion, other than to act neutrally. Mandating equal treatment of churches and public schools in the BCZR would not require the County, for example, to inquire into an institution's particular religious practices, or to evaluate the sincerity of an institution's beliefs.

None of the cases cited by the County support a finding of an Establishment Clause violation in this case. For example, in *Tree of Life Christian School v. City of Upper Arlington, Ohio*, 905 F.3d 357 (6th Cir. 2018), the City of Upper Arlington had a development ordinance that prohibited the operation of schools, both religious and secular in nature, in the city's "office district." *Id.* at 361. Yet, Tree of Life Christian School ("Tree of Life") purchased a large building, located in the office district, for the purpose of constructing a religious school. *Id.* After the city council denied multiple applications from Tree of Life, including an attempt to rezone the relevant area, the school filed suit. *Id.* at 362–63. The city had identified "revenue maximization" as its rationale for the exclusion of churches from the office district. *Id.* at 371. In evaluating the claim of an Equal Terms violation, the Seventh Circuit accepted the city's stated rationale and, based on this regulatory purpose, found that Tree of Life had failed to identify a similarly situated comparator. Although Tree of Life had put forward daycare centers as a comparator, the Court found that daycares generate far more revenue than schools, particularly on a square-foot basis. *Id.* at 376.[7] Thus, Tree of Life's Equal Terms claim failed. *Id.* Notably, the only invocation of the Establishment Clause was during the Court's preliminary discussion about what that circuit requires from plaintiffs in order to establish a valid "comparator," for purposes of analyzing a

---

[7] The revenue would primarily be generated by personal income tax collected from employees at the daycare. *See id.* at 375.

zoning scheme. *See id.* at 367.[8]  The panel observed that "it would likely run afoul of the First Amendment's Establishment Clause" to interpret RLUIPA as "requir[ing] municipalities to extend preferential treatment to religious entities." *See id.* at 368.  Here, the Court will not formulate or apply any test that would require preferential treatment for Hunt Valley, or for any other religious entity.  Rather, Hunt Valley's claim will be evaluated to determine, in keeping with the Equal Terms language, whether the relevant portions of the BCZR *disfavor* religious entities.

In *Vision Church v. Village of Long Grove*, 468 F.3d 975 (7th Cir. 2006), the village rejected requests from a religious corporation (1) to annex property and (2) to obtain a special use permit to construct a church. *Id.* at 982–84.  Vision Church sued, and claimed that the zoning regulations unjustifiably allowed restaurants, tearooms, taverns, and health clubs as "permitted uses" in business districts, while simultaneously requiring churches to obtain a special use permit. *Id.* at 1001.  On appeal, the Court found that Vision Church had failed to show that it was treated less favorably than a similarly situated comparator.  Specifically, while restaurants, tearooms, taverns, and health clubs were permitted uses in the town's *business* district, the church was zoned for a *residential* district. *Id.* at 1002.  Therefore, the comparison was inapposite.  Additionally, the Court rejected Vision Church's second proposed comparator, an elementary school that had been approved for annexation several years earlier. *See id.* at 1001.  Because the school had accepted all of the city's "conditions" for approval, and Vision Church had refused to comply with several conditions, it was not irrational for the city to approve one application and to deny the other. *Id.* at 1001–02.  The Court rejected Vision Church's contention that elements of the city's zoning regime violated the Establishment Clause. *Id.* at 991–95.  Whereas the plaintiff in *Vision Church*

_____

[8] As noted below, sustaining a RLUIPA claim requires that plaintiffs show that a religious entity was treated less favorably than a nonreligious entity.  In this section of the opinion, the *Tree of Life* Court analyzed tests from other circuits, to determine what type of nonreligious entity should be considered a proper "comparator" for purposes of scrutinizing a city's zoning scheme.

alleged that the city's zoning scheme violated the Establishment Clause, here, this Court confronts precisely the opposite situation; the County contends that *applying* RLUIPA to its zoning scheme is the Establishment Clause violation. Therefore, *Vision Church* provides no support for the County's argument that applying RLUIPA in this case would be an affront to the Establishment Clause.

Accordingly, RLUIPA's Equal Terms provision, both facially and as applied in this case, does not violate the Establishment Clause.

## B. Application of RLUIPA

Having found that RLUIPA's Equal Terms provision is constitutional, I will now address Hunt Valley's underlying claims. Hunt Valley contends that the County violated three separate sections of RLUIPA: Substantial Burdens, Nondiscrimination, and Equal Terms. Because the Court concludes that the County violated the Equal Terms provision, I will begin the analysis with Count III.

A government violates RLUIPA's Equal Terms provision when it "impose[s] or implement[s] a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). To establish an Equal Terms violation, a plaintiff bears the burden of demonstrating four elements: "(1) the plaintiff [is] a religious assembly or institution, (2) subject to a land use regulation, and (3) the regulation treat[s] the religious assembly on less than equal terms than (4) a nonreligious assembly or institution." *Redemption Cmty. Church v. City of Laurel, Md.*, 333 F. Supp. 3d 521, 531 (D. Md. 2018) (quoting *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1307 (11th Cir. 2006)). In this case, elements one and two are uncontested. Hunt Valley is a Christian Church that has been subject to the County's zoning regulations.

To assess the third and fourth elements, two primary approaches have emerged in other circuits. According to the stricter test, as adopted by the Eleventh Circuit Court of Appeals ("Eleventh Circuit")[9], any facial differentiation between religious and nonreligious institutions is a violation of RLUIPA. *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 291 (5th Cir. 2012) (explaining that the Eleventh Circuit test "treats all land use regulations that facially differentiate between religious and nonreligious institutions as violations of the Clause.") (citing *Midrash Sephardi,* 366 F.3d at 1231). The second, narrower approach is more demanding of RLUIPA plaintiffs. To sustain an Equal Terms claim, plaintiffs must show that a land use regulation treats religious institutions less well than "a *similarly situated* nonreligious comparator." *Opulent Life Church*, 697 F.3d at 291 (emphasis added).[10]

Importantly, the Fourth Circuit has not yet adopted either approach. *Redemption Cmty. Church*, 333 F. Supp. 3d at 532 ("The Fourth Circuit has yet to rule on this issue."). Thus, in *Redemption Community*, the Court found that the plaintiff church had sufficiently pled a violation under even the narrower test. *Id.* at 532–33. That case involved a non-denominational church that had purchased property in Laurel, Maryland, in order to operate a coffee shop during the week and a house of worship on Sundays. *Id.* at 526–27. However, the plaintiff's operations were frustrated when the city amended its code, which, in effect, bifurcated the permitting process. *Id.* at 527. Specifically, while houses of worship were required to obtain a "special exception," certain buildings could be constructed as of right, including: karaoke venues, theaters, health clubs and spas, libraries, and certain restaurants and schools. *Id.* Despite failing to obtain requisite approval

---

[9] All circuit courts will be identified in this abbreviated manner.

[10] Three distinct kinds of Equal Terms violations have emerged: (1) a statute facially differentiates between religious and secular institutions, (2) a facially neutral statute is nevertheless "gerrymandered" to place a burden solely on religious institutions, or (3) a truly neutral statute is selectively enforced against religious as opposed to secular institutions. *Congregation Rabbinical College of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 441 (S.D.N.Y. 2015). This case concerns the first type of violation.

from the city, the plaintiff continued to hold worship services on Sundays. *Id.* at 528. But following receipt of two cease and desist letters from the city, the church filed suit, asserting violations of, *inter alia*, RLUIPA's Equal Terms provision. *Id.* at 529. The Court declined to adopt either approach identified above and, instead, found that plaintiff had plausibly alleged a violation even under the narrower test, because the city's regulation permitted various uses that "could constitute a similarly situated comparator" to the church. *Id.* at 532–33.

Turning to the facts of this case, under the Eleventh Circuit's test, a violation has certainly been established. The BCZR, on its face, treats churches differently than it treats nonreligious entities, by requiring that the former obtain a special exception.[11] Even so, the same result is reached under the more demanding test, *i.e.*, if Hunt Valley is required to show that the BCZR favors a similarly situated nonreligious comparator over religious assemblies.

Among the circuits that have adopted the narrower test, slight variations exist in how a court should determine whether a comparator is similarly situated. In the Third Circuit, plaintiffs must show that a nonreligious entity is a similarly situated comparator with respect to the zoning regulation's "regulatory purpose." *See, e.g.*, *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 264 (3d Cir. 2007). The Seventh Circuit, on the other hand, considers whether secular institutions are "treated the same … from the standpoint of an accepted zoning criterion." *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 373 (7th Cir. 2010).

---

[11] Furthermore, the County's scheme would fail strict scrutiny review. *See Primera Iglesia*, 450 F.3d at 1308 (explaining that the government can avoid an Equal Terms violation if the relevant land use regulation survives strict scrutiny review). Facially distinguishing between churches and public schools is not the least restrictive means to advance the County's stated regulatory goal. As explained below, the County has never contended that churches have more of an effect on the watershed than do public schools. Thus, the BCZR could, for example, allow churches as of right, or could require public schools to obtain a special exception.

In *Lighthouse Institute*, the plaintiff had purchased a property that was located in the city's "commercial district." 510 F.3d at 257. As a result of the "commercial" designation, the plaintiff was subject to a city ordinance, which enumerated a number of permitted issues in that area, including bowling alleys, theaters, and municipal buildings. *Id.* When the plaintiff applied for a zoning permit to use the property as a church, the city denied its application, because churches were not "permitted uses" in the relevant commercial zone. *Id.* Subsequently, the city adopted a redevelopment plan, which superseded the ordinance at issue. *Id.* at 258. The plaintiff's property was located in the "Broadway Corridor," which, as designated by the redevelopment plan, aimed to "encourage a 'vibrant' and 'vital' downtown residential community." *Id.* While theaters, cinemas, dance studios, workshops, design schools, and other uses were allowed in the corridor, churches were prohibited. *Id.* Accordingly, the city denied the plaintiff's application to use its property as a church. *See id.* (stating that the city council denied the plaintiff's appeal because the proposed use was not permitted in that zone).

On appeal, the Third Circuit first rejected the Eleventh Circuit's approach to considering Equal Terms claims. *Id.* at 268 ("Under the Eleventh Circuit's interpretation, if a town allows a local, ten-member book club to meet in the senior center, it must also permit a large church with a thousand members"). As an alternative approach, according to the panel, a plaintiff "must identify a better-treated secular comparator that is similarly situated in regard to the *objectives* of the challenged regulation." *Id.* (emphasis in original). The Court applied this test to both the redevelopment plan and to the city's general ordinance, and found that the former did not violate RLUIPA's Equal Terms provision. The Court agreed with the city's argument that churches were unlike the secular institutions allowed in the relevant district, because churches were not likely to foster "extended-hours traffic and synergetic spending." *Id.* at 270. Additionally, permitting

churches in the corridor might actually hinder economic development in that area, because a New Jersey statute prohibited the issuance of liquor licenses in the vicinity of a house of worship. *Id.* Thus, "It would be very difficult for [the city] to create the kind of entertainment area envisaged by the Plan—one full of restaurants, bars, and clubs—if sizeable areas of the Broadway Corridor were not available for the issuance of liquor licenses." *Id.* at 270–71. The Court reached a different decision, however, with respect to the city's general ordinance. Although the ordinance did not specify regulatory objectives, it nonetheless permitted only certain uses, including restaurants, retail stores, and, most notably, assembly halls. *Id.* at 272. The Court explained that "it is not apparent from the allowed uses why a church would cause greater harm to regulatory objectives than an assembly hall," and directed the district court to grant summary judgment in favor of the plaintiff. *Id.*

In *River of Life*, the Seventh Circuit not only rejected the Eleventh Circuit test, but also identified issues with the Third Circuit's approach in *Lighthouse Institute*. In particular, the Court noted that analyzing a zoning regulation's "regulatory purpose" invites "speculation concerning the reason behind exclusion of churches" and "makes the meaning of 'equal terms' in a federal statute depend on the intentions of local government officials." 611 F.3d at 371. Therefore, the Third Circuit adopted a subtle variation, shifting to a focus on "zoning criteria." *Id.* The facts of *River of Life* offer useful instruction for this case. A small church in the Chicago suburbs desired to relocate to a building in a different suburb. *Id.* at 368. But because the building was located in an area zoned as a commercial district, churches were not permitted to occupy the space. *Id.* Part of the rationale for zoning the area as commercial was the location of a nearby train station. *Id.* (stating that "the presence of commuters might enable the district to be revitalized as a commercial center"). Nonetheless, the church sued, and sought a preliminary injunction to enjoin enforcement

of the zoning ordinance. *Id.* However, in applying its variation of the Third Circuit test, the Court found no Equal Terms violation. In fact, the majority found that it was a "straightforward" case, because the city was applying "conventional criteria for commercial zoning in banning noncommercial land uses from a part of the village suitable for a commercial district because of proximity to the train station." *Id.* at 373–74.

Under either the Third Circuit's consideration of "regulatory purpose," or the Seventh Circuit's consideration of "zoning criterion," Hunt Valley has met its burden to demonstrate an Equal Terms violation. All parties agree that the objective of an R.C.4 zone, as stated in the BCZR, is

> the protection of the water supplies of metropolitan Baltimore and neighboring jurisdictions by preventing contamination through unsuitable types or levels of development in their watersheds.

BCZR § 1A03.1; *see also Marzullo v. Kahl*, 366 Md. 158, 162 n.4 (2001); ECF 108-1, The County's Br. at 3.

Maryland courts have recognized that the creation of the R.C.4 zone, and its concomitant rationale, advanced a legitimate state interest. *See Security Mgmt. Corp. v. Baltimore County*, 104 Md. App. 234, 241–42 (1995). This Court agrees. In fact, the importance of this state interest further highlights the lack of justification for the County's decision to prefer public schools over churches. While public schools are permitted by right in the R.C.4 zone, churches, such as Hunt Valley, must apply for and obtain a special exception. However, the County has never contended that churches have a more deleterious effect on water supplies, when compared with public schools. Indeed, the County's expert, Mr. Josephson, agreed that a public school will also have an environmental impact on the watershed. *See* Josephson Dep., ECF 114-77 at 89: 11–14 ("Again, I would say with any use, whether it's a school or a church, there's going to be an impact from the

amount of impervious coverage that is on a site."). This situation is distinct from cases in which localities have developed "commercial districts," whereby the government might sensibly favor revenue-generating enterprises — such as restaurants and stores — over churches, synagogues, and mosques. *See, e.g.*, *River of Life*, 611 F.3d at 373–74. Moreover, the County has not argued that the regulatory purpose of the R.C.4 zone has anything to do with educational interests. Based on its underlying rationale for the R.C.4 zone's existence, the County has offered little justification for the imposition of an onerous process for churches, but not for similarly sized and constructed public schools.

A recent case from New York is instructive. *See Christian Fellowship Centers of New York v. Village of Canton,* 377 F. Supp. 3d 146 (N.D.N.Y. 2019). In *Christian Fellowship Centers*, a church purchased a building that previously had been used to operate a restaurant. *Id.* at 151. However, the building was located in a commercial district, and a village ordinance prohibited houses of worship from operating in that zone. *Id.* Because the village allowed secular entities to operate in the commercial zone, the church claimed that the zoning code violated RLUIPA's Equal Terms provision, and filed for a preliminary injunction. *Id.* at 151–52. In considering the plaintiff's likelihood of success on the merits, Judge Kahn noted, at the outset, that the Second Circuit has not yet decided what that jurisdiction will require from RLUIPA plaintiffs, in order to demonstrate a valid comparator. *Id.* at 157. Judge Kahn also contrasted the Eleventh Circuit's approach with the narrower tests leveraged by the Seventh and Third Circuits. *Id.* at 156. Nonetheless, she concluded that the Court did not need to adopt any of the various approaches, because the plaintiff was "likely to succeed under even the most demanding tests." *Id.* at 157. Under any analysis, Judge Kahn rejected several of the village's attempts to justify its exclusion of churches from the relevant zone, including its argument that churches were not commercial

enterprises. *See id.* at 158 (rejecting attempt to distinguish churches from restaurants, hotels, theaters, stores, and other permitted uses in the zone). The village's contention was unpersuasive because the codified regulatory purpose was not solely to promote commerce, but also "to provide 'recreational and cultural facilities … for the community as a whole.'" *Id.* at 159. Moreover, the zoning code permitted property owners to host meetings for educational, fraternal, and charitable purposes — none of which were more likely to generate commerce than would churches. *Id.*

Just as "there [was] no reason to believe that fraternal, social, or philanthropic gatherings would be any more likely to generate commerce," *id.*, there is no reason, in this case, to believe that churches would have a more pernicious effect on the Baltimore watershed than would public schools. In fact, in *Christian Fellowship Center*, the village at least rationalized treating churches differently by pointing to a New York law that prohibited the issuance of liquor licenses to entities located within 200 feet of a school. *Id.* at 158. But Judge Kahn rejected this argument as well. *See id.* at 162–63 (explaining that the New York law creates a "'formal difference' between religious and secular entities… that does not justify their unequal treatment."). Here, by contrast, not only is the record devoid of any type of similar rationale, but the County has also failed to answer Hunt Valley's Equal Terms claim in any meaningful form.

The County appears not to contest that the special exception process constitutes a facial violation of Equal Terms. Instead, it has argued, in a cursory fashion, that Hunt Valley's claim fails because the R.C.4 zone includes only one public school, which was constructed before the BCZR was enacted. ECF 126 at 27–28. Judge Kahn encountered precisely the same assertion in *Christian Fellowship Center*, and concluded that "RLUIPA does not require religious organizations to bear the burdens imposed by a facially discriminatory regulation until a comparable secular organization comes along to benefit from the regulation's unlawful

preference." 377 F. Supp. 3d at 160.  Indeed, even the Third Circuit's more demanding test does not require a RLUIPA plaintiff "to show that there *exists* a secular comparator that performs the same functions."  *Lighthouse Institute*, 510 F.3d at 266 (emphasis added).  Accordingly, other courts have found facial Equal Terms violations without requiring the plaintiff to identify a specific comparator that has *already* been treated more favorably.  For instance, in *Summit Church v. Randolph County Development Authority*, a town enacted covenants that limited land to certain acceptable uses, such as commercial businesses, offices, and residential developments.  *See* No. 2:15-CV-82, 2016 WL 865302, at *1 (N.D. W. Va. Mar. 2, 2016).  After the town authority determined that a church was not an acceptable use, the plaintiff brought an Equal Terms claim. *Id.*  Pertinent here, in granting summary judgment to the church, the Court considered non-religious comparators that would hypothetically be permitted as of right in the relevant zone.  *Id.* at *3 ("For instance, convention centers that could be used for unspecified meetings are permitted…").  The plaintiff was not required to identify a convention center that had already been treated more favorably by the city.  *Id.*; *see also Hope Rising Cmty. Church v. Municipality of Penn Hills*, No. CV 15-1165, 2015 WL 7720380, at *5 (W.D. Pa. Oct. 28, 2015) (recommending grant of preliminary injunction on Equal Terms claim, when ordinance allowed parks, playgrounds, and educational institutions as of right, but treated churches as a "conditional use"). It would be irreconcilable with RLUIPA's language to permit a facial violation to stand, simply because of a recent lack of demand for public schools in the R.C.4 zone.  By the BCZR's plain language, religious institutions like Hunt Valley must obtain a special exception, while public schools are permitted as of right.  The County has put forward no rationale for the disfavored treatment of religious entities, given that the purpose of the BCZR is to prevent contamination of the local water supplies.

### C. Other Counts[12]

### 1. RLUIPA Nondiscrimination

Hunt Valley has also brought claims under RLUIPA's Substantial Burdens and Nondiscrimination provisions. I will deny summary judgment on these counts, because numerous genuine questions of material fact remain unresolved. RLUIPA's Nondiscrimination provision requires that "No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). Establishing a claim under the Nondiscrimination provision requires a showing that the County's decision was motivated, at least in part, by discriminatory intent. *See Friends of Lubavitch v. Baltimore Cty., Md.*, 2019 WL 4805676, at *10 (D. Md. Sep. 30, 2019). Courts in this circuit evaluate several factors that are probative of whether a government action was motivated by discriminatory intent, including (1) evidence of a consistent pattern of actions disparately impacting members of a particular class of persons, (2) historical background of the decision, (3) the sequence of events leading up to the decision, and (4) contemporary statements made by the decisionmakers. *Id.* (quoting *Reaching Hearts*, 584 F. Supp. 2d at 781). Hunt Valley has provided evidence that Board members and community members made derisive comments about the proposed "megachurch," and took issue with the Church's position on home-schooling, for example. ECF 117 at 26–27. The County argues that these comments related merely to "the scale and size" of the project, and did not evince discriminatory intent. ECF 126 at 25. A reasonable factfinder could conclude that community members' efforts to oppose the project, such as the "Save Shawan" social media accounts, were not only motivated by religious animus, but

---

[12] Because the Court has not found a violation of the Substantial Burdens or Nondiscrimination provisions, the constitutionality of these sections is not addressed.

also served as an impetus for the County's ultimate decision.  Therefore, summary judgment will not be granted on this Count.

### 2.  RLUIPA Substantial Burdens

The Substantial Burdens provision prohibits the imposition of a land use regulation that imposes a substantial burden on religious exercise, unless the government's action can survive strict scrutiny.  *See* 42 U.S.C. § 2000cc(a)(1).  Importantly, "when a religious organization buys property reasonably expecting to build a church, governmental action impeding the building of that church may impose a substantial burden."  *Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 557 (4th Cir. 2013).  In *Bethel,* the Fourth Circuit determined that the plaintiff had "offered evidence raising a question of material fact as to whether it had a reasonable expectation of being able to build a church."  *Id.* at 558.  The same is true here.  A reasonable factfinder could conclude that Hunt Valley's Worthington Heights location has not adequately served the congregation's needs, and that expansion to the Shawan Road location would ameliorate the situation.

The County relies on expert testimony suggesting that Hunt Valley knew about the conservancy area easement before it purchased the Property.  Hunt Valley and the County disagree vehemently about whether the easement posed a significant impediment to Hunt Valley's pursuit of building at the Property.  To render a decision on this issue, a factfinder would need to, *inter alia*, (1) make credibility findings regarding testimony from various experts and fact witnesses, (2) consider whether and how easily the easement could be released, and (3) determine whether Hunt Valley could have reasonably believed that the new church would be constructed.  Accordingly, summary judgment on this Count is not warranted.

### 3. Constitutional Claims

As a result of the finding on the Equal Terms claim, Hunt Valley is entitled to relief. Thus, the Court declines to address Hunt Valley's constitutional claims, brought under § 1983. *See Hand of Hope Pregnancy Resource v. City of Raleigh*, 332 F. Supp. 3d 983, 992 (E.D.N.C. 2018) ("A court need not reach a constitutional question 'if there exists an alternative, nonconstitutional basis for [its] decision.'") (quoting *Hoffman v. Hunt*, 126 F.3d 575, 582 (4th Cir. 1997)).

## IV. CONCLUSION

For the reasons set forth above, the County's Motion for Summary Judgment, ECF 108, is DENIED, and Hunt Valley's Motion for Summary Judgment, ECF 114, is GRANTED as to Count III, and DENIED as to Counts I and II. The remaining Counts need not be addressed. The Court will schedule a status conference to discuss the process for determining a remedy. A separate Order follows.


Date: February 10, 2020                          _____/s/_____
                                                 Stephanie A. Gallagher
                                                 United States District Judge